Shiva Delrahim Beck (SBN 228841)
Email: sbeck@gardere.com
Todd A. Murray (*Pro Hac Vice*)
Email: tmurray@gardere.com
Thomas C. Scannell (*Pro Hac Vice*)
Email: tscannell@gardere.com
Andrew A. Howell (*Pro Hac Vice*)
Email: ahowell@gardere.com
Abigail K. Drake (*Pro Hac Vice*)
Email: adrake@gardere.com
GARDERE WYNNE SEWELL LLP
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
(214) 999-3000
(214) 999-4667 (fax)

Attorneys for William M. Aisenberg and Jeffrey Cordes

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY**

| | |
|---|---|
| In re:<br><br>ICPW LIQUIDATION CORPORATION, a California corporation, [1]<br><br>      Debtor and Debtor in Possession. | Lead Case No.: 1:17-bk-12408-MB<br>Jointly administered with Case No.: 1:17-bk-12409-MB; Chapter 11 Cases<br><br>Adv. Proc. No.: 1:18-ap-01011 |
| In re:<br><br>ICPW LIQUIDATION CORPORATION, a Nevada corporation, [2]<br><br>      Debtor and Debtor in Possession. | **DECLARATION OF JEFFREY CORDES IN SUPPORT OF DEFENDANTS WILLIAM AISENBERG'S AND JEFFREY CORDES' 12(B)(6) MOTION TO DISMISS AND MEMORANDUM IN SUPPORT** |
| Affects:<br><br>☒  Both Debtors<br><br>☐  ICPW Liquidation Corporation, a California corporation<br><br>☐  ICPW Liquidation Corporation, a Nevada corporation. | HEARING:<br><br>Date:      TBD<br>Time:     TBD<br>Ctrm:    303<br>          21041 Burbank Blvd.<br>          Woodland Hills, CA 91367 |

[1] Formerly known as Ironclad Performance Wear Corporation, a California corporation.
[2] Formerly known as Ironclad Performance Wear Corporation, a Nevada corporation.

1

1
2
3
4
5
6
7

| |
| --- |
| OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS of ICPW LIQUIDATION CORPORATION, a Nevada corporation, |
|           Objector and Plaintiff, |
|   -against- |
| JEFFREY CORDES and WILLIAM AISENBERG, |
|           Claimants and Defendants. |

8
9
    I, Jeffrey Cordes, declare as follows:

10
    1.    I am the former Chief Executive Officer of Ironclad Performance Wear Corp

11
("Ironclad"). I have personal knowledge of the facts stated in this declaration and, if called to

12
testify, would and could competently testify thereto.

13
    2.    This declaration is submitted in support of the Defendants William

14
Aisenberg's and Jeffrey Cordes' 12(B)(6) Motion to Dismiss and Memorandum in Support

15
(the "Motion to Dismiss").

16
17
    3.    I have reviewed the exhibits attached to the Motion to Dismiss, listed below

18
    Exhibit "1":    Ironclad's 2016 Fiscal Year Results press release;
    Exhibit "2":    Ironclad's 2016 Fiscal Year 10-K;

19
    Exhibit "3":    Jeffrey Cordes Letter Agreement dated February 3, 2014;

20
    Exhibit "5":    December 18, 2015 Letter to Ironclad's Board from Jeffrey
                    Cordes;

21
    Exhibit "7":    January 1, 2017 Amendment to Jeffrey Cordes Letter
                    Agreement; and

22
    Exhibit "8":    Articles of Incorporation of Ironclad Performance Wear
                    Corporation.

23
24
25
26
27
28

4.       Each of the aforementioned exhibits, attached hereto and as attached to the Motion to Dismiss, are true and correct copies of the documents they purport to be.

Executed on this 19th day of February, 2018, at Southlake, Texas.

*Jeffrey Cordes*

JEFFREY CORDES

**Exhibit "1"**

Page 1 of 5

Case 1:18-ap-01011-MB    Doc 7    Filed 02/20/18    Entered 02/20/18 14:09:33    Desc
EX-99.1 2 icpw0307178kex99_1.htm    Main Document    Page 5 of 115



**Ironclad Performance Wear Reports Fourth Quarter and
Fiscal Year 2016 Results**

FARMERS BRANCH, TX – March 9, 2017 – Ironclad Performance Wear Corporation (OTCQB:ICPW), the recognized leader in high-performance task-specific work gloves, reported financial results for the fourth quarter and fiscal year ended December 31, 2016.

**Fourth Quarter 2016 Results**

The Company reported Net Sales for the fourth quarter of 2016 of $8.3 million, a decrease of 1% from the fourth quarter total of $8.4 million for 2015. The Company recorded solid revenue increases for the quarter in both its industrial and retail channels. These increases were offset by two non-recurring revenue declines, first from the discontinuance of the 5.11 contract business after 2015 and second due to the discontinuation of business with the Company's former Canadian distributor.

Gross Profit increased to $3.0 million, or 36% of Net Sales in the fourth quarter of 2016, compared to $2.8 million, or 34% of Net Sales in the fourth quarter of 2015. The increase in gross profit is primarily attributable to the Company's improvement in purchase prices and the mix of business after dropping the 5.11 business.

Operating Expenses in the fourth quarter were $2.6 million or 32% of Net Sales, as compared to $2.6 million or 30% of Net Sales, during the same period last year.

Income from Operations increased for the fourth quarter to $0.36 million or 4% as compared to $0.26 million or 3% during the same period in 2015.

Net Income for the fourth quarter was $0.32 million, or $0.00 per share, as compared to $0.24 million, or $0.00 per share, in the same period last year.

**Fiscal 2016 Year-End Results**

Full-year Net Sales for 2016 were $25.2 million, representing a 7% increase from 2015 Net Sales of $23.6 million.

Gross Profit increased to $9.0 million or 36% of Net Sales in 2016, as compared to $8.3 million, or 35% of Net Sales for full-year 2015. The increase in gross profit is primarily attributable to higher sales, a better mix of business, royalty income recognized on licensing of our patented technologies and the result of our supply chain efforts.

Operating Expenses were $9.9 million or 39%, of Net Sales, as compared to $8.4 million or 36% of Net Sales, for the full-year 2015. The increase was primarily attributable to a combination of co-op advertising for major accounts, investment spend (primarily in staffing related to the increased Grainger business) and, costs related to the discontinuance of business with our former Canadian distributor.

Loss from Operations was $0.8 million for 2016 as compared to a Loss from Operations of $0.1 million for 2015.

Net Loss for 2016, including a non-cash reserve against the deferred tax asset of $1.8 million, was $2.8 million, or $0.03 per share, as compared to Net Loss of $0.2 million or $0.00 per share, in the prior year.

Jeff Cordes, Chief Executive Officer of Ironclad commented:

"In a year where most industrial distributors and numerous retailers reported declining performance, we are pleased to have grown our business for 2016 nearly 7%.

The strong growth we achieved through both the industrial and retail channels in the 4th quarter nearly replaced the old and unprofitable 5.11 contract business, as well as the loss of business from our prior Canadian distributor. That being said, having placed the ORR Safety litigation behind us, we are now taking control of our international business and expect improving performance in 2017 in this segment.

We realized improved gross margins for the 4th quarter and the full year as our supply chain and new products provided us greater value and we no longer had the lower margin 5.11 business.

While SG&A increased significantly year over year due to certain one-time expenses and our early in-year investments to service the Grainger expansion, you will note our SG&A for the final quarter of 2016, year over year, did not increase.

We have great expectations for strong growth in 2017. With three solid sales leaders driving the top line of our business and what appears to be an improving industrial marketplace, full year double digit growth is achievable. However, shareholders must remember that while we expect to see strong full year growth for 2017, as we have seen before, revenue volatility across the quarters will continue to be a fact of life given the size and types of customers in our portfolio."

**Conference Call**
Ironclad Performance Wear will hold a conference call to discuss 2016 financial results on Thursday, March 9th, at 3:30 p.m. Central Time (4:30 p.m. Eastern Time). To participate in the conference call, interested parties should dial:

**Date: March 9th, 2017**
**Time: 4:30 p.m. Eastern Time (3:30 p.m. Central Time)**
**Domestic Dial-In Number: 1-888-208-1814**
**International Dial-In Number: 1-719-457-2600**
**Conference ID Number: 6621751**

The conference call will be broadcast simultaneously and available for replay at: http://public.viavid.com/index.php?id=123289 and also via the landing page of the Company's website at www.ironcladinvestor.com.

Please call the conference telephone number 5-10 minutes prior to the start time. An operator will register your name and organization.

**Replay Dial-In Numbers:**
**TOLL-FREE 1-844-512-2921**
**TOLL/INTERNATIONAL 1-412-317-6671**
**From: 03/09/17 at 7:30 pm Eastern Time**
**To: 04/09/17 at 11:59 pm Eastern Time**
**Replay Pin Number: 6621751**

The Company's financial results will be posted online at www.ironcladinvestor.com once they are publicly released.

In addition, the conference call will also be broadcast live over the Internet and can be accessed at www.ironclad.com. For those unable to participate during the live broadcast, the Webcast will be archived on this site through March 19, 2017.

The Company's financial results will be posted online at www.ironclad.com once they are publicly released.

**About Ironclad Performance Wear Corporation**

Ironclad Performance Wear is a leader in high-performance task-specific work gloves. It created the performance work glove category in 1998, and continues to leverage its leadership position in the safety, construction and industrial markets through the design, development and distribution of specialized task-specific gloves for industries such as oil & gas extraction; automotive; and police, fire, first-responder and military. Ironclad engineers and manufactures its products with a focus on innovation, design, advanced material science and durability. Ironclad's gloves and apparel are available through industrial suppliers, hardware stores, home centers, lumber yards, and sporting goods retailers nationwide; and through authorized distributors in North America, Europe, Australia, Asia the Middle East and Africa.

Built Tough for the Industrial Athlete™

For more information on Ironclad, please visit the Company's Website at www.ironclad.com.


**Information about Forward-Looking Statements**

This release contains "forward-looking statements" that include information relating to future events and future financial and operating performance. Forward-looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times at, or by, which that performance or those results will be achieved. Forward-looking statements are based on information available at the time they are made and/or management's good faith belief as of that time with respect to future events, and are subject to risks and uncertainties that could cause actual performance or results to differ materially from those expressed in or suggested by the forward-looking statements. Important factors that could cause these differences include, but are not limited to: fluctuations in demand for Ironclad's products, the introduction of new products, Ironclad's ability to maintain customer and strategic business relationships, the impact of competitive products and pricing, growth in targeted markets, the adequacy of Ironclad's liquidity and financial strength to support its growth, and other information that may be detailed from time-to-time in Ironclad's filings with the United States Securities and Exchange Commission. Examples of such forward looking statements in this release include statements regarding strengthening partner relationships, additional markets for Ironclad's products, revenue volatility and Ironclad's growth in 2017. For a more detailed description of the risk factors and uncertainties affecting Ironclad, please refer to the Company's recent Securities and Exchange Commission filings, which are available at www.sec.gov. Ironclad undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.


**Contact**
William Aisenberg, CFO
Bill.Aisenberg@ironclad.com
(972) 996-5664

*Ironclad Performance Wear Corp.*
**CONSOLIDATED BALANCE SHEETS**

|  | December 31, 2016 | December 31, 2015 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 299,904 | $ 276,981 |
| Accounts receivable, net of allowance for doubtful accounts of $30,000 and $30,000 | 8,181,549 | 8,857,768 |
| Inventory, net of reserve of $197,549 and $547,800 | 8,649,632 | 6,681,715 |
| Deposits on inventory | 108,597 | 171,593 |
| Prepaid and other | 575,403 | 610,417 |
| Total Current Assets | 17,815,085 | 16,598,474 |
| | | |
| **Property and Equipment** | | |
| Computer equipment and software | 294,117 | 622,264 |
| Furniture and equipment | 343,499 | 308,398 |
| Leasehold improvements | 140,718 | 174,298 |
| Less: accumulated depreciation and amortization | (357,204) | (767,047) |
| Total Property and Equipment, Net | 421,130 | 337,913 |
| | | |
| **Other Assets** | | |
| Trademarks and patents, net of accumulated amortization of $81,260 and $68,094 | 235,738 | 125,895 |
| Deposits and other assets | 451,582 | 21,306 |
| Deferred tax asset - long term | - | 1,832,000 |
| Total Other Assets | 687,320 | 1,979,201 |
| | | |
| **Total Assets** | $ 18,923,535 | $ 18,915,588 |
| | | |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| **Current Liabilities** | | |
| Accounts payable and accrued expenses | $ 4,674,106 | $ 3,358,724 |
| Line of credit | 4,248,070 | 3,224,780 |
| Total Current Liabilities | 8,922,176 | 6,583,504 |
| | | |
| **Stockholder's Equity** | | |
| Common stock, $0.001 par value, 172,744,750 shares authorized, 84,500,454 and 82,937,309 shares issued and outstanding at December 31, 2016 and December 31, 2015, respectively | 84,500 | 82,937 |
| Capital in excess of par value | 21,282,588 | 20,776,012 |
| Accumulated deficit | (11,365,729) | (8,526,865) |
| Total Stockholders' Equity | 10,001,359 | 12,332,084 |
| | | |
| **Total Liabilities & Stockholders' Equity** | $ 18,923,535 | $ 18,915,588 |

*Ironclad Performance Wear Corp.*

**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Three Months Ended | | Twelve Months Ended | |
|---|---|---|---|---|
| | December 31, 2016 | December 31, 2015 | December 31, 2016 | December 31, 2015 |
| **REVENUES** | | | | |
| Net sales | $ 8,301,994 | $ 8,421,860 | $ 25,199,914 | $ 23,582,019 |
| **COST OF SALES** | | | | |
| Cost of sales | 5,296,958 | 5,603,071 | 16,160,195 | 15,303,597 |
| **GROSS PROFIT** | 3,005,036 | 2,818,789 | 9,039,719 | 8,278,422 |
| **EXPENSES** | | | | |
| General and administrative | 894,327 | 1,067,289 | 3,748,712 | 3,311,254 |
| Sales and marketing | 1,088,758 | 880,660 | 3,657,239 | 3,120,131 |
| Research and development | 151,936 | 190,623 | 636,745 | 670,590 |
| Purchasing, warehousing and distribution | 457,878 | 382,290 | 1,650,995 | 1,187,628 |
| Depreciation and amortization | 50,055 | 34,762 | 178,691 | 134,627 |
| Total Operating Expenses | 2,642,954 | 2,555,624 | 9,872,382 | 8,424,230 |
| **(LOSS) INCOME FROM OPERATIONS** | 362,082 | 263,165 | (832,663) | (145,808) |
| **OTHER INCOME (EXPENSE)** | | | | |
| Interest expense | (45,272) | (25,769) | (174,944) | (91,404) |
| Interest income | 23 | 7 | 73 | 28 |
| Other Income (Expense), Net | (45,249) | (25,762) | (174,871) | (91,376) |
| **NET LOSS BEFORE INCOME TAXES** | 316,833 | 237,403 | (1,007,534) | (237,184) |
| Benefit from income taxes - current | - | 5,869 | 670 | 5,869 |
| Income tax expense - deferred | - | - | (1,832,000) | - |
| Income Tax (Expense) Benefit | - | 5,869 | (1,831,330) | 5,869 |
| **NET INCOME (LOSS)** | $ 316,833 | $ 243,272 | $ (2,838,864) | $ (231,315) |
| **NET INCOME (LOSS) PER COMMON SHARE** | | | | |
| Basic | $0.00 | $0.00 | ($0.03) | ($0.00) |
| Diluted | $0.00 | $0.00 | ($0.03) | ($0.00) |
| **WEIGHTED AVERAGE COMMON SHARES OUTSTANDING** | | | | |
| Basic | 84,500,454 | 82,937,309 | 83,804,867 | 81,819,809 |
| Diluted | 94,960,425 | 93,844,508 | 83,804,867 | 81,819,809 |

**Exhibit "2"**

10-K 1 icpw10k032917.htm

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

[X] Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
**For the fiscal year ended December 31, 2016**

[_] Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**Commission file number 0-51365**

## IRONCLAD PERFORMANCE WEAR CORPORATION
(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **Nevada** | **98-0434104** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**1920 HUTTON COURT, SUITE 300**
**FARMERS BRANCH, TEXAS 75234**
(Address of Principal Executive Offices and Zip Code)

**(972) 996-5664**
(Registrant's Telephone Number, Including Area Code)

Securities registered under Section 12(b) of the Exchange Act:
**None**

Securities registered under Section 12(g) of the Exchange Act:
**Common Stock, par value $0.001 per share**
(Title of Class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes [_] No [X]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes [_] No [X]

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [_]

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

Yes [X] No [_]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [_]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large Accelerated Filer [_] Accelerated Filer [_]
Non-accelerated Filer [_] (Do not check if smaller reporting company) Smaller Reporting Company [X]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes [_] No [X]

The aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, as of the last business day of the registrant's most recently completed second fiscal quarter, was approximately $17,801,350.

At April 7, 2017, the issuer had 85,646,354 shares of common stock, par value $0.001 per share, issued and outstanding.

# IRONCLAD PERFORMANCE WEAR CORPORATION

## INDEX TO FORM 10-K

**PART I**    **1**

Item 1.   Business.    1

Item 1A.   Risk Factors.    9

Item 1B.   Unresolved Staff Comments.    18

Item 2.   Properties.    19

Item 3.   Legal Proceedings.    19

Item 4.   Mine Safety Disclosures.    20

**PART II**    **20**

Item 5.   Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.    20

Item 6.   Selected Financial Data.    20

Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations.    21

Item 7A.   Quantitative and Qualitative Disclosures About Market Risk.    28

Item 8.   Financial Statements and Supplementary Data.    29

Item 9.   Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.    54

Item 9A.   Controls and Procedures.    54

Item 9B.   Other Information.    55

**PART III**    **56**

Item 10.   Directors, Executive Officers and Corporate Governance.    56

Item 11.   Executive Compensation.    59

Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.    64

Item 13.   Certain Relationships and Related Transactions, and Director Independence.    66

Item 14.   Principal Accounting Fees and Services.    67

**PART IV**    **68**

Item 15.   Exhibits, Financial Statement Schedules.    68

## PART I

### CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

This report, including the sections entitled "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business," contains "forward-looking statements" that include information relating to future events, future financial performance, strategies, expectations, competitive environment, regulation and availability of resources. These forward-looking statements include, without limitation, statements regarding: proposed new services; our expectations concerning litigation, regulatory developments or other matters; statements concerning projections, predictions, expectations, estimates or forecasts for our business, financial and operating results and future economic performance; statements of management's goals and objectives; and other similar expressions concerning matters that are not historical facts. Words such as "may," "will," "should," "could," "would," "predicts," "potential," "continue," "expects," "anticipates," "future," "intends," "plans," "believes" and "estimates," and similar expressions, as well as statements in future tense, identify forward-looking statements.

Forward-looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times at, or by which, that performance or those results will be achieved. Forward-looking statements are based on information available at the time they are made and/or management's good faith belief as of that time with respect to future events, and are subject to risks and uncertainties that could cause actual performance or results to differ materially from those expressed in or suggested by the forward-looking statements. Important factors that could cause these differences include, but are not limited to other factors discussed under the headings "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business."

Forward-looking statements speak only as of the date they are made. You should not put undue reliance on any forward-looking statements. We assume no obligation to update forward-looking statements to reflect actual results, changes in assumptions or changes in other factors affecting forward-looking information, except to the extent required by applicable securities laws. If we do update one or more forward-looking statements, no inference should be drawn that we will make additional updates with respect to those or other forward-looking statements.

**Item 1. Business.**

With respect to this discussion, the terms "we," "us," "our," "Ironclad" and the "Company" refer to Ironclad Performance Wear Corporation, a Nevada corporation and its wholly-owned subsidiary Ironclad Performance Wear Corporation, a California corporation, or "Ironclad California."

**General**

Founded in 1998, we design and manufacture branded performance work wear for a variety of construction, do-it-yourself, industrial, sporting goods and general services markets. Since inception, we have leveraged our proprietary technologies to design task-specific technical gloves and performance apparel designed to improve the wearer's ability to safely, efficiently and comfortably perform specific job functions. Our goal is to establish and maintain a reputation in the construction, do-it-yourself, industrial, sporting goods and general services markets as a leader in performance gloves.

We manufacture our performance gloves using functional materials, including DuPont™ Kevlar®, Nomex® and Teflon®, Clarino® Synthetic Leather, CT-5® Cut Resistant Fabric and Duraclad®. We incorporate these materials in the manufacturing process to create products that meet the functional and protective requirements of our consumers. Since inception, we have employed an in-house research and development department responsible for identifying and creating new products and applications, and improving and enhancing existing products.

*Table Of Contents*       1

We currently sell our products in all 50 states and internationally through an estimated 10,000 retail outlets. Our gloves are priced at retail between $12 and $89 per unit.

**Glove Products**

Currently, our primary products are our task-specific technical gloves. Glove products are specially designed for individual user groups. Currently, we produce and sell over 100 distinct glove types in a variety of sizes and colors which cater to the specific demands and requirements of industrial, construction, do-it-yourself, and sporting goods consumers, including carpenters, machinists, package handlers, plumbers, welders, roofers, oil and gas workers, mechanics, hunters, gardeners and do-it-yourself users. Gloves are available in multiple levels of protection and abrasion that allow the wearer to choose a product based on the task demands, weather and ease of motion. Glove products are currently manufactured by multiple suppliers operating in China, Bangladesh, Cambodia, Vietnam and Indonesia. The manufacturing capabilities necessary for the manufacturing of our gloves is not particularly specialized and we believe that we would be able to replace our current manufacturers without significant disruption in supply, if necessary. Raw material suppliers and substitute materials are readily available and we believe that our manufacturers would be able to replace their current raw material suppliers without significant disruption in supply.

**Competition**

Ironclad competes in the following principal markets: industrial, construction and sport.

Ironclad faces competition from other specialty gloves and apparel companies, such as Custom Leathercraft Manufacturing Company, Ergodyne, Hex Armour, Mechanix Wear and Ringer's. Compared generally, we believe our material selection and construction provides for superior protection, durability, quality and repeat customers affording a substantial, sustainable advantage in the category.

**Mainstream Product Channels**

To date, we have established our reputation, customer loyalty and brand by selling our products through hardware stores (including do-it-yourself (DIY) chains), lumber yards, big box home centers, industrial distributors and automotive and sporting goods retailers. We intend to continue to expand into additional large retailers and distributors in 2017.

**International Expansion**

We began distributing products internationally in 2005 in Australia and Japan. In 2006, we entered the Canadian market through a distributor. We expanded into the United Kingdom in 2007 and into Spain and the Netherlands in 2008. In 2010 we expanded into Sweden through a direct customer. Several of our domestic distributors market our gloves into other international markets through their own networks. In 2013 we established a third party Free Trade Zone ("FTZ") warehouse in Singapore in order to better service our international customers. We plan to expand further into Europe and additional international markets in the future.

**Private-Label and Co-Branded Products and Relationships**

We have selectively teamed up with several existing brands in our marketplace to produce private-label gloves (co-branded with a "Built Tough by Ironclad" tag). In addition, we have also developed co-branded gloves with qualified partners to penetrate alternate marketplaces, such as the oil & gas industry (i.e. the KONG™ glove). We have also licensed brand names whereby we have the right to use their logo or patterns on gloves we produce for sale to our customers.

**Ironclad Branding**

We place an emphasis on the establishment and maintenance of our brand equity. Since the inception of our business, our products have carried the "Ironclad" brand. In addition, we have built a significant market presence for our other trademarked brand "Kong". We believe that our success in building a dedicated following of users with substantial product penetration across a large number of retailers and storefronts was instrumental in allowing us to gain entry into larger retailers, and providing the foundation to expand internationally and into broader industrial distributors.

*Table Of Contents*
2

We have been expanding our efforts on Web sales and marketing through a redesigned Ironclad Website and a dedicated KONG™ website and will continue to focus on e-commerce (i.e. offering our complete line of gloves, in all sizes, directly to the end consumer).

**Sales and Customer Analysis**

We are currently distributing our products through an estimated 10,000 outlets that cater to the professional tradesman, do-it-yourself consumer, industrial user and sporting goods consumer, including "Big Box" home centers, hardware co-ops, lumber yards, industrial distributors, national auto retailers and sporting goods retailers. Currently, we estimate that our products are sold in only 25% of the retail and distribution outlets identified by our management as viable Ironclad outlets. We intend to continue to emphasize and expand our relationships with these retailers and distributors.

Sales through industrial distributors accounted for approximately 69% and 66% of our sales revenue in 2016 and 2015, respectively. One distributor, Customer "A", accounted for approximately 4% of our sales in 2016 and approximately 20% of our sales in 2015. Another distributor, Customer "B", accounted for approximately 15% of our sales in 2016 and approximately 12% of our sales in 2015. Another distributor, Customer "C", accounted for approximately 34% of our sales in 2016 and approximately 6% of our sales in 2015.

**Selected Analysis of "Big Box" and International Retailers**

We plan to continue our expansion by increasing selling efforts through "Big Box" home centers, large industrial distributors and international channels, which we believe creates significant opportunities for strengthening our brand and expanding our product penetration in the various markets.

**Geographic Information**

Domestic sales accounted for 79% of our revenue in 2016 and 74% in 2015. International sales through our independent distributors in Australia, the United Kingdom, Canada, the Netherlands, Sweden and other countries, accounted for our remaining revenue in each year. All of our fixed assets are located in the United States, principally in Texas at our headquarters. Our products are currently manufactured in China, Bangladesh, Indonesia, Vietnam and Cambodia. Most of our inventory is held in our main, third party warehouse in California, however, we do maintain a small, varying amount in our FTZ warehouse in Singapore.

**Intellectual Property and Proprietary Rights**

We currently have thirteen U.S. patents, eleven international patent and five U.S. and multiple international patents pending, which are intended to protect the design and technical innovations found in our performance work gloves. Following are descriptions of the patents or patents pending.

**U.S. Patents Issued – 13**

"Glove Palm Pattern"

U.S. Patent No. D514,771, Issued February 14, 2006, expires 2/14/20

Palm reinforcement design - provides high dexterity and protection (the Ironclad 'apple core' palm design).

Example of usage - *General Utility Glove*

"Glove having molded rubber palm pattern with a portion that rolls over fingertips"

*Table Of Contents*
      3

2/16/2018    Case 1:18-ap-01011-MB   Doc 7   sec.gov/Archives/edgar/data/1301712/000072174817000261/icpw10k032917.htm   Filed 02/20/18   Entered 02/20/18 14:09:33    Desc

Main Document     Page 17 of 115

U.S. Patent No. 7,100,212, Reissue number RE42,839, Issued September 5, 2006, expires 8/13/22

Seamless, molded rubber fingertip design - provides comfort and tactility at the fingertips, and molded rubber reinforcement for grip and durability.

Example of usage – *Extreme Duty 2 Glove*

"Glove Palm Pattern"

U.S. Patent No. D536,837 Issued February 13, 2007, expires 2/13/21

Three-dimensional, impact protection palm pad design – provides impact and vibration protection while holding pneumatic and electric power tools, with increased dexterity and tool control, and reduces injury-inducing pressure on the median nerve of the hand (ContourGrip®).

Example of usage – *Vibration Impact Glove*

"Glove construction wherein palm material rolls over fingertip"

U.S. Patent No. 7,287,285, Issued October 30, 2007, expires 8/13/22

Three-dimensional fingertip design that eliminates seams at the fingertips - provides comfort and tactility at the fingertips, and mimics the three-dimensional shape of the finger (Rolltop® fingertips).

Example of usage –*Ranchworx Glove, Tuffchix Glove*

"Glove Palm Pattern"

U.S. Patent No. D568,003, Issued April 29, 2008, expires 4/29/22

Silicone grip palm design – provides enhanced 'tacky' grip on smooth surfaces (cardboard boxes, hand and power tools, glass, drywall, etc.), while maintaining fabric breathability and dexterity.

Example of usage – *Box Handler Glove*

"Glove Palm Design"

U.S. Patent No. D618,882, Issued July 6, 2010, expires 7/6/24

Palm design for grip or reinforcements – provides the same benefits as D568,003, in a design specific to the automotive retail market.

Example of usage – *Snap-on SuperGrip Glove*

"Glove for use in the oil and natural gas extraction industries"

U.S. Patent No. 9,241,519, Issued January 26, 2016, expires 5/4/31

Glove design with enhanced back of hand impact protection – designed to reduce or eliminate injuries that occur on oil drilling sites, such as broken and fractured bones, pinched fingers, bruises, etc., while maintaining high dexterity, comfort and grip.

Example of usage – *KONG Original Glove, Ironclad Industrial Impact Gloves*

*Table Of Contents*         4

<u>"Improved Glove Palm Construction and Method For Fabricating the Palm Construction"</u>

<u>U.S. Patent No. 9,266,263, Issued February 23, 2016, expires 12/22/34</u>

Glove palm material – a material that provides oil resistance, heat resistance and grip in the presence of heavy oil saturation, while maintaining breathability, washability, dexterity, and durability.

Example of usage – *KONG HPT SuperGrip Glove*

<u>"Glove Back Design"</u>

<u>U.S. Patent No. D756,039, Issued May 10, 2016, expires 5/10/30</u>

Back of hand design for impact protection rubber pieces.

Example of usage – *KONG ORIGINAL*

<u>"Glove Back (HEX)"</u>

**U.S. Patent No.** D774,277, Issued <u>Dec 20, 2016, expires 12/20/31</u>

Design patent for glove with characteristics that enhance visibility at a distance.

Example of usage – *Ironclad Industrial Impact gloves*

<u>"Glove Back (CIRCLE)"</u>

**U.S. Patent No.** D774,276, Issued Dec 20, 2016, expires 12/20/31

Design patent for glove with characteristics that enhance visibility at a distance.

Example of usage – *Ironclad Industrial Impact gloves*

<u>"Glove Back (SQUARE)"</u>

**U.S. Patent No.** D774,275, Issued Dec 20, 2016, expires 12/20/31

Design patent for glove with characteristics that enhance visibility at a distance.

Example of usage – *Ironclad Industrial Impact gloves*

*Table Of Contents*                              5

"Glove Back Design (ICON)"

**U.S. Patent No.** D771, 901, Issued Nov 22, 2016, expires 11/22/31

Design patent for glove with characteristics that enhance visibility at a distance.

Example of usage – *Ironclad Industrial Impact gloves*

**U.S. Patents Pending - 5**

"Glove with Optimized Safety Markings"

USPTO Application No. 62/233,210, September 25th, 2015 PROVISIONAL

Utility patent for glove with characteristics that enhance visibility at a distance.

Example of usage – *Ironclad Industrial Impact gloves*

"Glove with Optimized Safety Markings"

USPTO Application No. 62/257,376, November 19th, 2015 PROVISIONAL

Utility patent for glove with characteristics that enhance visibility at a distance.

Example of usage – *Ironclad Industrial Impact gloves*

"Glove Palm Design"

USPTO Application No. 29/540,689, September 25th, 2015 PENDING

Design patent for glove with rubber palm.

Example of usage – *Ironclad Industrial Impact Vibram gloves*

"Glove with Improved Grip and Durability"

USPTO Application No. 62/233,282, September 25th, 2015 PROVISIONAL

Utility patent for glove molded rubber palm.

Example of usage – *Ironclad Industrial Impact Vibram gloves*

*Table Of Contents*                    6

"Fabric with improved heat resistance and methods of making same"

USPTO Application No. 11/731,061, March 30, 2007

Glove palm material – a material that provides contact heat resistance while maintaining breathability, washability, dexterity, durability and shrink resistance.

Example of usage – *Heatworx Heavy Duty Glove*

**Foreign Patents Issued – 11**

Singapore

"Glove for use in the oil and natural gas extraction industries",
Patent number: 169763 [WO 2010/032218], Issued April 13, 2012, expires 9/18/29

Example of usage – KONG Original Glove, Ironclad Industrial Impact Gloves

Australia (7)

"Glove for use in the oil and natural gas extraction industries",
Patent number: 2009294212, Issued February 25, 2016, expires 9/18/29

Example of usage – KONG Original Glove, Ironclad Industrial Impact Gloves

"Glove Back"

Application/Registration numbers:

201611525

201611526

201611527

201611528

201611529

201611530

Issued March 31, 2016, expires 3/17/26

Design patent for glove with characteristics that enhance visibility at a distance.

Example of usage – Ironclad Industrial Impact gloves

*Table Of Contents*                              7

Korea

"Glove for use in the oil and natural gas extraction industries",
Patent number: 10-1616146, Issued April 21, 2016, expires 9/18/29

Example of usage – KONG Original Glove, Ironclad Industrial Impact Glove

European Union

"Glove Back"

Application/Registration number: 003039031 Issued March 23, 2016, expires 3/23/41

Design patent for glove with characteristics that enhance visibility at a distance.

Example of usage – Ironclad Industrial Impact gloves

Canada

"Glove for use in the oil and natural gas extraction industries",
Patent number: 2771751, Issued August 9, 2016, expires 9/18/29

Example of usage – KONG Original Glove, Ironclad Industrial Impact Gloves

Foreign Patents Pending – Multiple Countries

Impact Protection Patent – 3 countries/regions

"Glove for use in the oil and natural gas extraction industries"

PCT/IB2009/054108, September 30, 2009

EU - PUBLISHED,\ Example of usage – KONG Original Glove

IVE Design Patent – 3 countries/regions

Canada

China

Indonesia

VIBRAM Palm Design Patent – 5 countries/regions

Australia

Canada

EU

China

Indonesia

Ironclad owns the following trademark intellectual property: 52 registered U.S. trademarks, 6 in-use U.S. trademarks, 13 U.S. trademark pending registration, 39 registered international trademarks and 43 pending international trademarks. These trademarks significantly strengthen consumer awareness of the Ironclad brand, and enable Ironclad to maintain distinction between it and other companies trying to copy the Ironclad brand image. We also have 7 copyright marks.

*Table Of Contents*                                        8

We seek to protect our intellectual property through existing laws and regulations, and by contractual restrictions. We rely upon trademark, patent and copyright law, trade secret protection and confidentiality or license agreements with our employees, customers, partners and others to help us protect our intellectual property.

The status of any patent involves complex legal and factual questions. The scope of allowable claims is often uncertain. As a result, we cannot be sure that any patent application filed by us will result in a patent being issued, nor that any patents issued in the future will afford adequate protection against competitors with similar technology; nor can we provide assurance that patents issued to us will not be infringed upon or be designed around by others.

### Employees

As of April 7, 2017, Ironclad had 40 full-time employees. Since inception, we have never had a work stoppage, and our employees are not represented by a labor union. Ironclad considers its relationships with its employees to be positive.

### Item 1A. Risk Factors.

*Investing in our common stock involves a high degree of risk. You should carefully consider the following risk factors and all other information contained in this report before purchasing our common stock. The risks and uncertainties described below are not the only ones facing us. Additional risks and uncertainties that we are unaware of, or that we currently deem immaterial, also may become important factors that affect us. If any of the following risks occur, our business, financial condition or results of operations could be materially and adversely affected. In that case, the trading price of our common stock could decline, and you may lose some or all of the money you paid to purchase our common stock.*

**RISKS RELATING TO OUR BUSINESS**

**We may need additional funding to support our operations and capital expenditures. Our inability to obtain such funding could adversely affect our business.**

We have funded our operations and capital expenditures with cash flow from operations, our cash on hand, the net proceeds of the private placements and credit agreements. As part of our planned growth, we will be required to make expenditures necessary to expand and improve our operating and management infrastructure.

While capital resources have historically been insufficient to support the continued growth of our operations, we believe that the proceeds from our financing transactions, our cash flows from operations and borrowings available to us under our senior secured credit facility, the availability of purchase order financing and our continuing cost containment measures will be adequate to meet our liquidity needs and capital expenditure requirements for at least the next 12 months. In the event that our working capital needs exceed our cash sources, we will need to raise additional funds. There can be no assurance that any financing arrangements will be available in amounts or on terms acceptable to us, if at all. Furthermore, if we are able to raise additional capital through the sale of equity or convertible debt securities it may result in additional dilution to our existing stockholders. If adequate additional funds are not available, we may be required to delay, reduce the scope of, or eliminate material parts of the implementation of our business strategy. This limitation could substantially harm our business, results of operations and financial condition.

**Our operating results may fluctuate significantly and our stock price could decline or fluctuate if our results do not meet the expectation of analysts or investors.**

Management expects that we will experience substantial variations in our net sales and operating results from quarter to quarter. We believe that the factors which influence this variability of quarterly results include:

*Table Of Contents*　　　　　　　　　　　9

·   the timing of our introduction of new product lines;

·   the level of consumer acceptance of each new product line;

·   general economic and industry conditions that affect consumer spending and retailer purchasing;

·   trends in the industries in which our customers generally operate;

·   the availability of manufacturing capacity;

·   the seasonality of the markets in which we participate;

·   the timing of trade shows;

·   the product mix of customer orders;

·   the timing of the placement or cancellation of customer orders;

·   the weather;

·   transportation delays;

·   quotas and other regulatory matters; and

·   the timing of expenditures in anticipation of increased sales and actions of competitors.

As a result of fluctuations in our revenue and operating expenses that may occur, management believes that period-to-period comparisons of our results of operations are not a good indication of our future performance. It is possible that in some future quarter or quarters, our operating results will be below the expectations of securities analysts or investors. In that case, our common stock price could fluctuate significantly or decline.

**We have a history of operating losses and there can be no assurance that we can achieve and maintain profitability.**

We have a history of operating losses and may not achieve and sustain profitability. Even if we achieve profitability we cannot guarantee that we will remain profitable. Even if we remain profitable, given the competitive and evolving nature of the industry in which we operate, we may be unable to sustain or increase profitability and our failure to do so would adversely affect our business, potentially requiring us to raise additional funds to continue operations.

**Our failure to comply with the covenants contained in our credit facility with Capital One, N. A. could result in an event of default, which could materially and adversely affect our operating results and our financial condition.**

Our credit facility with Capital One, N.A. ("Capital One") requires us to maintain certain financial ratios and to comply with various operational and other covenants. If there were an event of default under our credit facility that was not cured or waived, Capital One could cause all amounts outstanding under our credit facility to be due and payable immediately. There can be no assurance that our assets or cash flow would be sufficient to fully repay borrowings under our credit facility if accelerated upon an event of default, or that we would be able to refinance or restructure the payments thereon.

We have received waivers of the minimum debt service coverage ratio required under our credit facility for the four quarters of fiscal 2016. If, in the future, we are required to obtain similar waivers as a result of our inability to meet the required financial ratios, there can be no assurance that those waivers will be available on commercially reasonable terms or at all. While we have extended our credit facility with Capital One to April 17, 2018, if we are unable to repay, refinance or restructure our credit facility, or amend and/or obtain waivers of the covenants contained therein, Capital One could elect to terminate their commitments thereunder, cease making further loans and institute foreclosure proceedings against our assets. This would have a material adverse impact on our liquidity, financial position and results of operations.

*Table Of Contents*                10

**We may be unable to effectively manage our growth.**

Our strategy envisions growing our business. Any growth in or expansion of our business is likely to continue to place a strain on our financial, managerial and other administrative resources, infrastructure and systems. We have historically been undercapitalized to effectively manage and sustain our growth. As with other growing businesses, we expect that we will need to continually restructure and expand our business development capabilities, our systems and processes and our access to financing sources. We also will need to hire, train, supervise and manage new employees. These processes are time consuming and expensive, will increase management responsibilities and will divert management attention. We cannot assure you that we will be able to:

·      expand our systems effectively or efficiently or in a timely manner;

·      allocate our human resources optimally;

·      meet our capital needs;

·      identify and hire qualified employees or retain valued employees; or

·      incorporate effectively the components of any business or product line that we may acquire in our effort to achieve growth.

Our inability or failure to manage our growth and expansion effectively could harm our business and materially and adversely affect our operating results and financial condition.

**Substantially all of our revenues have been derived from a relatively limited product line consisting of task-specific gloves, and our future success depends on our ability to expand our product line and achieve broader market acceptance of our company and our products.**

To date, our products have consisted mainly of task-specific gloves, targeted primarily to the construction, do-it-yourself, industrial and sporting goods markets. Our success and the planned growth and expansion of our business depend on us achieving greater and broader acceptance in our existing market segments as well as in new segments. We may be required to enter into new arrangements and relationships with vendors, suppliers and others to achieve broader acceptance of our products, but cannot guarantee that we will be able to enter into such relationships. We also may be required to undertake new types of risks or obligations that we may be unable to manage. There can be no assurance that consumers will purchase our products or that retail outlets will stock our products. Though we plan to continue to expend resources on promoting, marketing and advertising to increase product awareness, we cannot guarantee that any expenses we incur in such efforts will generate the desired product awareness or commensurate increase in sales of our products. If we are unable to expand into new market segments, we may be unable to grow and expand our business or implement our business strategy as described in this report. This could materially impair our ability to increase sales and revenue and materially and adversely affect our margins, which could harm our business and cause our stock price to decline.

**A high concentration of our revenues has been derived from a few customers, and our future success depends on our ability to expand our customer base and achieve broader market acceptance of our company and our products.**

To date, our customer base has consisted of several major customers and numerous smaller customers. Our success and the planned growth and expansion of our business depend on us achieving greater and broader acceptance in our existing market segments as well as in new segments. We may be required to enter into new arrangements and relationships with customers to achieve broader acceptance of our products, but cannot guarantee that we will be able to enter into such relationships. We also may be required to undertake new types of risks or obligations that we may be unable to manage. There can be no assurance that consumers will purchase our products or that retail outlets will stock our products. Though we plan to continue to expend resources on promoting, marketing and advertising to increase product awareness, we cannot guarantee that any expenses we incur in such efforts will generate the desired product awareness or commensurate increase in sales of our products. If we are unable to expand into new market segments, we may be unable to grow and expand our business or implement our business strategy as described in this report. This could materially impair our ability to increase sales and revenue and materially and adversely affect our margins, which could harm our business and cause our stock price to decline.

*Table Of Contents*
                                           11

**We may be unable to compete successfully against existing and future competitors, which could decrease our revenue and margins, and harm our business.**

The performance task specific glove industry is highly competitive. There are several other companies that provide similar products, many of which are larger and have greater financial resources than us. Our future growth and financial success depend on our ability to further penetrate and expand our existing distribution channels and to increase the size of our average annual net sales per account in these channels, as well as our ability to penetrate and expand other distribution channels. For example, we encounter competition in our existing glove and workwear distribution channels from a number of competitors. Unknown or unforeseen new entrants into our distribution channels, particularly low-cost overseas producers, will further increase the level of competition in these channels. There can be no assurance that we will be able to maintain our growth rate or increase our market share in our distribution channels at the expense of existing competitors and other apparel manufacturers choosing to enter the market segments in which we compete. In addition, there can be no assurance that we will be able to enter and achieve significant growth in other distribution channels.

**Failure to expand into new distribution channels and new international markets could materially and adversely impact our growth plan and profitability.**

Our sales growth depends in part on our ability to expand from our existing hardware and lumber retail channels and industrial distributors into new distribution channels, particularly "Big Box" home centers and work wear and sporting goods retailers. Failure to expand into these mass-market channels could severely limit our growth.

Our business plan also depends in part on our ability to expand into international markets. We have begun the distribution of our products in Japan, Australia, Canada and Europe and we are in the process of establishing additional distribution in Europe and other international markets. Failure to expand international sales through these and other markets could limit our growth capability and leave us vulnerable solely to United States market conditions.

**Our dependence on independent manufacturers reduces our ability to control the manufacturing process, which could harm our sales, reputation and overall profitability.**

We depend on independent contract manufacturers to maintain sufficient manufacturing and shipping capacity in an environment characterized by declining prices, labor shortages, continuing cost pressure and increased demands for product innovation and speed-to-market. This dependence could subject us to difficulty in obtaining timely delivery of products of acceptable quality. In addition, a contractor's failure to ship products to us in a timely manner or to meet the required quality standards could cause us to miss the delivery date requirements of our customers. The failure to make timely deliveries may cause our customers to cancel orders, refuse to accept deliveries, impose non-compliance charges through invoice deductions or other charge-backs, demand reduced prices or reduce future orders, any of which could harm our sales, reputation and overall profitability.

We do not have long-term contracts with any of our independent contractors and any of these contractors may unilaterally terminate their relationship with us at any time. While management believes that there exists an adequate supply of contractors to provide products and services to us, our business would be harmed to the extent we are not able to secure or maintain relationships with independent contractors that are able to fulfill our requirements.

We have initiated standards for our suppliers, and monitor our independent contractors' compliance with applicable labor laws, but we do not control our contractors or their labor practices. The violation of federal, state or foreign labor laws by one of our contractors could result in us being subject to fines and our goods that are manufactured in violation of such laws being seized or their sale in interstate commerce being prohibited. To date, we have not been subject to any sanctions that, individually or in the aggregate, have had a material adverse effect on our business, and we are not aware of any facts on which any such sanctions could be based. There can be no assurance, however, that in the future we will not be subject to sanctions as a result of violations of applicable labor laws by our contractors, or that such sanctions will not have a material adverse effect on our business and results of operations.

*Table Of Contents*                                        12

**Our dependence on a single provider for all warehouse and fulfillment functions reduces our ability to control the warehousing and fulfillment processes, which could harm our sales, reputation, and overall business.**

We have entered into an agreement to outsource most of our warehouse and fulfillment functions to a single provider where we will consolidate most of our inventory at one site, which is managed by an independent contractor who will then perform most of our warehousing, assembly, packaging and fulfillment services. We depend on our independent contractor fulfiller to properly fulfill customer orders in a timely manner and to properly protect our inventories. The contractor's failure to ship products to customers in a timely manner, to meet the required quality standards, to correctly fulfill orders, to maintain appropriate levels of inventory, or to provide adequate security measures and protections against excess shrinkage could cause us to miss delivery date requirements of our customers or incur increased expense to replace or replenish lost or damaged inventory or inventory shortfall. The failure to make timely and proper deliveries may cause our customers to cancel orders, refuse to accept deliveries, impose non-compliance charges through invoice deductions or other charge-backs, demand reduced prices or reduce future orders, any of which could harm our sales, reputation and overall profitability.

**Trade matters may disrupt our supply chain, which could result in increased expenses and decreased sales.**

We cannot predict whether any of the countries in which our merchandise currently is manufactured or may be manufactured in the future will be subject to additional trade restrictions imposed by the U.S. and other foreign governments, including the likelihood, type or effect of any such restrictions. Trade restrictions, including increased tariffs or quotas, embargoes, safeguards and customs restrictions, against apparel items, as well as U.S. or foreign labor strikes, work stoppages or boycotts, could increase the cost or reduce the supply of apparel available to us and adversely affect our business, financial condition and results of operations. Although the quota system established by the Agreement on Textiles and Clothing was completely phased out for World Trade Organization countries effective January 1, 2005, there can be no assurances that restrictions will not be reestablished for certain categories in specific countries. We are unable to determine the impact of the changes to the quota system on our sourcing operations, particularly in China. Our sourcing operations may be adversely affected by trade limits or political and financial instability resulting in the disruption of trade from exporting countries, significant fluctuation in the value of the U.S. dollar against foreign currencies, restrictions on the transfer of funds and/or other trade disruptions.

**Our international operations, and the operations of our foreign manufacturers and suppliers, are subject to additional risks that are beyond our control and that could harm our business.**

Our glove products are manufactured by 6 manufacturers operating in China, Bangladesh, Cambodia, Vietnam and Indonesia. We use offshore manufacturers for all or some of these products. In addition, approximately 22% of our fiscal 2016 net revenues were generated through international sales and we plan to increase our sales to international markets in the future. As a result of our international manufacturing and sales, we are subject to additional risks associated with doing business abroad, including:

· political unrest, terrorism and economic instability resulting in the disruption of trade from foreign countries in which our products are manufactured;

· difficulties in managing foreign operations, including difficulties associated with inventory management and collection on foreign accounts receivable;

· dependence on foreign distributors and distribution networks;

· currency exchange fluctuations and the ability of our manufacturers to change the prices they charge us based on fluctuations in the value of the U.S. dollar relative to their respective currencies;

*Table Of Contents*                    13

· the imposition of new laws and regulations, including those relating to labor conditions, quality and safety standards as well as restrictions on the transfer of funds;

· disruptions or delays in shipments;

· changes in local economic and non-economic conditions and standards in which our manufacturers, suppliers or customers are located; and

· reduced protection for intellectual property rights in jurisdictions outside the United States.

These and other factors beyond our control could interrupt our manufacturers' production in offshore facilities, influence the ability of our manufacturers to export our products cost-effectively or at all, inhibit our unaffiliated manufacturer's ability to produce certain materials and influence our ability to sell our products in international markets, any of which could have an adverse effect on our business, financial conditions and operations.

**We may be unable to adequately protect our intellectual property rights.**

We rely in part on patent, trade secret, trade dress and trademark law to protect our rights to certain aspects of our products, including product designs, proprietary manufacturing processes and technologies, product research and concepts and recognized trademarks, all of which we believe are important to the success of our products and our competitive position. There can be no assurance that any of our pending patent or trademark applications will result in the issuance of a registered patent or trademark, or that any patent or trademark granted will be effective in thwarting competition or be held valid if subsequently challenged. In addition, there can be no assurance that the actions taken by us to protect our proprietary rights will be adequate to prevent imitation of our products, that our proprietary information will not become known to competitors, that we can meaningfully protect our rights to unpatented proprietary information or that others will not independently develop substantially equivalent or better products that do not infringe on our intellectual property rights. We could be required to devote substantial resources to enforce our patents and protect our intellectual property, which could divert our resources and result in increased expenses. In addition, an adverse determination in litigation could subject us to the loss of our rights to a particular patent or other intellectual property, could require us to grant licenses to third parties, could prevent us from manufacturing, selling or using certain aspects of our products or could subject us to substantial liability, any of which could harm our business.

**We may become subject to litigation for infringing the intellectual property rights of others**.

Others may initiate claims against us for infringing on their intellectual property rights. We may be subject to costly litigation relating to such infringement claims and we may be required to pay compensatory and punitive damages or license fees if we settle or are found culpable in such litigation, we may be required to pay damages, including punitive damages. In addition, we may be precluded from offering products that rely on intellectual property that is found to have been infringed by us. We also may be required to cease offering the affected products while a determination as to infringement is considered. These developments could cause a decrease in our operating income and reduce our available cash flow, which could harm our business and cause our stock price to decline.

**We may be unable to attract and retain qualified, experienced, highly skilled personnel, which could adversely affect the implementation of our business plan.**

Our success depends to a significant degree upon our ability to attract, retain and motivate skilled and qualified personnel. If we fail to attract, train and retain sufficient numbers of these qualified people, our prospects, business, financial condition and results of operations will be materially and adversely affected. In particular, we are heavily dependent on the continued services of our senior management team. While we have employment agreements with our Chief Executive Officer and our Executive Vice President and Chief Financial Officer, each may voluntarily terminate their employment with us at any time. Following any termination of employment, these employees would not be subject to any non-competition covenants other than those linked to severance payments as provided in their agreements. The loss of any key employee, including members of our senior management team, and our inability to attract highly skilled personnel with sufficient experience in our industries could harm our business.

*Table Of Contents*
14

**Adverse conditions in the economy and disruption of financial markets could negatively impact us and our customers and therefore our results of operations.**

A further economic downturn in the businesses or geographic areas in which we sell our products could reduce demand for these products and result in a decrease in sales volume that could have a negative impact on our results of operations. Volatility and disruption of financial markets could limit our ability, as well as our customers' ability, to obtain adequate financing or credit to purchase and pay for our products in a timely manner, or to maintain operations, and result in a decrease in sales volume that could have a negative impact on our results of operations.

**If we are unable to adequately fund our operations, we may be forced to voluntarily file for deregistration of our common stock with the U.S. Securities and Exchange Commission.**

Compliance with the periodic reporting requirements required by the U.S. Securities and Exchange Commission (or SEC) consumes a considerable amount of both internal, as well external, resources and represents a significant cost for us. If we are unable to continue to devote adequate funding and the resources needed to maintain such compliance, while continuing our operations, we may be forced to deregister with the SEC. If we file for deregistration, our common stock will no longer be listed on the OTC Markets' OTCQB tier (or OTCQB), and it may suffer a decrease in or absence of liquidity as after the deregistration process is complete, our common stock will only be tradable on the "Pink Sheets." As a result of such deregistration, non-affiliates will no longer have access to information regarding our results of operations. Without the availability of such information, our lenders may be forced to increase their monitoring of our operations which may result in higher costs to us when borrowing money which could have a negative impact and harm our business.

**Failure to maintain effective internal control over our financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act could cause our financial reports to be inaccurate.**

We are required pursuant to Section 404 of the Sarbanes-Oxley Act of 2002, or Section 404, to maintain internal control over financial reporting and to assess and report on the effectiveness of those controls. This assessment includes disclosure of any material weaknesses identified by our management in our internal control over financial reporting. Our management concluded that our internal controls over financial reporting were ineffective as of the year ended December 31, 2016, having identified a material weakness in our internal controls due to the controls on revenue recognition. While management is working to remediate the material weakness, there is no assurance that such changes, when economically feasible and sustainable, will remediate the identified material weaknesses or that the controls will prevent or detect future material weaknesses. If we are not able to maintain effective internal control over financial reporting, our financial statements, including related disclosures, may be inaccurate, which could have a material adverse effect on our business.

**RISKS RELATING TO OUR INDUSTRY**

**If we are unable to respond to the adoption of technological innovation in our industry and changes in consumer demand, our products will cease to be competitive, which could result in a decrease in revenue and harm our business.**

Our future success will depend, in part, on our ability to keep up with changes in consumer tastes and our continued ability to differentiate our products through implementation of new technologies, such as new materials and fabrics. We may not, however, be able to successfully do so, and our competitors may be able to produce designs that are more appealing, implement new technologies or innovations in their designs, or manufacture their products at a much lower cost. These types of developments could render our products less competitive and possibly eliminate any differentiating advantage in designs and materials that we might hold at the present time.

**We are susceptible to general economic conditions, and a downturn in our industries or a reduction in spending by consumers could adversely affect our operating results.**

The apparel industry in general has historically been characterized by a high degree of volatility and subject to substantial cyclical variations. Our operating results will be subject to fluctuations based on general economic conditions, in particular conditions that impact consumer spending and construction and industrial activity. A downturn in the construction, industrial or housing sectors could be expected to directly and negatively impact sales of protective gear to workers in these sectors, which could cause a decrease in revenue and harm our sales.

*Table Of Contents*
                                              15

**Changes in international treaties or governmental regulatory schemes could adversely impact our business.**

Any negative changes to international treaties and regulations such as the North American Free Trade Agreement (or NAFTA), and to the effects of international trade agreements and embargos imposed by entities such as the World Trade Organization, could result in a rise in trade quotas, duties, taxes and similar impositions, limit the countries from whom we can purchase our fabric or other component materials, or limit the countries where we might market and sell our products, any of which could correspondingly have an adverse effect on our business.

Any changes in regulation by the Federal Trade Commission (or FTC) with respect to labeling and advertising of our products could have an adverse effect on our business. The FTC requires apparel companies to provide a label clearly stating the country of origin of manufacture and the company's apparel registration number and a second label stating washing instructions for the product. A change in these requirements could add additional cost to the production of our products, though we do not believe that this additional cost would be material, especially in relation to the cost of producing our products.

### RISKS RELATING TO OUR COMMON STOCK

**There is a limited trading market for our common stock and a market for our stock may not be sustained, which will adversely affect the liquidity of our common stock and could cause our market price to decline.**

Although prices for our shares of common stock are quoted on the OTCQB (under the symbol ICPW), there is a limited public trading market for our common stock, and no assurance can be given that a public trading market will be sustained.

Active trading markets generally result in lower price volatility and more efficient execution of buy and sell orders. The absence of an active trading market reduces the liquidity of our common stock. As a result of the lack of trading activity, the quoted price for our common stock on the OTCQB is not necessarily a reliable indicator of its fair market value. Further, if we cease to be quoted, holders of our common stock would find it more difficult to dispose of, or to obtain accurate quotations as to the market value of, our common stock, and the market value of our common stock would likely decline.

**The market price of our common stock is likely to be highly volatile and subject to wide fluctuations, and you may be unable to resell your shares at or above the offering price.**

The market price of our common stock is likely to be highly volatile and could be subject to wide fluctuations in response to a number of factors that are beyond our control, including announcements of new products or services by our competitors. In addition, the market price of our common stock could be subject to wide fluctuations in response to a variety of factors, including:

- quarterly variations in our revenues and operating expenses;
- developments in the financial markets, apparel industry and the worldwide or regional economies;
- announcements of innovations or new products or services by us or our competitors;
- announcements by the government that affect international trade treaties;
- fluctuations in interest rates and/or the asset backed securities market;
- significant sales of our common stock or other securities in the open market; and
- changes in accounting principles.

*Table Of Contents*                        16

In the past, stockholders have often instituted securities class action litigation after periods of volatility in the market price of a company's securities. If a stockholder were to file any such class action suit against us, we would incur substantial legal fees and our management's attention and resources would be diverted from operating our business to respond to the litigation, which could harm our business.

**Substantial future sales of our common stock in the public market could cause our stock price to fall.**

Sales of a significant number of shares of our common stock in the open market could depress the market price of our common stock. Further reduction in the market price for our shares could make it more difficult to raise funds through future equity offerings.

Moreover, as additional shares of our common stock become available for resale in the open market (including shares issued upon the exercise of our outstanding options and warrants), the supply of our publicly traded shares will increase, which could decrease its price.

Some of our shares may also be offered from time-to-time in the open market pursuant to Rule 144, and these sales may have a depressive effect on the market for our shares. In general, a non-affiliate who has held restricted shares for a period of six months may sell an unrestricted number of shares of our common stock into the market. The resale of these shares under Rule 144 may cause our stock price to decline.

**The sale of securities by us in any equity or debt financing could result in dilution to our existing stockholders and have a material adverse effect on our earnings.**

Any sale of common stock by us in a future private placement offering could result in dilution to the existing stockholders as a direct result of our issuance of additional shares of our capital stock. In addition, our business strategy may include expansion through internal growth, by acquiring complementary businesses, by acquiring or licensing additional brands, or by establishing strategic relationships with targeted customers and suppliers. In order to do so, or to finance the cost of our other activities, we may issue additional equity securities that could dilute our stockholders' stock ownership. We may also assume additional debt and incur impairment losses related to goodwill and other tangible assets if we acquire another company and this could negatively impact our earnings and results of operations.

**The trading of our common stock on the OTCQB and the designation of our common stock as a "penny stock" could impact the trading market for our common stock.**

Our securities, as traded on the OTCQB, are subject to SEC rules that impose special sales practice requirements on broker-dealers who sell these securities to persons other than established customers or accredited investors. For the purposes of the rule, the phrase "accredited investors" means, in general terms, institutions with assets in excess of $5,000,000, or individuals having a net worth in excess of $1,000,000 or having an annual income that exceeds $200,000 (or that, when combined with a spouse's income, exceeds $300,000). For transactions covered by the rule, the broker-dealer must make a special suitability determination for the purchaser and receive the purchaser's written agreement to the transaction before the sale. Consequently, the rule affects the ability of broker-dealers to sell our securities and also affects the ability of purchasers to sell their securities in any market that might develop therefor.

*Table Of Contents*          17

In addition, the SEC has adopted a number of rules to regulate "penny stock" that restrict transactions involving these securities. Such rules include Rules 3a51-1, 15g-1, 15g-2, 15g-3, 15g-4, 15g-5, 15g-6, 15g-7, and 15g-9 under the Securities Exchange Act of 1934, as amended. These rules may have the effect of reducing the liquidity of penny stocks. "Penny stocks" generally are equity securities with a price of less than $5.00 per share (other than securities registered on certain national securities exchanges or quoted on the NASDAQ Stock Market if current price and volume information with respect to transactions in such securities is provided by the exchange or system). Because our securities constitute "penny stocks" within the meaning of the rules, the rules would apply to us and to our securities.

Stockholders should be aware that, according to the SEC, the market for penny stocks has suffered in recent years from patterns of fraud and abuse. Such patterns include (i) control of the market for the security by one or a few broker-dealers that are often related to the promoter or issuer; (ii) manipulation of prices through prearranged matching of purchases and sales and false and misleading press releases; (iii) "boiler room" practices involving high-pressure sales tactics and unrealistic price projections by inexperienced sales persons; (iv) excessive and undisclosed bid-ask differentials and markups by selling broker-dealers; and (v) the wholesale dumping of the same securities by promoters and broker-dealers after prices have been manipulated to a desired level, resulting in investor losses. Our management is aware of the abuses that have occurred historically in the penny stock market. Although we do not expect to be in a position to dictate the behavior of the market or of broker-dealers who participate in the market, management will strive within the confines of practical limitations to prevent the described patterns from being established with respect to our securities.

**We have not paid dividends in the past and do not expect to pay dividends for the foreseeable future, and any return on investment may be limited to potential future appreciation on the value of our common stock.**

We currently intend to retain any future earnings to support the development and expansion of our business and do not anticipate paying cash dividends in the foreseeable future. Our payment of any future dividends will be at the discretion of our board of directors after taking into account various factors, including without limitation, our financial condition, operating results, cash needs, growth plans and the terms of any credit agreements that we may be a party to at the time. To the extent we do not pay dividends, our stock may be less valuable because a return on investment will only occur if and to the extent our stock price appreciates, which may never occur. In addition, investors must rely on sales of their common stock after price appreciation as the only way to realize their investment, and if the price of our stock does not appreciate, then there will be no return on investment. Investors seeking cash dividends should not purchase our common stock.

**Our officers, directors and principal stockholders can exert significant influence over us and may make decisions that are not in the best interests of all stockholders.**

Our officers, directors and principal stockholders (greater than 5% stockholders) collectively control approximately 30.6% of our outstanding common stock. As a result, these stockholders will be able to affect the outcome of, or exert significant influence over, all matters requiring stockholder approval, including the election and removal of directors and any change in control. In particular, this concentration of ownership of our common stock could have the effect of delaying or preventing a change of control of us or otherwise discouraging or preventing a potential acquirer from attempting to obtain control of us. This, in turn, could have a negative effect on the market price of our common stock. It could also prevent our stockholders from realizing a premium over the market prices for their shares of common stock. Moreover, the interests of this concentration of ownership may not always coincide with our interests or the interests of other stockholders, and accordingly, they could cause us to enter into transactions or agreements that we would not otherwise consider.

**Anti-takeover provisions may limit the ability of another party to acquire us, which could cause our stock price to decline.**

Our Articles of Incorporation, as amended, our bylaws, as amended, and Nevada law contain provisions that could discourage, delay or prevent a third party from acquiring us, even if doing so may be beneficial to our stockholders. In addition, these provisions could limit the price investors would be willing to pay in the future for shares of our common stock.

### Item 1B. Unresolved Staff Comments.

Not applicable.

*Table Of Contents*                    18

## Item 2. Properties.

We lease all of our facilities. Our headquarters are located at 1920 Hutton Court, Suite 300, Farmers Branch, Texas 75234. The table below sets forth certain information regarding our leaseholds as of December 31, 2016.

| Address | Approximate Floor Space (Sq. Ft.) | Monthly Rent | Use |
|---|---|---|---|
| 1920 Hutton Court, Suite 300, Farmers Branch, TX | 13,026 | $11,102** | Corporate offices and warehouse |

** For the period of 9/1/14 – 2/28/15 we received a rent abatement of 100%. In addition, we received a $60,000 tenant build-out/improvement credit at the time we executed the lease.

| Address | Approximate Floor Space (Sq. Ft.) | Monthly Rent | Use |
|---|---|---|---|
| The Garden Centre #3-08 Cilandak Commercial Estate Jl. Raya Cilandak KKO Jakarta Selatan 12560 Indonesia | 1,006 | $1,200 | International sourcing office. |

We believe our facilities are adequate to meet our current and near-term needs.

## Item 3. Legal Proceedings.

On September 28, 2015, Ironclad Performance Wear Corporation filed a Petition in the District Court of Dallas County, Texas, 193rd Judicial District, Cause No. DC-15-11878, against Orr Safety Corporation ("Orr"), a significant customer of the Company. The Petition alleged that Orr had materially breached an Exclusive License and Distributorship Agreement with Ironclad by, inter alia, failing to use its best efforts to actively promote, market and sell the KONG® brand of gloves manufactured by Ironclad, and selling gloves that were similar to, or competitive with, the KONG® brand. The Petition also alleged that Orr materially breached other agreements between the parties, and provided notice that Ironclad was terminating the Exclusive License and Distributorship Agreement due to Orr's material breaches. The Petition sought damages, declaratory relief regarding Ironclad's rights and obligations under the relevant agreements, and all other available relief. On October 23, 2015, Orr filed an Answer and Counterclaim in the Dallas County action, and concurrently removed the case to the United States District Court for the Northern District of Texas, Case No. 3:15-cv-03453-D. Orr's Counterclaim alleged that Ironclad breached the Exclusive License and Distributorship Agreement, as well as a Sub-Distributorship Agreement between the parties by, inter alia, infringing upon Orr's exclusive rights under the agreements, failing to pay appropriate royalties to Orr, and failing to protect the intellectual property of the KONG® brand of glove. The Counterclaim also alleged that Ironclad engaged in selling "counterfeit" KONG® products in violation of the parties' agreement. Ironclad filed an Answer to the Counterclaim on November 27, 2015 denying all material allegations. On December 7, 2015, Orr filed an Amended Answer to Ironclad's Petition responding to each of the allegations pursuant to the pleading standards in federal court. On December 3, 2015, the Court entered a Scheduling Order setting deadlines for discovery and dispositive motions. On July 13, 2016, the Company filed a motion for summary judgement.

*Table Of Contents*　　　　　　　　19

On August 26, 2016, the Company executed a settlement agreement to settle the lawsuit. The terms of this agreement are confidential. Orr will continue to be an important distributor of the Company's products, but the Company can also sell KONG® through other distribution channels.

**Item 4. Mine Safety Disclosures.**

Not applicable.

## PART II

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

**Common Stock**

Our common stock is quoted on the OTC Markets' OTCQB tier under the symbol "ICPW." The following table sets forth, for the periods indicated, the high and low bid information for our common stock, as determined from sporadic quotations on the OTCQB. The following quotations reflect inter-dealer prices, without retail mark-up, mark-down or commission, and may not represent actual transactions.

|  | High | | Low | |
|---|---|---|---|---|
| **Year Ended December 31, 2015** | | | | |
| First Quarter | $ | 0.30 | $ | 0.20 |
| Second Quarter | $ | 0.31 | $ | 0.24 |
| Third Quarter | $ | 0.30 | $ | 0.23 |
| Fourth Quarter | $ | 0.31 | $ | 0.21 |
| **Year Ended December 31, 2016** | | | | |
| First Quarter | $ | 0.30 | $ | 0.235 |
| Second Quarter | $ | 0.28 | $ | 0.22 |
| Third Quarter | $ | 0.28 | $ | 0.215 |
| Fourth Quarter | $ | 0.28 | $ | 0.22 |

On April 7, 2017, the closing sales price of our common stock as reported on the OTCQB was $0.22 per share. As of April 7, 2017, there were 136 stockholders of record of our common stock.

**Dividends**

We have never paid dividends on our common stock. We intend to retain any future earnings for use in our business.

**Item 6. Selected Financial Data.**

Not applicable.

*Table Of Contents*                    20

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion and analysis should be read together with the Consolidated Financial Statements of Ironclad Performance Wear Corporation and the "Notes to Consolidated Financial Statements" included elsewhere in this report. This discussion summarizes the significant factors affecting the consolidated operating results, financial condition and liquidity and cash flows of Ironclad Performance Wear Corporation for the fiscal years ended December 31, 2016 and 2015. Except for historical information, the matters discussed in this Management's Discussion and Analysis of Financial Condition and Results of Operations are forward-looking statements that involve risks and uncertainties and are based upon judgments concerning various factors that are beyond our control.*

**Overview**

We are a leading designer and manufacturer of branded performance work wear. Founded in 1998, we have grown and leveraged our proprietary technologies to produce task-specific gloves that are designed to significantly improve the wearer's ability to safely, efficiently and comfortably perform general to highly specific job functions. We have built and continue to augment our reputation among professionals in the construction and industrial service markets, and do-it-yourself and sporting goods consumers with products specifically designed for individual tasks or task types. We believe that our dedication to quality and durability and focus on our clients' needs has created a high level of brand loyalty and has solidified substantial brand equity.

We plan to increase our domestic revenues by leveraging our relationships with existing retailers and industrial distributors, including "Big Box" and sporting goods retailers, increasing our product offerings in new and existing locations, and introducing new products, developed and targeted for specific customers and/or industries.

We believe that our products have international appeal. In 2005, we began selling products in Australia and Japan through independent distributors. From 2006 through 2012 we entered the Canadian and European markets through distributors. International sales represent approximately 21% of total sales in 2016. We plan to continue to increase sales internationally by expanding our distribution into international markets during the fiscal year ending December 31, 2017.

**Critical Accounting Policies, Judgments and Estimates**

Our Management's Discussion and Analysis of Financial Condition and Results of Operations section discusses our financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. To prepare these financial statements, we must make estimates and assumptions that affect the reported amounts of assets and liabilities. These estimates also affect our reported revenues and expenses. On an ongoing basis, management evaluates its estimates and judgment, including those related to revenue recognition, accrued expenses, financing operations and contingencies and litigation. Management bases its estimates and judgment on historical experience and on various other factors that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions. The following represents a summary of our critical accounting policies, defined as those policies that we believe are the most important to the portrayal of our financial condition and results of operations and that require management's most difficult, subjective or complex judgments, often as a result of the need to make estimates about the effects of matters that are inherently uncertain.

**Revenue Recognition**

Under our sales model, a customer is obligated to pay us for products sold to it within a specified number of days from the date that title to the products is transferred to the customer. Our standard terms are typically net 30 days from the transfer of title to the products to a customer, however, we have negotiated special terms with certain customers and industries. We typically collect payment from a customer within 30 to 60 days from the transfer of title to the products to a customer. Transfer of title occurs and risk of ownership passes to a customer at the time of shipment or delivery, depending on the terms of our agreement with a particular customer. The sale price of our products is substantially fixed or determinable at the date of sale based on purchase orders generated by a customer and accepted by us. A customer's obligation to pay us for products sold to it is not contingent upon the resale of those products. We recognize revenue at the time product is shipped or delivered to a customer, based on terms of agreement with a customer and collection is reasonably assured.

*Table Of Contents*       21

In June 2016, the Company entered into a barter agreement whereby it delivered $307,837 of its inventory in exchange for future advertising credits and other items. The credits, which expire in June 2019, are valued at the lower of the Company's cost or market value of the inventory transferred. The Company has recorded barter credits of $307,837 in "Other Assets - Non-current" at December 31, 2016. Under the terms of the barter agreement, the Company is required to pay cash equal to a negotiated amount of the bartered advertising, or other items, and use the barter credits to pay the balance. These credits are charged to expense as they are used. During the twelve months ended December 31, 2016 $0 was charged to expense for barter credits used.

In Q2, Q3 and Q4 2016, the Company entered into patent licensing agreements with multiple companies. The licenses are for a fixed fee and are non-cancellable by the licensee. The Company has no significant continuing obligation with regards to the use of the patent and the license arrangements are treated as an outright sale. The total value of these agreements was $383,500. The payment terms for these licenses varied by licensee and, in one case, payments extend over a period of five years. The Company has recorded $41,980 in "Prepaid expenses and other current assets" at December 31, 2016, representing the amounts that are due and payable within twelve months of December 31, 2016. At December 31, 2016, "Other Assets - Non-current" includes $101,430 of amounts that are due and payable in periods after December 31, 2017.

**Revenue Disclosures**

The Company's revenues are derived from the sale of our core line of task specific work gloves plus our line of workwear apparel products, available to all of our customers, both domestically and internationally through third party distributors. Below is a table outlining this breakdown for the comparative periods:

|  | Year Ended December 31, 2016 | Year Ended December 31, 2015 |
|---|---|---|
| Domestic | $ 19,743,090 | $ 16,265,891 |
| International | 5,243,788 | 7,316,128 |
| Total | $ 24,986,878 | $ 23,582,019 |

The Company sells product directly to numerous international distributors, located on various continents. As the Company does not receive information from these distributors regarding their customers and their respective locations, the Company is not able to specifically disclose in which countries its products are sold.

**Cost of Goods Sold**

Our cost of goods sold includes the Free on Board cost of the product plus landed costs. Landed costs include freight-in, insurance, duties and administrative costs to deliver the finished goods to our distribution warehouse. Cost of goods sold does not include purchasing costs, warehousing or distribution costs. These costs are captured as incurred on a separate line in operating expenses. Our gross profit may not be comparable to other entities that may include some or all of these costs in the calculation of gross profit.

**Inventory Obsolescence Allowance**

We review the inventory level of all products quarterly. For most glove products that have been in the market for one year or greater, we consider inventory levels of greater than one year's sales to be excess. Due to limited market penetration for our apparel products we have decided to provide a 50% allowance against this line of products. Products that are no longer part of the current product offering are considered obsolete. The potential for re-sale of slow-moving and obsolete inventories is based upon our assumptions about future demand and market conditions. The recorded cost of obsolete inventories is then reduced to zero and a reserve is established for slow moving products. Both the write down and reserve adjustments are recorded as charges to cost of goods sold. For the years ended December 31, 2016 and December 31, 2015 we adjusted our inventory reserve by $350,251 and $0, with the corresponding adjustments in cost of goods sold, respectively, and reported an obsolescence reserve balance of $197,549 as of December 31, 2016 and $547,800 as of December 31, 2015, respectively. All adjustments for obsolete inventory establish a new cost basis for that inventory as we believe such reductions are permanent declines in the market price of our products. Generally, obsolete inventory is sold to companies that specialize in the liquidation of these items or contributed to charities, while we continue to market slow-moving inventories until they are sold or become obsolete. As obsolete or slow-moving inventory is sold or disposed of, we reduce the reserve.

https://www.sec.gov/Archives/edgar/data/1301712/000072174817000261/icpw10k032917.htm                                        25/74

**Allowance for Doubtful Accounts**

We maintain allowances for doubtful accounts for estimated losses resulting from the inability of our customers to make required payments. Our current customers consist of large national, regional and smaller independent customers with good payment histories with us. We perform periodic credit evaluations of our customers and maintain allowances for potential credit losses based on management's evaluation of historical experience and current industry trends. If the financial condition of our customers were to deteriorate, resulting in the impairment of their ability to make payments, additional allowances may be required. New customers are evaluated by us for credit worthiness before terms are established. Although we expect to collect all amounts due, actual collections may differ.

**Product Returns, Allowances and Adjustments**

Product returns, allowances and adjustments is a broad term that encompasses a number of offsets to gross sales. Included herein are warranty returns of defective products, returns of saleable products and sales adjustments.

*Warranty Returns* - We have a warranty policy that covers defects in workmanship. It allows customers to return damaged or defective products to us following a customary return merchandise authorization process for a period of one year from the date of purchase.

*Saleable Product Returns* - We may allow from time-to-time, depending on the customer and existing circumstances, stock adjustment returns, whereby the customer is given the opportunity to 'trade out' of a style of product that does not sell well in their territory, usually in exchange for another product, again following the customary return merchandise authorization process. In addition, we may allow from time to time other saleable product returns from customers for other business reasons, for example, in settlement of an outstanding accounts receivable, from a discontinued distributor customer or other customer service purpose.

*Sales Adjustments* - These adjustments include pricing and shipping corrections and periodic adjustments to the product returns reserve.

For both warranty and saleable product returns we utilize actual historical return rates to determine our allowance for returns in each period, adjusted for unique, one-time events. Gross sales are reduced by estimated returns. We record a corresponding accrual for the estimated liability associated with the estimated returns which is based on the historical gross sales of the products corresponding to the estimated returns. This accrual is offset each period by actual product returns.

Our current estimated future sales return rate is approximately 0.30% of the trailing twelve months' net sales. As noted above, our return rate is based upon our past history of actual returns and we estimate amounts for product returns for a given period by applying this historical return rate and reducing actual gross sales for that period by a corresponding amount. We believe that using a trailing 12-month return rate provides us with a sufficient period of time to establish recent historical trends in product returns for two primary reasons: (i) our products' useful life is approximately 3-4 months and (ii) we are able to quickly correct any significant quality issues as we learn about them. If an unusual circumstance exists, such as a product that has begun to show materially different actual return rates as compared to our average 12-month return rates, we will make appropriate adjustments to our estimated return rates. Factors that could cause materially different actual return rates as compared to the 12-month return rates include a new product line, a change in materials or product being supplied by a new factory. Although we have no specific statistical data on this matter, we believe that our practices are reasonable and consistent with those of our industry. Our warranty terms under our arrangements with our suppliers do not provide for individual products returned by retailers or retail customers to be returned to the vendor.

*Table Of Contents*                    23

### Reserve for Product and Warranty Returns

| | |
|---|---:|
| Reserve Balance 12/31/14 | $ 75,000 |
| Payments Recorded During the Period | (294,959) |
| | (219,959) |
| Accrual for New Liabilities During the Reporting Period | 294,959 |
| | |
| Reserve Balance 12/31/15 | 75,000 |
| Payments Recorded During the Period | (192,230) |
| | (117,230) |
| Accrual for New Liabilities During the Reporting Period | 192,230 |
| | |
| Reserve Balance 12/31/16 | $ 75,000 |

### Stock Based Compensation

The Company accounts for stock based compensation under the provisions of Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 718, *Share-Based Payment*. This statement establishes standards surrounding the accounting for transactions in which an entity exchanges its equity instruments for goods and services. The statement focuses primarily on accounting for transactions in which an entity obtains employee services in share-based payment transactions, such as the options issued under our stock option plans. We follow a fair value approach using an option-pricing model, Black-Scholes option valuation model, at the date of a stock option grant. The deferred compensation calculated under the fair value method would then be amortized over the respective vesting period of the stock option.

### Income Taxes

Deferred income taxes are provided using the liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carryforwards and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of the changes in tax laws and rates as of the date of enactment.

When tax returns are filed, it is highly certain that some positions taken would be sustained upon examination by the taxing authorities, while others are subject to uncertainty about the merits of the position taken or the amount of the position that would be effectively sustained. The benefit of a tax position is recognized in the financial statements in the period during which, based on all available evidence, management believes it is more-likely-than-not that the position will be sustained upon examination, including the resolution of appeals or litigation, if any. Tax positions taken are not offset or aggregated with other positions. Tax positions that meet the more-likely-than-not recognition threshold are measured as the largest amount of tax benefit that is more than 50% likely of being realized upon settlement with the applicable taxing authority. The portion of the benefits associated with tax positions taken that exceeds the amount measured as described above would be reflected as a liability for unrecognized tax benefits in our balance sheet along with any associated interest and penalties that would be payable to the taxing authorities upon examination. For the year ended December 31, 2015 we assessed the need for a valuation allowance against our deferred tax assets and concluded that it is more likely than not that we will not be able to realize more of our deferred tax asset than estimated in 2014. Accordingly, there is no adjustment to deferred taxes for 2015. At September 30, 2016, we reviewed current profitability and forecasted future results and concluded that it was more likely than not that we would not be able to realize any of our deferred tax assets. In recognition of this risk, we provided a full valuation allowance on the deferred taxes for the period ended September 30, 2016 amounting to $1,832,000. At December 31, 2016, we maintained our position to provide a full allowance on our net deferred tax assets. We will continue to evaluate if it is more likely than not that we will realize the future benefits from current and future deferred tax assets. These deferred tax benefits are recorded on the balance sheet as long term deferred tax assets of $0 and $1,832,000 as of December 31, 2016 and December 31, 2015.

*Table Of Contents*                                24

Interest and penalties associated with unrecognized tax benefits would be classified as additional income taxes in the statement of operations.

**Recent Accounting Pronouncements**

See Note 2 to our audited consolidated financial statements included in this report for recently issued accounting pronouncements, including the expected dates of adoption and expected impact to our consolidated financial statements upon adoption.

**Results of Operations**

**Comparison of Years Ended December 31, 2016 and December 31, 2015**

*Net Sales* increased $1,404,859, or 6.0%, to $24,986,878 in the year ended December 31, 2016 from $23,582,019 for the corresponding period in 2015. This increase was primarily due to increased sales to one specific industrial customer "Customer C" who chose Ironclad as a strategic vendor partner over previous suppliers, who primarily sells to the maintenance, repair and overhaul (MRO) industry and the oil & gas industry. The industrial distributor category sales increased approximately $3,393,000 and our retail customers, most notably the retail Do It Yourself (DIY) increased approximately $1,483,000. These increases were partially offset by decreased sales of approximately $1,740,000 with international customers and $1,731,000 to our private label customers. Customer "A", who primarily sells to the oil & gas industry, accounted for approximately $957,000 or 4% of net sales for year ended December 31, 2016, Customer "B", who primarily sells to the international mining and retail industries, accounted for approximately $3,764,000 or 15% of net sales for the year ended December 31, 2016 and Customer "C", who primarily sells to the North American MRO market, accounted for approximately $8,446,000 or 34% of net sales for the year ended December 31, 2016. Customer "A" accounted for approximately $4,673,000 or 20% of net sales for year ended December 31, 2015, Customer "B" accounted for approximately $2,919,000 or 12% of net sales for the year ended December 31, 2015 and Customer "C" accounted for approximately $1,351,000 or 6% of net sales for the year ended December 31, 2015. We continue to focus our sales efforts on those areas where we see continued growth, the industrial and safety channels, international markets and job specific glove styles.

*Gross Profit* increased $631,944 to $8,910,366 for the year ended December 31, 2016 from $8,278,422 for the year ended December 31, 2015. Gross profit, as a percentage of net sales, or gross margin, increased to 35.7% in 2016 from 35.1% in 2015. This increase in gross profit is primarily due to product mix and customer sales mix shifts.

*Operating Expenses* increased by $1,448,152, or 17.2%, to $9,872,382 in 2016 from $8,424,230 in 2015. As a percentage of net sales, operating expenses increased to 39.5% in 2016 from 35.7% in the same period of 2015. The increased spending in 2016 was primarily due to increased wages and benefits to support the increased domestic and international sales initiatives of approximately $920,000 and increased bad debt expense related to the discontinuance of business with our former Canadian distributor of approximately $510,000. Our number of employees increased to 42 at December 31, 2016 from 41 at December 31, 2015.

*Loss from Operations* increased $816,208, to $962,016 in 2016 from $145,808 in 2015. Loss from operations as a percentage of net sales increased to (3.7%) in 2016 from (0.6%) in 2015. The decrease in income from operations for 2016 was primarily the result of higher operating expenses as mentioned above.

*Interest Expense* increased $83,540 to $174,944 in 2016 from $91,404 in 2015. The increase was primarily due to higher working capital needs which necessitated higher bank borrowings in the current year.

*Deferred Income Tax Expense*. For the year ended December 31, 2015 we assessed the need for a valuation allowance against our deferred tax assets and concluded that it is more likely than not that we will not be able to realize more of our deferred tax asset than estimated in 2014. Accordingly, there is no adjustment to deferred taxes for 2015. For the year ended December 31, 2016, we reviewed current profitability and forecasted future results and concluded that it was not more likely than not that we would be able to realize any of our deferred tax assets. In recognition of this risk, we provided a full valuation allowance on the deferred taxes at December 31, 2016. We will continue to evaluate if it is more likely than not that we will realize the future benefits from current and future deferred tax assets. These deferred tax benefits are recorded on the balance sheet as long term deferred tax assets of $0 and $1,832,000 as of December 31, 2016 and December 31, 2015, respectively.

*Net loss* increased $2,736,902 to $2,968,217 in 2016 from $231,315 in 2015. This decrease in income is a result of two factors, the combination of each of the net sales, profit and expense factors discussed above, and increase in valuation allowances against deferred tax assets recognized in 2016.

*Table Of Contents*          25

**Seasonality and Annual Results**

Our glove business generally shows an increase in sales during the third and fourth quarters due primarily to an increase in the sale of our winter glove line during this period. We typically generate approximately 60% of our glove net sales during these months. As the overall economy continues to experience pockets of recovery, our results have been positively impacted by the successful introduction of new products designed specifically for the oil and gas, safety & MRO, automotive and sporting goods industries.

Our working capital, at any particular time, reflects the seasonality of our glove business and plans to expand product lines and enter new markets. We expect inventory, accounts payable and accrued expenses to be higher in the third and fourth quarters for these reasons.

**Liquidity and Capital Resources**

Our cash requirements are principally for working capital. Our need for working capital is seasonal, with the greatest requirements from July through the end of October each year as a result of our inventory build-up during this period for the fall and winter selling seasons. Historically, our main sources of liquidity have been borrowings under our existing revolving credit facility, the issuance of subordinated debt and the sale of equity. In the short term we are monitoring our credit issuances and cash collections to maximize cash flows and investigating opportunities to quickly reduce our current inventories to convert these assets into cash. Over the past year, and continuing in the near and longer term we are focused on controlling our operating costs, increasing revenue and margins and improving operating procedures to generate sustained profitability. This will be accomplished through hiring and training the right staff and implementing robust systems.

*Operating Activities.* In 2016, cash used in operating activities was $763,249 and consisted primarily of net loss of $2,968,217, increased by non-cash items of $2,033,946, a decrease in accounts receivable of $889,255, a decrease in deposits on inventory of $62,996, an increase in accounts payable and accrued expenses of $1,315,382; offset by an increase in inventory of $1,701,349 and an increase in prepaid expenses and other assets of $395,262.

In 2015, cash used in operating activities was $659,425 and consisted primarily of net loss of $231,315, increased by non-cash items of $489,829, a decrease in inventory of $441,939, a decrease in deposits on inventory of $490,151, an increase in accounts payable and accrued expenses of $769,102; offset by an increase in accounts receivable of $2,574,736 and an increase in prepaid expenses and other assets of $44,395.

*Investing Activities.* In 2016 and 2015, investing activities were primarily the result of capital expenditures, mainly for computer equipment, furniture, leasehold improvements and trademark applications. Cash used in investing activities increased $199,055 to $371,751 for 2016 from $172,696 in 2015. Expenditures for property and equipment in 2016 and 2015 were $248,742 and $172,330, and investment in trademarks and patents were $123,009 and $366, respectively.

*Financing Activities.* Financing activities in 2016 consisted of net borrowing under our bank credit facility of $1,023,290 and cash proceeds from the issuance of common stock due to stock option exercises of $134,633. Financing activities during 2015 consisted of net borrowings under our bank credit facility of $638,746 and cash proceeds from the issuance of common stock due to stock option exercises of $129,453.

*Table Of Contents*                                    26

The Company reported net losses of $3.0 million (including a non-cash reserve for the deferred tax asset of $1.8 million) and $0.2 million for the years ended December 31, 2016 and December 31, 2015, respectively. At December 31, 2016 and 2015, we had an accumulated deficit of $11.5 million and $8.5 million, respectively.  While revenue from certain customers declined, the Company still experienced total revenue growth of $1.4 million, primarily attributed to our recurring revenue customer base and new customers. In order to generate the growth in the Company's revenue and customer base, the Company made significant investments in staff, and the related benefit, advertising and travel costs, in order to acquire and maintain these customers in anticipation of stable future recurring revenues. This in-part caused our total operating costs to out-pace the increase in gross profit, resulting in continued operating losses during 2016 of $0.9 million. Included in the $0.9 million operating loss, the Company experienced significant one time charges totaling $0.6 million related primarily to the discontinuance of business with our authorized Canadian distributor and legal costs related to our now settled ORR litigation. The Company expects to continue to strategically expend resources to retain and increase the revenue from these customers. Additionally, in excess of $1.8 million of the increase in the accumulated deficit is attributable to a valuation reserve established against the Company's deferred tax asset. This reserve is a non-cash charge to the income statement. In aggregate, of the $3.0 million increase in the accumulated deficit, approximately $2.5 million is attributable to these charges. The balance is attributable to investing in the business to grow the Company's revenues. The resultant impact of these continuing losses was that the Company failed to meet its required covenants with Capital One, N.A. which in combination raised substantial doubt on our ability to continue as a going concern. However, as discussed further below in the credit facilities section, the Company has obtained waivers to existing covenants and addbacks to covenant calculations to cure the violations and extended the due date of our facility to April 17, 2018. With the extension and management's operational plans, the occurrence of which we believe is probable , our liquidity needs will be met for 12 months from the issuance date of the financial statements.

The Company does not have sufficient funds to pay down the credit line at its current due date, however, Capital One, N.A. has extended the maturity date of the line and is working with the Company to facilitate an orderly exit from the line. On April 11, 2017, Capital One, N.A. granted the Company an extension of the maturity date from February 23, 2017 to April 17, 2018 and elected to waive the Minimum Debt Service Coverage Ratio covenant calculated as of December 31, 2016. Capital One, N.A. also replaced the Minimum Debt Service Coverage Ratio covenants calculated as of March 31, 2017, June 30, 2017 and September 30, 2017, with a twelve month trailing adjusted EBITDAS covenant, and reset the debt service charge covenant for September 30, 2017. Effective October 1, 2017, Capital One, N.A. will reduce the cap on the line of credit to $5,000,000. The Company worked diligently in modeling the impact of these changes and it is probable that we will be able to perform above the required covenant levels. In addition, the Company believes that it will generate adequate funds to finance its operating needs and it will continue to operate within the line of credit agreement.

The Company believes that it will meet the forecasts provided to Capital One, N.A. due to new sales commitments that had not existed in 2016 and reduced selling, general and administrative costs based on the non-recurrence of the litigation and bad debt expenses in 2016 and numerous cost cutting measures that the Company has identified and already put in place. The management plan indicates that it is probable that the Company will be able to meet the bank covenants and will have sufficient resources for the measurement period one year from the date of issuance of the financials.

Management also believes that it is capable of renewing this type of loan based on the value of its accounts receivable and inventory and the strength of its business going forward. The Company also intends to commence talks to refinance the line of credit with another funding source and intends to close on a new line prior to the expiration of the current Capital One N.A. extension.

*Table Of Contents*                    27

Although it is probable that we can meet these strategies, we cannot guarantee that we would be able to successfully execute our strategies described above, or obtain alternative financing, if necessary, on commercially reasonable terms or at all, or that implementing these strategies would allow us to meet our debt obligations and capital requirements.

Management believes the successful execution of the Company's business plan does not depend on the ability to raise additional capital. However, to the extent that existing capital resources and sales growth are not sufficient to fund future activities, we may need to raise additional funds through private equity offerings, debt financing and public financing, as well as monitoring and controlling our expenditures to limit cash outflows. Additional funds may not be available on terms favorable to us or at all. Failure to raise additional capital, if and when needed, could have a material adverse effect on our financial position, results of operations, and cash flows.

### Credit Facilities

On November 28, 2014 we entered into a Revolving Loan and Security Agreement with Capital One, N.A. which currently provides a revolving loan of up to $8,000,000. The loan was due to expire on November 30, 2016. On September 16, 2015, pursuant to the terms of the agreement, we increased the line limit from $6,000,000 to $8,000,000. All advances, up to the line limit of $8,000,000, are subject to a Borrowing Base report. The term Borrowing Base means an amount equal to (a) 80% of the net amount of all eligible accounts receivable plus, (b) 50% of the value of eligible landed inventory, plus (c) 35% of eligible in-transit inventory. In addition, the outstanding principal amount of all advances against eligible inventory shall not exceed 50% of the total line limit. All of our assets secure amounts borrowed under the terms of this agreement. Interest on borrowed funds accrued at LIBOR plus 2.80% until such time as the Company's trailing twelve month EBITDAS (Earnings Before Interest, Taxes, Depreciation, Amortization and Stock compensation expense) exceeded $1,000,000 at which time the rate decreased to LIBOR plus 2.50%. The interest rate at December 31, 2016 was 3.023%. This agreement contains a Minimum Debt Service Coverage Ratio covenant and a Tangible Net Worth covenant (each as defined in the agreement). On March 16, 2016, the Company modified its Revolving Loan and Security Agreement with Capital One, N.A. which allowed the Company to add certain legal expenses of up to $325,000 in the calculation of EBITDAS for the trailing twelve month periods ending March 31, June 30, September 30 and December 31, 2016 and permit including certain receivables of up to $300,000 in the definition of eligible accounts receivable in determining the Borrowing Base.

On August 9, 2016 and November 7, 2016 Capital One, N.A. also elected to waive the Minimum Debt Service Coverage Ratio covenant, calculated as of June 30, 2016 and September 30, 2016, respectively, in accordance with Section 7.15(a) of the Loan and Security Agreement. On November 7, 2016, Capital One, N.A. granted the Company 90-day extensions of the maturity date from November 30, 2016 to February 28, 2017.

On April 11, 2017, Capital One, N.A. granted the Company an extension of the maturity date from February 28, 2017 to April 17, 2018 and elected to waive the Minimum Debt Service Coverage Ratio covenant calculated as of December 31, 2016. Capital One, N.A. also replaced the Minimum Debt Service Coverage Ratio covenants calculated as of March 31, 2017, June 30, 2017 and September 30, 2017, with a twelve month trailing adjusted EBITDAS covenant and reset the debt service charge covenant for September 30, 2017. Effective October 1, 2017, Capital One, N.A. will reduce the cap on the line of credit to $5,000,000.

Although we were able to obtain waivers for our loan covenant violations we do not guarantee that we can meet the requirements of our covenants throughout the end of the extension period of the loan. At December 31, 2016, we had unused credit available under our current facility of approximately $3,751,930.

### Off Balance Sheet Arrangements

At December 31, 2016, we did not have any relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance, variable interest or special purpose entities, which would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes. As such, we are not exposed to any financing, liquidity, market or credit risk that could arise if we had engaged in such relationships.

### Item 7A. Quantitative and Qualitative Disclosures About Market Risk.

Not applicable.

*Table Of Contents*                    28

**Item 8. Financial Statements and Supplementary Data.**

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|                                                                                                                          | Page |
|--------------------------------------------------------------------------------------------------------------------------|------|
| **Audited Financial Statements:**                                                                                        |      |
| Report of Independent Registered Public Accounting Firm                                                                   | 30   |
| Consolidated Balance Sheets at December 31, 2016 and December 31, 2015                                                    | 31   |
| Consolidated Statements of Operations for the Years Ended December 31, 2016, and December 31, 2015                        | 32   |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2016, and December 31, 2015                        | 33   |
| Consolidated Statements of Stockholders' Equity for the Years Ended December 31, 2016 and December 31, 2015               | 34   |
| Notes to the Consolidated Financial Statements                                                                           | 35   |
| *Table Of Contents*                                                              29                                       |      |

**Report of Independent Registered Public Accounting Firm**

Board of Directors and Stockholders
Ironclad Performance Wear Corporation
Farmers Branch, Texas

We have audited the accompanying consolidated balance sheets of Ironclad Performance Wear Corporation as of December 31, 2016 and 2015 and the related consolidated statements of operations, stockholders' equity, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Ironclad Performance Wear Corporation at December 31, 2016 and 2015, and the results of its operations and its cash flows for the years then ended**,** in conformity with accounting principles generally accepted in the United States of America.

/s/ BDO USA, LLP
Dallas, Texas
April 17, 2017

*Table Of Contents*                    30

## IRONCLAD PERFORMANCE WEAR CORPORATION
## CONSOLIDATED BALANCE SHEETS

### ASSETS

| | December 31, 2016 | December 31, 2015 |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $ 299,904 | $ 276,981 |
| Accounts receivable, net of allowance for doubtful accounts of $30,000 and $30,000 | 7,968,513 | 8,857,768 |
| Inventory, net of reserve of $197,549 and $547,800 | 8,733,315 | 6,681,715 |
| Deposits on inventory | 108,597 | 171,593 |
| Prepaid and other | 575,403 | 610,417 |
| **Total Current Assets** | 17,685,732 | 16,598,474 |
| **PROPERTY AND EQUIPMENT** | | |
| Computer equipment and software | 294,117 | 622,264 |
| Furniture and equipment | 343,499 | 308,398 |
| Leasehold improvements | 140,718 | 174,298 |
| Less: accumulated depreciation and amortization | (357,204) | (767,047) |
| **Total Property and Equipment, Net** | 421,130 | 337,913 |
| **OTHER ASSETS** | | |
| Trademarks and patents, net of accumulated amortization of $81,260 and $68,094 | 235,738 | 125,895 |
| Deposits and other assets | 451,582 | 21,306 |
| Deferred tax assets – long term | — | 1,832,000 |
| **Total Other Assets** | 687,320 | 1,979,201 |
| **TOTAL ASSETS** | $ 18,794,182 | $ 18,915,588 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES** | | |
| Accounts payable and accrued expenses | $ 4,674,106 | $ 3,358,724 |
| Line of credit | 4,248,070 | 3,224,780 |
| **Total Current Liabilities** | 8,922,176 | 6,583,504 |
| Commitments and contingencies (Note 10) | | |
| **STOCKHOLDERS' EQUITY** | | |
| Common stock, $0.001 par value, 172,744,750 shares authorized, 84,500,454 and 82,937,309 shares issued and outstanding at December 31, 2016 and 2015, respectively | 84,500 | 82,937 |
| Capital in excess of par value | 21,282,588 | 20,776,012 |
| Accumulated deficit | (11,495,082) | (8,526,865) |
| **Total Stockholders' Equity** | 9,872,006 | 12,332,084 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 18,794,182 | $ 18,915,588 |

See accompanying notes to consolidated financial statements.

*Table Of Contents*
31

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**For the Years Ended December 31,**

| | 2016 | 2015 |
|---|---|---|
| **REVENUES** | | |
| Net sales | $ 24,986,878 | $ 23,582,019 |
| **COST OF SALES** | | |
| Cost of sales | 16,076,512 | 15,303,597 |
| **GROSS PROFIT** | 8,910,366 | 8,278,422 |
| **EXPENSES** | | |
| General and administrative | 3,748,712 | 3,311,254 |
| Sales and marketing | 3,657,239 | 3,120,131 |
| Research and development | 636,745 | 670,590 |
| Purchasing, warehousing and distribution | 1,650,995 | 1,187,628 |
| Depreciation and amortization | 178,691 | 134,627 |
| **Total Operating Expenses** | 9,872,382 | 8,424,230 |
| **LOSS FROM OPERATIONS** | (962,016) | (145,808) |
| **OTHER INCOME (EXPENSE)** | | |
| Interest expense | (174,944) | (91,404) |
| Interest income | 73 | 28 |
| **Other Income (Expense), Net** | (174,871) | (91,376) |
| **NET LOSS BEFORE INCOME TAXES** | (1,136,887) | (237,184) |
| Benefit from income taxes - current | 670 | 5,869 |
| Income tax expense – deferred | (1,832,000) | — |
| INCOME TAX (EXPENSE) BENEFIT | (1,831,330) | 5,869 |
| **NET LOSS** | $ (2,968,217) | $ (231,315) |
| **NET LOSS PER COMMON SHARE** | | |
| Basic | $ (0.04) | $ 0.00 |
| Diluted | $ (0.04) | $ 0.00 |
| **WEIGHTED AVERAGE COMMON SHARES OUTSTANDING** | | |
| Basic | 83,804,867 | 81,819,809 |
| Diluted | 83,804,867 | 81,819,809 |

See accompanying notes to consolidated financial statements.

*Table Of Contents*

32

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**For the Years Ended December 31,**

|  | 2016 | 2015 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ (2,968,217) | $ (231,315) |
| Adjustments to reconcile net loss to net cash used in operating activities | | |
| Inventory (recoveries) reserve | (350,251) | — |
| Depreciation and amortization | 178,691 | 134,627 |
| Deferred income tax valuation allowance | 1,832,000 | — |
| Stock option expense | 373,506 | 355,202 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 889,255 | (2,574,736) |
| Inventory | (1,701,349) | 441,939 |
| Deposits on inventory | 62,996 | 490,151 |
| Prepaid and other | (395,262) | (44,395) |
| Accounts payable and accrued expenses | 1,315,382 | 769,102 |
| Net cash flows used in operating activities | (763,249) | (659,425) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Property and equipment purchased | (248,742) | (172,330) |
| Investment in trademarks and patents | (123,009) | (366) |
| Net cash flows used in investing activities | (371,751) | (172,696) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from bank lines of credit | 16,028,887 | 13,711,687 |
| Payments on bank lines of credit | (15,005,597) | (13,072,941) |
| Proceeds from issuance of common stock | 134,633 | 129,453 |
| Net cash flows provided by financing activities | 1,157,923 | 768,199 |
| | | |
| **NET INCREASE (DECREASE) IN CASH and CASH EQUIVALENTS** | 22,923 | (63,922) |
| **CASH AND CASH EQUIVALENTS BEGINNING OF YEAR** | 276,981 | 340,903 |
| **CASH AND CASH EQUIVALENTS END OF YEAR** | $ 299,904 | $ 276,981 |
| | | |
| **SUPPLEMENTAL SCHEDULE OF CASH FLOW INFORMATION:** | | |
| Cash paid during the year for: | | |
| Interest paid in cash | 174,944 | 91,404 |
| Income taxes (refunded) paid | (670) | (8,359) |

See accompanying notes to consolidated financial statements.

*Table Of Contents*                    33

### IRONCLAD PERFORMANCE WEAR CORPORATION
### CONSOLIDATED STATEMENTS OF
### STOCKHOLDERS' EQUITY

| | Common Stock | | | | | |
| | Shares Issued and Outstanding | $0.001 Par Value | Par | Capital in Excess of Par Value | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| Balance at December 31, 2014 | 80,808,629 | $ 80,808 | $ | 20,293,486 $ | (8,295,550) | $ 12,078,744 |
| Common stock issued upon exercise of stock options | 1,395,347 | 1,396 | | 128,057 | - | 129,453 |
| Stock option expense | - | - | | 181,041 | - | 181,041 |
| Board restricted stock issuance | 733,333 | 733 | | 173,428 | - | 174,161 |
| Net loss | - | - | | - | (231,315) | (231,315) |
| Balance at December 31, 2015 | 82,937,309 | 82,937 | | 20,776,012 | (8,526,865) | 12,332,084 |
| Common stock issued upon exercise of stock options | 1,063,145 | 1,063 | | 133,570 | - | 134,633 |
| Stock option expense | - | - | | 227,439 | - | 227,439 |
| Board restricted stock issuance……. …………………………. | 500,000 | 500 | | 145,567 | - | 146,067 |
| Net loss | - | - | | - | (2,968,217) | (2,968,217) |
| Balance at December 31, 2016 | 84,500,454 | $ 84,500 | $ | 21,282,588 $ | (11,495,082) | $ 9,872,006 |

See accompanying notes to consolidated financial statements.

*Table Of Contents*                    34

## IRONCLAD PERFORMANCE WEAR CORPORATION
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**1.    Description of Business and Liquidity**

Ironclad Performance Wear Corporation (the "Company", "we", "us") was incorporated in Nevada on May 26, 2004 and engages in the business of design and manufacture of branded performance work wear including task-specific gloves designed to significantly improve the wearer's ability to safely, efficiently and comfortably perform general to highly specific job functions. Its customers are primarily hardware, lumber retailers, "Big Box" home centers, industrial distributors and automotive and sporting goods retailers. The Company has received 13 U.S. patents and 11 international patents and has 5 U.S. and 9 international patents pending for design and technological innovations incorporated in its performance work gloves. The Company has 52 registered U.S. trademarks, 6 in-use U.S. trademarks, 13 U.S. trademark pending registration, 39 registered international trademarks and 43 pending international trademark. We also have 7 copyright marks.

The Company reported net losses of $3.0 million and $0.2 million for the years ended December 31, 2016 and December 31, 2015, respectively. At December 31, 2016 and 2015, the Company had an accumulated deficit of $11.5 million and $8.5 million, respectively. As of December 31, 2016, the Company has a line of credit originally due on February 23, 2017 amounting to $4.2 million and the Company's cash resources may not be sufficient to fund the payment of the line of credit. The combination of these two events raised substantial doubt on the Company's ability to continue as a going concern.

On April 11, 2017, Capital One, N.A. granted the Company an extension of the maturity date from February 28, 2017 to April 17, 2018 and elected to waive the Minimum Debt Service Coverage Ratio covenant calculated as of December 31, 2016. Capital One, N.A. also replaced the Minimum Debt Service Coverage Ratio covenants calculated as of March 31, 2017, June 30, 2017 and September 30, 2017, with a twelve month trailing adjusted EBITDAS covenant and reset the debt service charge covenant for September 30, 2017. Effective October 1, 2017, Capital One, N.A. will reduce the cap on the line of credit to $5,000,000.

Based on management forecasts, the Company believes it is probable that it will be able to perform above the required covenant levels and continue to operate within the line of credit agreement and will have sufficient resources for the measurement period one year from the date of issuance of the financials which will alleviate the substantial doubt of the Company's ability to continue as a going concern. The Company's ability to meet the forecasts is due to new sales commitments that had not existed in 2016 and reduced selling, general and administrative costs based on probable non-recurring expenses in 2016 and numerous cost cutting measures that the Company has identified and already put in place.

**2.    Accounting Policies.**

Basis of Consolidation

The consolidated financial statements include the accounts of Ironclad Performance Wear Corporation, the parent company, and its wholly owned subsidiary Ironclad California. All significant inter-company transactions have been eliminated in consolidation.

Cash and Cash Equivalents

The Company considers all highly liquid investments with original maturities of three months or less when purchased to be cash equivalents. The Company places its cash with high credit quality institutions. The Federal Deposit Insurance Company ("FDIC") insures cash amounts at each institution for up to $250,000. From time to time, the Company maintains cash in excess of the FDIC limit. The Company has not experienced any losses with respect to deposits in excess of the FDIC limit.

Accounts Receivable

The allowance for doubtful accounts for all probable uncollectible receivables is based on a combination of historical data, cash payment trends, specific customer issues, write-off trends, general economic conditions and other factors. These factors are continuously monitored by management to arrive at the estimate for the amount of accounts receivable that may be ultimately uncollectible. In circumstances where we are aware of a specific customer's inability to meet its financial obligations, we record a specific allowance for doubtful accounts against amounts due to reduce the net recognized receivable to the amount we reasonably believe will be collected. Management believes the balances for allowance for doubtful accounts at December 31, 2016 and 2015 are reasonably stated.

https://www.sec.gov/Archives/edgar/data/1301712/000072174817000261/icpw10k032917.htm                     38/74

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

| Accounts Receivable | | December 31, 2016 | | December 31, 2015 |
|---|---|---|---|---|
| Accounts receivable | $ | 7,998,513 | $ | 8,887,768 |
| Less-Allowance for doubtful accounts | | (30,000) | | (30,000) |
| Net accounts receivable | $ | 7,968,513 | $ | 8,857,768 |

Inventory

Inventory is stated at the lower of average cost (which approximates first in, first out) or market and consists primarily of finished goods. The Company regularly reviews its inventory quantities on hand and records a provision for excess and obsolete inventory based primarily on management's estimated forecast of product demand and production requirements.

Property and Equipment

Property and equipment are recorded at cost less accumulated depreciation. Depreciation is recorded using the straight-line method over the estimated useful lives of the related assets. Computers and software are depreciated over a period of 36 months. Furniture and equipment is depreciated over a period of 60 months. Leasehold improvements are depreciated over fifteen years or the lease term, whichever is shorter. Maintenance and repairs are charged to expense as incurred.

Operating Leases

Rental expense for operating leases is recognized on a straight-line basis over the term of the lease agreements including rent free periods.

Trademarks and Patents

The costs incurred to acquire trademarks and patents, which are active and relate to products with a definite life cycle, are amortized over the estimated useful life of fifteen years. Trademarks, which are active and relate to corporate identification, such as logos, are not amortized. Pending trademarks and patents are capitalized and reviewed monthly for active status. Indefinite-lived intangible assets are tested for impairment at least annually; however, these tests are performed more frequently when events or changes in circumstances indicate that the asset may be impaired. Impairment exists when carrying value exceeds fair value. The Company's fair value methodology is based on prices of similar assets or other valuation methodologies including discounted cash flow techniques. Definite-lived intangible assets are amortized over their estimated useful lives. The Company continually evaluates the reasonableness of the useful lives of these assets. Once these assets are fully amortized, they are removed from the Consolidated Balance Sheets.

*Table Of Contents*                                    36

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Long-Lived Asset Impairment

The Company periodically evaluates whether events and circumstances have occurred that indicate the remaining estimated useful life of long-lived assets may warrant revision or that the remaining balance may not be recoverable. When factors indicate that the asset should be evaluated for possible impairment, the Company uses an estimate of the undiscounted net cash flows over the remaining life of the asset in measuring whether the asset is recoverable. The carrying value of a long-lived asset group is considered impaired when the total projected undiscounted cash flows from the assets are separately identifiable and are less than its carrying value. In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair value of the long-lived asset. Based upon the anticipated future income and cash flow from operations and other factors, relevant in the opinion of the Company's management, there has been no impairment.

Operating Segment Reporting

The Company has one product line, "gloves". In previous years the Company had two product lines, "gloves" and "apparel", but as a result of the decrease in the number of performance apparel items produced and sold by the Company, the Company has determined that it has one product line. The Company's chief operating decision maker makes operating decisions and assesses performance for the "gloves" product line.

Revenue Recognition

A customer is obligated to pay for products sold to it within a specified number of days from the date that title to the products is transferred to the customer. The Company's standard terms are typically net 30 days from the transfer of title to the products to the customer, however, we have negotiated special terms with certain customers and industries. The Company typically collects payment from a customer within 30 to 60 days from the transfer of title to the products to a customer. Transfer of title occurs and risk of ownership passes to a customer at the time of shipment or delivery, depending on the terms of the agreement with a particular customer. The sale price of the Company's products is substantially fixed or determinable at the date of sale based on purchase orders generated by a customer and accepted by the Company. A customer's obligation to pay the Company for products sold to it is not contingent upon the resale of those products. The Company recognizes revenues when products are shipped or delivered to customers, based on terms of agreement with the customer and collection is reasonably assured.

In June 2016, the Company entered into a barter agreement whereby it delivered $307,837 of its inventory in exchange for future advertising credits and other items. The credits, which expire in June 2019, are valued at the lower of the Company's cost or market value of the inventory transferred. The Company has recorded barter credits of $307,837 in "Other Assets - Non-current" at December 31, 2016. Under the terms of the barter agreement, the Company is required to pay cash equal to a negotiated amount of the bartered advertising, or other items, and use the barter credits to pay the balance. These credits are charged to expense as they are used. During the twelve months ended December 31, 2016 $0 was charged to expense for barter credits used.

In Q2, Q3 and Q4 2016, the Company entered into patent licensing agreements with multiple companies. The licenses are for a fixed fee and are non-cancellable by the licensee. The Company has no significant continuing obligation with regards to the use of the patent and the license arrangements are treated as an outright sale. The total value of these agreements was $383,500. The payment terms for these licenses varied by licensee and, in one case, payments extend over a period of five years. The Company has recorded $41,980 in "Prepaid expenses and other current assets" at December 31, 2016, representing the amounts that are due and payable within twelve months of December 31, 2016. At December 31, 2016, "Other Assets - Non-current" includes $101,430 of amounts that are due and payable in periods after December 31, 2017.

*Table Of Contents*                                37

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

<u>Revenue Disclosures</u>

The Company's revenues are derived primarily from the sale of our core line of task specific work gloves, available to all of our customers, both domestically and internationally through third party distributors. Below is a table outlining this breakdown for the comparative periods:

|  | Year Ended December 31, 2016 | Year Ended December 31, 2015 |
|---|---|---|
| Domestic | $ 19,743,090 | $ 16,265,891 |
| International | 5,243,788 | 7,316,128 |
| Total | $ 24,986,878 | $ 23,582,019 |

The Company sells product directly to numerous international distributors, located on various continents. As the Company does not receive information from these distributors regarding their resellers and end user customers and their respective locations, the Company is not able to specifically disclose all the countries in which its' products are sold.

<u>Cost of Goods Sold</u>

Cost of goods sold includes all of the costs associated with producing the product by independent, third party factories (FOB costs), plus the costs of transporting, inspecting and delivering the product to our distribution warehouse in California (landed costs). Landed costs consist primarily of ocean/air freight, transport insurance, import duties, administrative charges and local trucking charges from the port to our warehouse. Purchasing, warehousing and distribution costs are reported in operating expenses on the line item entitled "Purchasing, warehousing and distribution".

<u>Product Returns, Allowances and Adjustments</u>

Product returns, allowances and adjustments is a broad term that encompasses a number of offsets to gross sales. Included herein are warranty returns of defective products, returns of saleable products and sales adjustments.

Warranty Returns - the Company has a warranty policy that covers defects in workmanship. It allows customers to return damaged or defective products to us following a customary return merchandise authorization process. Warranty returns for the years ended December 31, 2016 and 2015, were approximately $9,000 or 0.0% and $17,000 or 0.1% of net sales, respectively.

Saleable Product Returns - the Company may allow from time to time, depending on the customer and existing circumstances, stock adjustment returns, whereby the customer is given the opportunity to 'trade out' of a style of product that does not sell well in their territory, usually in exchange for another product, again following the customary return merchandise authorization process. In addition, we may allow from time to time other saleable product returns from customers for other business reasons, for example, in settlement of an outstanding accounts receivable, from a discontinued distributor customer or other customer service purpose. Saleable product returns for the years ended December 31, 2016 and 2015, were approximately $183,000 or 0.7% and $279,000 or 1.2% of net sales, respectively. Adjustments to the product returns reserve for the years ended December 31, 2016 and 2015 were approximately $0 or 0.0%, respectively.

Sales Adjustments - these adjustments include pricing and shipping corrections and periodic adjustments to the product returns reserve. Pricing and shipping corrections for the years ending December 31, 2016 and 2015 were approximately $49,000 or 0.2% and $129,000 or 0.5%, respectively.

For both warranty and saleable product returns we utilize actual historical return rates to determine our allowance for returns in each period, adjusted for unique, one-time events. Gross sales are reduced by estimated returns. We record a corresponding accrual for the estimated liability associated with the estimated returns which is based on the historical gross sales of the products corresponding to the estimated returns. This accrual is offset each period by actual product returns.

*Table Of Contents*       38

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**Reserve for Product and Warranty Returns**

| | |
|---|---:|
| Reserve Balance 12/31/14 | $    75,000 |
| Payments Recorded During the Period | (294,959) |
| | (219,959) |
| Accrual for New Liabilities During the Reporting Period | 294,959 |
| Reserve Balance 12/31/15 | 75,000 |
| Payments Recorded During the Period | (192,230) |
| | (117,230) |
| Accrual for New Liabilities During the Reporting Period | 192,230 |
| Reserve Balance 12/31/16 | $    75,000 |

Advertising and Marketing

Advertising and marketing costs are expensed as incurred. Advertising expenses for the years ended December 31, 2016 and 2015 were $580,568 and $342,403, respectively.

Shipping and Handling Costs

Freight billed to customers is recorded as sales and the related freight costs as cost of sales.

Customer Concentrations

Customer "A" accounted for approximately $957,000 or 4% of net sales for year ended December 31, 2016, Customer "B" accounted for approximately $3,764,000 or 15% of net sales for the year ended December 31, 2016 and Customer "C" accounted for approximately $8,446,000 or 34% of net sales for the year ended December 31, 2016. Customer "A" accounted for approximately $4,673,000 or 20% of net sales for year ended December 31, 2015, Customer "B" accounted for approximately $2,919,000 or 12% of net sales for the year ended December 31, 2015 and Customer "C" accounted for approximately $1,351,000 or 6% of net sales for the year ended December 31, 2015. No other customer accounted for more than 10% of net sales. All transactions were in United States dollars. There were no transaction gains or losses associated with sales transactions.

Accounts Receivable Concentrations

Customer "B" accounted for approximately $1,038,000 or 13% of accounts receivable at December 31, 2016, and Customer "C" accounted for approximately $3,058,000 or 38% of accounts receivable at December 31, 2016. Customer "B" accounted for approximately $1,372,000 or 15% of accounts receivable at December 31, 2015, Customer "C" accounted for approximately $559,000 or 6% of accounts receivable at December 31, 2015 and Customer "D" accounted for approximately $2,132,000 or 24% of accounts receivable at December 31, 2015. No other customer accounted for more than 10% of accounts receivable. All transactions were in United States dollars.

Seasonality

Our glove business generally shows an increase in sales during the third and fourth quarters due primarily to an increase in the sale of our winter glove line during this period. We typically generate approximately 60% of our glove net sales during these months. As the overall economy continues to experience pockets of recovery, our results have been positively impacted by the successful introduction of new products designed specifically for the oil and gas, safety, automotive and sporting goods industries.

Our working capital, at any particular time, reflects the seasonality of our glove business and plans to expand product lines and enter new markets. We expect inventory, accounts payable and accrued expenses to be higher in the third and fourth quarters for these reasons.

*Table Of Contents*    39

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

<u>Earnings Per Share</u>

The Company utilizes FASB ASC 260, "*Earnings per Share.*" Basic earnings per share is computed by dividing earnings available to common stockholders by the weighted-average number of common shares outstanding. Diluted earnings per share is computed similar to basic earnings per share except that the denominator is increased to include the number of additional common shares that would have been outstanding if the potential common shares had been issued and if the additional common shares were dilutive. Common equivalent shares are excluded from the computation if their effect is anti-dilutive.

The following table sets forth the calculation of the numerators and denominators of the basic and diluted per share computations for the years ended December 31:

|  | 2016 | 2015 |
|---|---|---|
| **Numerator: Net Loss** | $ (2,968,217) | $ (231,315) |
| **Denominator: Basic EPS** | | |
| Common shares outstanding, beginning of year | 81,819,809 | 80,808,629 |
| Weighted average common shares issued during the year | 1,985,058 | 1,011,180 |
| Denominator for basic earnings per common share | 83,804,867 | 81,819,809 |
| **Denominator: Diluted EPS** | | |
| Common shares outstanding, beginning of period | 81,819,809 | 80,808,629 |
| Weighted average common shares issued during the year | 1,985,058 | 1,011,180 |
| Denominator for diluted earnings per common share | 83,804,867 | 81,819,809 |

The following potential common shares have been excluded from the computation of diluted net earnings per share for the periods presented because their effect would be anti-dilutive:

|  | Year Ended December 31, | |
|---|---|---|
|  | 2016 | 2015 |
| Common Stock Warrants | 43,146 | 43,146 |
| Stock Options | 10,416,825 | 10,864,053 |

*Table Of Contents*                    40

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Income Taxes

The Company adopted the provisions of FASB ASC 740-10 effective January 1, 2007. Management considers the Company's tax positions to be routine transactions for which the law is clear and unambiguous and that there are no uncertain tax positions. Interest and penalties associated with unrecognized tax benefits would be classified as additional income taxes in the statement of operations.

Income taxes are provided for the tax effects of the transactions reported in the financial statements and consist of taxes currently due plus deferred taxes related primarily to the difference between the basis of the allowance for doubtful accounts, accumulated depreciation and amortization, accrued payroll and net operating loss carryforwards for financial and income tax reporting. The deferred tax assets and liabilities represent the future tax return consequences of those differences, which will either be taxable or deductible when the assets and liabilities are recovered or settled.

Deferred tax assets and liabilities are reflected at income tax rates applicable to the period in which the deferred tax assets or liabilities are expected to be realized or settled. As changes in tax laws or rates are enacted, deferred tax assets and liabilities are adjusted through the provision for income taxes. If it is more likely than not that some portion or all of a deferred tax asset will not be realized, a valuation allowance is recognized.

The significant components of benefit of income tax expense were federal tax expense of $1,832,000 and ($8,359) for the years ended December 31, 2016 and 2015, respectively and current state provisions of ($9,885) and $2,490, for the years ended December 31, 2016 and 2015, respectively. For the year ended December 31, 2015 we assessed the need for a valuation allowance against our deferred tax assets and concluded that it is more likely than not that we will not be able to realize more of our deferred tax asset than estimated in 2014. Accordingly, there is no adjustment to deferred taxes for 2015. For the year ended December 31, 2016, we reviewed current profitability and forecasted future results and concluded that it was more likely than not that we would not be able to realize any of our deferred tax assets. In recognition of this risk, we provided a full valuation allowance on the deferred taxes. We will continue to evaluate if it is more likely than not that we will realize the future benefits from current and future deferred tax assets. These deferred tax benefits are recorded on the balance sheet as long term deferred tax assets of $0 and $1,832,000 as of December 31, 2016 and December 31, 2015, respectively.

By statute, tax years ending in December 31, 2016 through 2011 remain open to examination by the major taxing jurisdictions to which the Company is subject.

Use of Estimates

The preparation of financial statements requires management to make a number of estimates and assumptions relating to the reporting of assets and liabilities and the disclosure of contingent assets and liabilities. Actual results could differ from those estimates. Significant estimates and assumptions made by management are used for, but not limited to, the allowance for doubtful accounts, inventory obsolescence, allowance for returns, income taxes and the estimated useful lives of assets and stock-based compensation.

*Table Of Contents*                                                41

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Fair Value Measurements

Under the accounting for fair value measurements and disclosures, a fair value hierarchy was established that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (level 1 measurements) and the lowest priority to unobservable inputs (level 3 measurements). A financial instrument's level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement.

The company uses the following valuation techniques to measure fair value for its assets and liabilities:

Level 1 – Quoted market prices in active markets for identical assets or liabilities;

Level 2 – Significant other observable inputs (e.g. quoted prices for similar items in active markets, quoted prices for identical or similar items in markets that are not active, inputs other than quoted prices that are observable such as interest rate and yield curves, and market-corroborated inputs); and

Level 3 – Unobservable inputs for the asset or liability, which are valued based on management's estimates of assumptions that market participants would use in pricing the asset or liability.

The carrying value of financial instruments reported in the accompanying consolidated balance sheets for cash, accounts receivable, line of credit, accounts payable and accrued expenses payable and other liabilities approximate fair value due to the immediate or short-term nature or maturity of these financial instruments.

Defined Contribution Plan

Obligations for contributions to defined contribution plans are expensed as the related service is provided. Prepaid contributions are recognized as an asset to the extent that a cash refund or a reduction in future payments is available. Employer match contributions to the Company's 401(k) plan, for the years ended December 31, 2016 and 2015 were $91,282 and $81,206, respectively.

Contingent Losses

We record a liability for a contingent loss when it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated.

Recently Issued Accounting Pronouncements

In May 2014, the FASB issued ASU No. 2014-09, "Revenue from Contracts with Customers." ASU 2014-09 replaces most existing revenue recognition guidance, and requires companies to recognize revenue based upon the transfer of promised goods and/or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods and/or services. In addition, the new guidance requires enhanced disclosures, including revenue recognition policies to identify performance obligations to customers and significant judgments in measurement and recognition. ASU 2014-09 is effective, as amended, for annual and interim periods beginning on or after December 15, 2017, applied retrospectively to each prior period presented or retrospectively with a cumulative effect adjustment recognized as of the adoption date. We expect to adopt the new standard on January 1, 2018, and have not yet selected a transition method. We are currently evaluating the overall impact this guidance will have on our consolidated financial statements. Based on our preliminary assessment, we do not expect the adoption of ASU 2014-09 to materially change the timing of revenue recognition and classification of transactions within our consolidated financial statements and related disclosures. We are, however, continuing our assessment, which may identify potential impacts.

*Table Of Contents*
42

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

In August 2014, the FASB issued ASU No. 2014-15, Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern ("ASU 2014-15"). ASU 2014-15 requires management to assess an entity's ability to continue as a going concern by incorporating and expanding upon certain principles that are currently in U.S. auditing standards. Specifically, the amendments (1) provide a definition of the term substantial doubt, (2) require an evaluation every reporting period including interim periods, (3) provide principles for considering the mitigating effect of management's plans, (4) require certain disclosures when substantial doubt is alleviated as a result of consideration of management's plans, (5) require an express statement and other disclosures when substantial doubt is not alleviated, and (6) require an assessment for a period of one year after the date that the financial statements are issued (or available to be issued). The new standard applies prospectively to annual periods ending after December 15, 2016, with early adoption permitted. The Company adopted ASU 2014-15 for the year ended December 31, 2016 and updated the going concern disclosure accordingly.

In April 2015, the FASB issued ASU 2015-03, *Interest – Imputation of Interest*, requiring entities to present debt issuance costs related to a debt liability as a reduction of the carrying amount of the liability. In August 2015, the FASB issued ASU 2015-15, *Interest – Imputation of Interest: Presentation and Subsequent Measurement of Debt Issuance Costs Associated with Line-of-Credit Arrangements,* to provide additional guidance pertaining to debt issuance costs related to line-of-credit arrangements. The guidance is effective for fiscal years and interim periods beginning after December 15, 2015. We adopted this standard in the first quarter of 2016. The adoption of this guidance did not have a material impact on our financial position and results of operations.

On July 22, 2015, the FASB issued ASU 2015-11, which requires entities to measure most inventory "at the lower of cost and net realizable value," thereby simplifying the current guidance under which an entity must measure inventory at the lower of cost or market (market in this context is one of three different measures). The ASU will not apply to inventories that are measured by using either the last-in, first-out (LIFO) method or the retail inventory method (RIM). For public business entities, the ASU is effective prospectively for annual periods beginning after December 15, 2016, and interim periods therein. Early application of the ASU is permitted. Upon transition, entities must disclose the nature of and reason for the accounting change. We are currently evaluating the impact this ASU will have on our financial position and results of operations.

In November 2015, the FASB issued ASU No. 2015-17, Income Taxes (Topic 740), Balance Sheet Classification of Deferred Taxes. The amendments under the new guidance require that deferred tax liabilities and assets be classified as noncurrent in a classified statement of financial position. The guidance is effective for financial statements issued for annual periods beginning after December 15, 2016, and interim periods within those annual periods. Earlier application is permitted for all entities as of the beginning of an interim or annual reporting period. The amendments in this ASU may be applied either prospectively to all deferred tax liabilities and assets or retrospectively to all periods presented. The Company adopted this guidance effective January 1, 2016 on a retrospective basis. Accordingly, we have reclassified $404,000 of deferred tax assets previously classified as current as of December 31, 2015 to non-current.

In February 2016, the FASB issued ASU No. 2016-02 amending the accounting for leases. The new guidance requires the recognition of lease assets and liabilities for operating leases with terms of more than 12 months, in addition to those currently recorded, on our consolidated balance sheets. Presentation of leases within the consolidated statements of operations and consolidated statements of cash flows will be generally consistent with the current lease accounting guidance. The ASU is effective for reporting periods beginning after December 15, 2018, with early adoption permitted. We are currently evaluating the impact the ASU will have on our financial position and results of operations.

*Table Of Contents*  43

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

In March 2016, the FASB issued ASU 2016-09, Improvements to Employee Share-Based Payment Accounting (Topic 718). This guidance will change how companies account for certain aspects of share-based payments to employees. Companies will be required to recognize the difference between the estimated and the actual tax impact of awards within the income statement when the awards vest or are settled, and additional paid-in capital ("APIC") pools will be eliminated. This ASU also impacts the classification of awards as either equity or liabilities and the classification of share-based transactions within the statement of cash flows. ASU 2016-09 is effective for annual and interim reporting periods beginning after December 15, 2016, and early adoption is permitted. We are currently evaluating the impact this ASU will have on our financial position and results of operations.

In August 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments (a consensus of Emerging Issues Task Force)*, ("ASU 2016-15") to reduce the existing diversity in practice in how certain cash receipts and cash payments are presented and classified in the statement of cash flows under Topic 230, Statement of Cash Flows, and other topics. This ASU is effective for fiscal years beginning after December 15, 2017, and interim periods therein. Early adoption is permitted. Entities will have to apply the guidance retrospectively, but if it is impracticable to do so for an issue, the amendments related to that issue would be applied prospectively. We are currently evaluating the impact this ASU will have on our financial position and results of operations.

**3. Inventory**

At December 31, 2016 and 2015 the Company had one class of inventory - finished goods.

|  | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Finished Goods | $ 8,930,864 | $ 7,229,515 |
| Reserve for Obsolescence | (197,549) | (547,800) |
| Net Inventory | $ 8,733,315 | $ 6,681,715 |

**4. Property and equipment**

Property and equipment consisted of the following:

|  | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Computer hardware and software | $ 294,117 | $ 622,264 |
| Furniture and equipment | 343,499 | 308,398 |
| Leasehold improvements | 140,718 | 174,298 |
|  | 778,334 | 1,104,960 |
| Less accumulated depreciation | (357,204) | (767,047) |
| **Property and equipment, net** | **$ 421,130** | **$ 337,913** |

Depreciation expense for the years ended December 31, 2016 and 2015 was $165,525 and $125,093, respectively.

*Table Of Contents*
44

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**5.    Trademarks and patents**

Trademarks and patents consisted of the following:

|  | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Trademarks and patents | $ 316,998 | $ 193,989 |
| Less: Accumulated amortization | (81,260) | (68,094) |
| **Trademarks, net** | $ 235,738 | $ 125,895 |

Trademarks consist of definite-lived trademarks of $239,667 and $126,890 and indefinite-lived trademarks of $77,331 and $67,099 at December 31, 2016 and 2015, respectively. All trademark costs have been generated by the Company, and consist of initial legal and filing fees.

Amortization expense was $13,166 and $9,534 for the years ended December 31, 2016 and 2015, respectively. The Company expects to amortize approximately $10,000 in each of the next five years.

**6.    Accounts payable and accrued expenses**

Accounts payable and accrued expenses consisted of the following:

|  | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Accounts payable | $ 3,005,539 | $ 574,657 |
| Accrued inventory | 523,223 | 1,894,190 |
| Accrued rebates and co-op | 540,265 | 159,227 |
| Accrued returns reserve | 75,000 | 75,000 |
| Customer deposits | — | 7,722 |
| Accrued expenses – other | 530,079 | 647,928 |
| **Total accounts payable and accrued expenses** | $ 4,674,106 | $ 3,358,724 |

**7.    Bank Lines of Credit**

<u>Bank Revolving Loan</u>

On November 28, 2014 we entered into a Revolving Loan and Security Agreement with Capital One, N.A. which currently provides a revolving loan of up to $8,000,000. The loan was due to expire on November 30, 2016. On September 16, 2015, pursuant to the terms of the agreement, we increased the line limit from $6,000,000 to $8,000,000. All advances, up to the line limit of $8,000,000, are subject to a Borrowing Base report. The term Borrowing Base means an amount equal to (a) 80% of the net amount of all eligible accounts receivable plus, (b) 50% of the value of eligible landed inventory, plus (c) 35% of eligible in-transit inventory. In addition, the outstanding principal amount of all advances against eligible inventory shall not exceed 50% of the total line limit. All of our assets secure amounts borrowed under the terms of this agreement. Interest on borrowed funds accrued at LIBOR plus 2.80% until such time as the Company's trailing twelve month EBITDAS (Earnings Before Interest, Taxes, Depreciation, Amortization and Stock compensation expense) exceeded $1,000,000 at which time the rate decreased to LIBOR plus 2.50%. The interest rate at December 31, 2016 was 3.023%. This agreement contains a Minimum Debt Service Coverage Ratio covenant and a Tangible Net Worth covenant. On March 16, 2016, the Company modified its Revolving Loan and Security Agreement with Capital One, N.A. which allowed the Company to add certain legal expenses of up to $325,000 in the calculation of EBITDAS for the trailing twelve month periods ending March 31, June 30, September 30 and December 31, 2016 and permit including certain receivables of up to $300,000 in the definition of eligible accounts receivable in determining the Borrowing Base.

*Table Of Contents*
                                    45

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

On August 9, 2016 and November 7, 2016 Capital One, N.A. also elected to waive the Minimum Debt Service Coverage Ratio covenant, calculated as of June 30, 2016 and September 30, 2016, respectively, in accordance with Section 7.15(a) of the Loan and Security Agreement. On November 7, 2016, Capital One, N.A. granted the Company 90-day extensions of the maturity date from November 30, 2016 to February 28, 2017.

On April 11, 2017, Capital One, N.A. granted the Company an extension of the maturity date from February 28, 2017 to April 17, 2018 and elected to waive the Minimum Debt Service Coverage Ratio covenant calculated as of December 31, 2016. Capital One, N.A. also replaced the Minimum Debt Service Coverage Ratio covenants calculated as of March 31, 2017, June 30, 2017 and September 30, 2017, with a twelve month trailing adjusted EBITDAS covenant and reset the debt service charge covenant for September 30, 2017. Effective October 1, 2017, Capital One, N.A. will reduce the cap on the line of credit to $5,000,000. At December 31, 2016, the Company had unused credit available under our current facility of approximately $3,751,930.

Although we were able to obtain waivers for our loan covenant violations we do not guarantee that we will meet the requirements of our covenants throughout the end of the extension period of the loan.

**8.**     **Equity transactions**

Common Stock

On February 18, 2016 the Company issued 161,291 shares of common stock upon the exercise of stock options at an exercise price of $0.09.

On May 3, 2016 the Company issued 2,000 shares of common stock upon the exercise of stock options at an exercise price of $0.09.

On May 16, 2016 the Company issued 115,000 shares of common stock upon the exercise of stock options at an exercise price of $0.09.

On May 18, 2016 the Company issued 531,854 shares of common stock upon the exercise of stock options at an exercise price of $0.09.

On June 15, 2016 the Company issued 253,000 shares of common stock upon the exercise of stock options at a range of exercise prices from of $0.24 to $0.25.

On August 16, 2016 the Company issued 500,000 shares of restricted common stock with a fair value of $0.24, vesting over a period of one year.

There were 84,500,454 shares of common stock of the Company outstanding at December 31, 2016.

*Table Of Contents*
                       46

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

<u>Warrant Activity</u>

A summary of warrant activity is as follows**:**

|  | Number of Shares | | Weighted Average Exercise Price |
|---|---|---|---|
| Warrants outstanding at December 31, 2015 | 43,146 | $ | 0.19 |
| Warrants outstanding at December 31, 2016 | 43,146 | $ | 0.19 |

<u>Stock Based Compensation</u>

The Company accounts for stock based compensation under the provisions of FASB ASC 718 *"Share-Based Payments"*.

Effective May 18, 2006, the Company reserved 4,250,000 shares of its common stock for issuance to employees, directors and consultants under its 2006 Stock Incentive Plan (the "2006 Plan"). Under the 2006 Plan, options may be granted at prices not less than the fair market value of the Company's common stock at the grant date. Options generally have a ten-year term and shall be exercisable as determined by the Company's board of directors.

Effective May 9, 2009, the Company reserved an additional 6,750,000 shares of its common stock for issuance to employees, directors and consultants under its 2006 Stock Plan.

Effective April 11, 2011, the Company reserved an additional 2,000,000 shares of its common stock for issuance to employees, directors and consultants under its 2006 Stock Plan.

Effective May 21, 2013, the Company reserved an additional 3,000,000 shares of its common stock for issuance to employees, directors and consultants under its 2006 Stock Plan.

Effective April 7, 2014, the Company reserved an additional 5,000,000 shares of its common stock for issuance to employees, directors and consultants under its 2006 Stock Plan.

The fair value of each stock option granted under either the 2000 or 2006 Plan is estimated on the date of the grant using the Black-Scholes Model. The Black-Scholes Model has assumptions for risk free interest rates, dividends, forfeitures, stock volatility and expected life of an option grant. Forfeitures are estimated at the date of the grant based on historical experience and future expectations. The risk free interest rate is based on the U.S. Treasury Bill rate with a maturity based on the expected life of the options and on the closest day to an individual stock option grant. Dividend rates are based on the Company's dividend history. The stock volatility factor is based on historical market prices of the Company's common stock. The expected life of an option grant is based on management's estimate. The fair value of each option grant is recognized as compensation expense over the vesting period of the option on a straight line basis.

For stock options issued during the years ended December 31, 2016 and 2015, the fair value of these options was estimated at the date of the grant using a Black-Scholes Model with the following range of assumptions:

|  | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Risk free interest rate | 0.51% - 1.70% | 1.54% |
| Dividends | — | — |
| Volatility factor | 70.47% - 101.00% | 133.9% |
| Expected life | 4.89 years | 6.25 years |

*Table Of Contents*
47

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

A summary of stock option activity is as follows:

| | Number of Shares | | Weighted Average Exercise Price |
|---|---|---|---|
| Outstanding at December 31, 2014 | 12,674,991 | $ | 0.16 |
| Exercised | (1,395,347) | $ | 0.09 |
| Cancelled/Expired | (1,148,924) | $ | 0.16 |
| Outstanding at December 31, 2015 | 10,130,720 | $ | 0.16 |
| Granted | 1,600,000 | $ | 0.23 |
| Exercised | (1,063,145) | $ | 0.13 |
| Cancelled/Expired | (250,750) | $ | 0.23 |
| Outstanding at December 31, 2016 | 10,416,825 | $ | 0.17 |
| Exercisable at December 31, 2016 | 7,543,901 | $ | 0.16 |

The following tables summarize information about stock options outstanding at December 31, 2016:

| Range of Exercise Price | Number Outstanding | Weighted Average Remaining Contractual Life (Years) | Weighted Average Exercise Price | Intrinsic Value Outstanding Shares |
|---|---|---|---|---|
| $0.09 - $0.27 | 10,416,825 | 5.76 | $0.17 | $1,217,756 |

The following tables summarize information about stock options exercisable at December 31, 2016:

| Range of Exercise Price | Number Exercisable | Weighted Average Remaining Contractual Life (Years) | Weighted Average Exercise Price | Intrinsic Value Exercisable Shares |
|---|---|---|---|---|
| $0.09 - $0.27 | 7,543,901 | 5.00 | $0.16 | $898,894 |

*Table Of Contents*    48

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The following tables summarize information about non-vested stock options:

| | Number of Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Non-Vested at December 31, 2014 | 5,491,868 | $ | 0.14 |
| Vested | (2,243,114) | $ | 0.13 |
| Forfeited | (633,332) | $ | 0.14 |
| Non-Vested at December 31, 2015 | 2,615,422 | $ | 0.16 |
| Granted | 1,600,000 | $ | 0.23 |
| Vested | (1,186,245) | $ | 0.14 |
| Forfeited | (156,253) | $ | 0.22 |
| Non-Vested at December 31, 2016 | 2,872,924 | $ | 0.18 |

From time to time, we issue awards of restricted common stock to board members representing common stock of the Company. Generally, the awards vest over a period of one year after the date of grant contingent upon the continued service of the recipients. Awards are valued based on the market value of the common stock at grant date and compensation expense is recognized over the vesting period. The Company granted 500,000 restricted common stock awards in 2016 and 733,333 restricted stock awards in 2015.

The following tables summarize information about non-vested stock awards:

| | Number of Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Non-Vested at December 31, 2014 | 366,667 | $ | 0.23 |
| Granted | 733,333 | $ | 0.28 |
| Vested | (733,335) | $ | 0.26 |
| Non-Vested at December 31, 2015 | 366,665 | $ | 0.23 |
| Granted | 500,000 | $ | 0.24 |
| Vested | (616,665) | $ | 0.26 |
| Non-Vested at December 31, 2016 | 250,000 | $ | 0.24 |

The Company recorded $373,506 of compensation expense for employee stock options during the year ended December 31, 2016. There was a total of $460,714 of unrecognized compensation costs related to non-vested share-based compensation arrangements under the 2000 and 2006 Option Plans outstanding at December 31, 2016. This cost is expected to be recognized over a weighted average period of 2.2 years. The total fair value of shares vested during the year ended December 31, 2016 was $324,101.

*Table Of Contents*       49

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**9.   Income Taxes**

The income tax expense for the years ended December 31, 2016 and 2015 consisted of the following:

|  | 2016 | 2015 |
|---|---|---|
| Current | $         (9,885) | $         (5,869) |
| Deferred | 1,832,000 | — |
|  | $       1,822,115 | $         (5,869) |

The provision for income taxes differs from the amount that would result from applying the federal statutory rate for the years ended December 31, 2016 and 2015 as follows:

|  | 2016 | 2015 |
|---|---|---|
| Statutory regular federal income benefit rate | 34.0% | 34.0% |
| State income taxes, net of federal benefit | 4.46 | 3.76 |
| Change in valuation allowance | (219.10) | (30.14) |
| True-up federal income tax liability | 1.35 | (1.30) |
| Other | (1.57) | (3.83) |
| Total | (180.86)% | 2.49% |

In assessing the realizability of deferred tax assets, management considers whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. Management considers the scheduled reversals of deferred tax liabilities, projected future taxable income, and tax planning strategies in making this assessment. Based upon the level of historical taxable income and projections for future taxable income over the periods which the deferred tax assets are deductible, management believes it is more likely than not the Company will not realize any of the deferred tax assets and has provided a 100% valuation allowance.

*Table Of Contents*                                    50

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

Significant components of the Company's deferred tax assets and liabilities for federal incomes taxes at December 31, 2016 and 2015 consisted of the following:

|  | 2016 | 2015 |
|---|---|---|
| Deferred tax assets |  |  |
| Net operating loss carryforward | $ 2,164,760 | $ 1,799,777 |
| Stock option expense | 1,709,965 | 1,561,198 |
| Allowance for doubtful accounts | 11,949 | 11,949 |
| Allowance for product returns | 29,873 | 29,873 |
| Inventory reserve | 78,684 | 218,189 |
| Other | 159,847 | 143,884 |
| Valuation allowance | (3,802,185) | (1,594,720) |
|  |  |  |
| Total deferred tax assets | 352,893 | 2,170,150 |
| Fixed Assets/Intangibles | (40,902) | (32,958) |
| Deferred tax liabilities – state taxes | (311,991) | (305,192) |
| Total deferred tax liabilities | (352,893) | (338,150) |
| **Net deferred tax assets** | $ — | $ 1,832,000 |

As of December 31, 2016, the Company had unused federal and state net operating loss carryforwards available to offset future taxable income of $4,885,000 and $5,701,000, respectively, that expire between 2017 and 2028.

**10.    Commitments and Contingencies**

The Company entered into a five-year lease with one option to renew for an additional five years for a corporate office and warehouse lease commencing in July 2006. The Company exercised its five-year option to renew this lease commencing in July 2011. The facility is located in El Segundo, California. As part of this renewal process we reduced our square footage by approximately 1,700 square feet of unneeded warehouse space in exchange for six months of rent concessions and approximately $40,000 for tenant improvements. Rent expense for this facility for the years ended December 31, 2016 and 2015 was $0 and $3,069, respectively. The Company has sublet this facility for the remainder of its lease term as the Company relocated to Texas.

On June 11, 2014, the Company entered into a 42-month lease for a new corporate office facility in Farmers Branch, Texas, commencing in the third quarter of 2014. The Company relocated its corporate headquarters to Texas in the third quarter. This new facility is approximately 13,026 square feet and the Company has negotiated six months of rent abatement. The monthly base rent is $7,653 plus $3,449 for common area operating expenses. A security deposit of one month's rent has been made in the amount of $11,102. As part of this process, we were granted $60,000 for tenant improvements. Rent expense attributable to this facility for the years ended December 31, 2016 and 2015 was $109,992 and $108,768, respectively.

On November 10, 2015, the Company entered into a 24-month lease for a new international sourcing office in Jakarta, Indonesia, commencing on January 1, 2016. The monthly base rent is approximately $1,200 during the first year of the lease with an increase to approximately $1,325 per month for the second year of the lease. A security deposit of three month's rent has been made in the amount of $3,730. Rent expense attributable to this facility for the years ended December 31, 2016 and 2015 was $17,736 and $0, respectively.

*Table Of Contents*                    51

2/16/2018    Case 1:18-ap-01011-MB   Doc 7 www.sec.gov/Archives/edgar/data/1301712/000072174817000261/icpw10k032917.htm Entered 02/20/18 14:09:33   Desc

Main Document    Page 65 of 115

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

The Company has various non-cancelable operating leases for office equipment expiring through August, 2019. Equipment lease expense charged to operations under these leases was $20,511 and $13,672 for the years ended December 31, 2016 and 2015, respectively.

Future minimum rental commitments under these non-cancelable operating leases for years ending December 31 are as follows:

| Year | Facility | Equipment | Total |
|------|---------:|----------:|------:|
| 2017 | $ 112,919 | $ 10,794 | $ 123,713 |
| 2018 | 16,175 | 7,329 | 23,504 |
| 2019 | - | 1,295 | 1,295 |
| | $ 129,094 | $ 19,418 | $ 148,512 |

Ironclad California executed a Consulting Agreement with Eduard Albert Jaeger, its founder and former CEO, effective in February 18, 2014. Pursuant to the terms of this two-year Consulting Agreement, Mr. Jaeger will be paid an initial base fee of $225,000 for the first year of the agreement and a base fee of $150,000 for the second year of the agreement. In addition, the Company will reimburse Mr. Jaeger for 100% of the premiums for COBRA coverage for himself and his family for the first 12 months of the agreement. The Company will also reimburse Mr. Jaeger for any travel and lodging expense incurred while rendering services to the Company. The total expense recognized in the years ended December 31, 2016 and December 31, 2015 for Mr. Jaeger's fees and COBRA was $0 and $188,314, respectively.

**Legal Proceedings.**

On September 28, 2015, Ironclad Performance Wear Corporation filed a Petition in the District Court of Dallas County, Texas, 193rd Judicial District, Cause No. DC-15-11878, against Orr Safety Corporation ("Orr"), a significant customer of the Company. The Petition alleged that Orr had materially breached an Exclusive License and Distributorship Agreement with Ironclad by, inter alia, failing to use its best efforts to actively promote, market and sell the KONG® brand of gloves manufactured by Ironclad, and selling gloves that were similar to, or competitive with, the KONG® brand. The Petition also alleged that Orr materially breached other agreements between the parties, and provided notice that Ironclad was terminating the Exclusive License and Distributorship Agreement due to Orr's material breaches. The Petition sought damages, declaratory relief regarding Ironclad's rights and obligations under the relevant agreements, and all other available relief. On October 23, 2015, Orr filed an Answer and Counterclaim in the Dallas County action, and concurrently removed the case to the United States District Court for the Northern District of Texas, Case No. 3:15-cv-03453-D. Orr's Counterclaim alleged that Ironclad breached the Exclusive License and Distributorship Agreement, as well as a Sub-Distributorship Agreement between the parties by, inter alia, infringing upon Orr's exclusive rights under the agreements, failing to pay appropriate royalties to Orr, and failing to protect the intellectual property of the KONG® brand of glove. The Counterclaim also alleged that Ironclad engaged in selling "counterfeit" KONG® products in violation of the parties' agreement. Ironclad filed an Answer to the Counterclaim on November 27, 2015 denying all material allegations. On December 7, 2015, Orr filed an Amended Answer to Ironclad's Petition responding to each of the allegations pursuant to the pleading standards in federal court. On December 3, 2015, the Court entered a Scheduling Order setting deadlines for discovery and dispositive motions. On July 13, 2016, the Company filed a motion for summary judgement.

On August 26, 2016, the Company executed a settlement agreement to settle the lawsuit. The terms of this agreement are confidential. Orr will continue to be an important distributor of the Company's products, but the Company can also sell KONG® through other distribution channels.

*Table Of Contents*
52

**IRONCLAD PERFORMANCE WEAR CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (continued)**

**11.    Subsequent Events**

On April 11, 2017, Capital One, N.A. granted the Company an extension of the maturity date from February 28, 2017 to April 17, 2018 and elected to waive the Minimum Debt Service Coverage Ratio covenant calculated as of December 31, 2016. Capital One, N.A. also replaced the Minimum Debt Service Coverage Ratio covenants calculated as of March 31, 2017, June 30, 2017 and September 30, 2017, with a twelve month trailing adjusted EBITDAS covenant and reset the debt service charge covenant for September 30, 2017. Effective October 1, 2017, Capital One, N.A. will reduce the cap on the line of credit to $5,000,000.

*Table Of Contents*                                    53

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

**Item 9A. Controls and Procedures.**

*Evaluation of Controls and Procedures*

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports under the Securities Exchange Act of 1934, as amended, or the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, including to ensure that information required to be disclosed by us in the reports filed or submitted by us under the Exchange Act is accumulated and communicated to our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act.

As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended, or the Exchange Act. Based on that evaluation, our management, including our Chief Executive Officer and our Chief Financial Officer, has identified material weaknesses in our internal control over financial reporting. As a result of these material weaknesses, management has concluded that, as of the end of the period covered by this Annual Report on Form 10-K, our internal control over financial reporting was not effective.

*Changes in Internal Controls*

During the last fiscal year, there have been no changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*Management's Report on Internal Control over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Our internal control system is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Internal control over financial reporting includes those policies and procedures that:

• pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets;

• provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and

• provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

*Table Of Contents*                                    54

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2016. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission, or COSO, in the Internal Control-Integrated Framework (2013). A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. In management's assessment of internal controls, it concluded that deficiencies exist in several key areas that, individually or in combination with one another, may not reasonably and timely detect or prevent a material misstatement in our financial reporting. Management's findings of material weaknesses are summarized below.

*Controls over Revenue Recognition*

We did not effectively ensure that there was persuasive evidence of a final sales arrangement before we recognized revenue. Specifically, the Company, outside of its' normal protocol, accepted an email from a customer to initiate a sale in lieu of a formal purchase order which was not considered persuasive evidence of an arrangement under SEC Staff Accounting Bulletin No. 104. The Company also inappropriately recognized revenues for the same customer in the incorrect period based on revised shipping term arrangements which were not reflected in accordance with the customer/supplier distribution agreement.

Management also noted a deficiency related to controls over monitoring of invoices that that were re-issued due to revisions on a customer purchase order as the offsetting reversal of the original invoice created was not keyed timely into the system, thereby overstating revenues.

As a result of these material weaknesses, management has concluded that, as of the end of the period covered by this Annual Report on Form 10-K, our internal control over financial reporting was not effective.

*Remediation of the Material Weakness in Internal Control over Financial Reporting*

In response to the identified material weaknesses, management, with Audit Committee oversight, is in the process of dedicating resources and effort to improve the effectiveness of our revenue recognition controls to prevent recurrence of these process failures. Management, with Audit Committee oversight, has begun to implement a remediation program for the remainder of 2017. To properly align the remediation process, the annual risk assessment will include a more focused attention on transaction processing and reporting.

Management believes the foregoing efforts will effectively remediate the material weaknesses. As we continue to evaluate and work to improve our internal control over financial reporting, management may take additional measures to address the material weaknesses or modify the remediation plan and will continue to review and make necessary changes to the overall design of its internal controls.

**Item 9B. Other Information.**

None.

*Table Of Contents*                                    55

## PART III

**Item 10. Directors, Executive Officers and Corporate Governance.**

The following table sets forth the name, age and position of each of our executive officers and directors as of March 22, 2017. All directors serve until the next annual meeting of stockholders or until their successors are elected and qualified. Officers are appointed by our board of directors and their terms of office are, except to the extent governed by an employment contract, at the discretion of our board of directors.

| Name | Age | Position |
|------|-----|----------|
| Jeffrey Cordes | 59 | Chief Executive Officer, Director |
| William Aisenberg | 56 | Executive Vice President, Chief Financial Officer And Secretary |
| Vane Clayton | 58 | Director |
| David Jacobs | 83 | Director |
| Michael A. DiGregorio | 62 | Director |
| Charles H. Giffen | 59 | Director |

*Jeffrey Cordes, Chief Executive Officer, Director*

Mr. Cordes has served as our Chief Executive Officer and a member of our board of directors since February 2014. He brings more than 30 years of extensive executive experience in global textiles and apparel. Mr. Cordes served as President and Chief Operating Officer of Walls Industries, Inc., a leading global company in safety and work apparel, from 2010 through 2013, and as Chief Operating Officer from 2004 to 2010. Prior to Walls, Mr. Cordes served as the Chief Executive officer of Hometown Wholesale Furniture Clubs, Inc. from 2002 to 2004 and as the Chief Operating Officer and Chief Financial Officer of e2 Communications Inc. from 2000 to 2001. Prior to e2 Communications, Mr. Cordes served as President and Chief Operating Officer and as a Director of Pillowtex Corporation (NYSE PTX), a marketer, manufacturer and importer of home textiles, from 1997 to 1999. Mr. Cordes served as Chief Financial Officer and Director of Pillowtex from 1993 to 1997. Mr. Cordes held additional Vice President positions with Pillowtex from 1984 to 1993. Mr. Cordes holds an MBA from the Cox School of Business at Southern Methodist University and an undergraduate degree in Business Administration from Hope College. Mr. Cordes' extensive executive and industry experience led to the conclusion that he should serve as a director in light of our business and structure.

*William Aisenberg, Executive Vice President, Chief Operating Officer & Secretary*

Mr. Aisenberg has served as our Executive Vice President & Chief Financial Officer since May 2014. Mr. Aisenberg, a Certified Public Accountant, brings more than 30 years of financial executive experience in apparel, consumer products, and the public accounting field. Most recently Mr. Aisenberg served as Executive Vice President and Chief Financial Officer at Walls Industries, a leading company in work, sporting and safety apparel. Prior to Walls, Mr. Aisenberg served as Vice President and Corporate Controller at Strategic Equipment and Supply Corporation. Mr. Aisenberg also has acquired cross functional experience working with other companies, including The Brinkmann Corporation, Pinnacle Trading Card Company, The Foster Grant Group and Arthur Andersen & Co. Mr. Aisenberg holds a Bachelor of Science degree in Accounting from Long Island University.

*Vane Clayton, Director*

Mr. Clayton has served on our board of directors since March 2004, and has served as our Chairman of the Board since May 2014. He currently serves as the Chairman, CEO and board member of KPA, LLC, a technology enabled services company providing environment, health and safety compliance, human resource management software and sales and finance compliance solutions to 6,000 clients in the U.S. and Canada. Mr. Clayton created liquidity for KPA's prior private equity investors in 2014 with the sale of KPA to CIVC Partners, a Chicago-based Private Equity firm. Prior to KPA, Mr. Clayton was President of ZOLL Data Systems, an Enterprise Software subsidiary of ZOLL Medical Corporation (purchased by Asahi Kasei for $2.2B in 2012). Earlier in his career, Mr. Clayton managed a sales team for Raychem ($1.7B in Sales), a division of Tyco Electronics. Mr. Clayton has experience in directing public and private companies in high growth sales and marketing strategies; new product and channel development; fund raising; Sarbanes-Oxley Section 404 compliance; strategic positioning; and building successful teams. Mr. Clayton holds a B.S. in Agricultural/Mechanical Engineering from Purdue University and an MBA from Harvard Business School.

*Table Of Contents*
     56

*David Jacobs, Director*

Mr. Jacobs has served on our board of directors since May 2012. He is the Founder (in 1978), of Spyder Active Sports, Inc., the largest specialty ski wear brand in the world with sales in 54 countries. It was purchased by Apax Partners, in 2004. Prior to Spyder, Mr. Jacobs introduced the Pearl Izumi brand of bicycling wear to the U.S. through a joint venture with the Japanese owners from 1982 to 1989. In 1972, Mr. Jacobs founded the Hot Gear children's ski wear brand. From 1966 to 1969, he was a joint venture partner with Bob Lange, the founder of the first plastic ski boot, and then served as Vice President in charge of International operations for Lange USA from 1969 to 1972. Mr. Jacobs is the winner of the Ernst & Young Entrepreneur of the Year award for the Rocky Mountain Region in 2004, and was inducted into the Boulder Business Hall of Fame in 2004. As an athlete, Mr. Jacobs was the Canadian National Downhill Champion, Head Coach of Canada's National Ski Team, and has been named to the Canadian Ski Hall of Fame, the Colorado Ski Hall of fame, and the Laurentian Ski Hall of fame. From 2001 to 2002, before the Company went public, Mr. Jacobs served on the board of directors of Ironclad Performance Wear Corporation, a California corporation and our wholly-owned subsidiary. Mr. Jacobs' extensive experience managing and growing apparel businesses make him a valuable addition to our Board of Directors in light of our business and structure.

*Michael A. DiGregorio, Director*

Mr. DiGregorio was appointed to our board of directors in January 2013 pursuant to the terms of a Settlement Agreement signed in December 2012. He has spent many years in senior financial and operating capacities in domestic and international markets. A CPA by background, he has been CFO of public and private companies, and also president of two large organizations. Thirteen of those years were spent working with private equity groups, in which he helped transform underperforming companies and helped add significant market value to those enterprises. Since early 2012, he has been developing his board and advisory practice. From mid-2009 to February 2012, he was EVP & CFO for Korn Ferry International, Inc. Previously he had been the CFO at St. John Knits and also at Jafra Cosmetics International, Inc. Mr. DiGregorio also serves as a member of the board of directors of Calavo Growers, Inc. (NASDAQ: CVGW), Lux Beauty Group Inc., Matilda Jane Clothing Co. LLC and Humantelligence, LLC. Mr. DiGregorio's experience in senior financial and operating capacities led to the conclusion that Mr. DiGregorio should serve on our board of directors in light of our business and structure.

*Charles H. Giffen, Director*

Mr. Giffen was appointed to our board of directors in January 2013 pursuant to the terms of a Settlement Agreement signed in December 2012. He is a veteran management consultant and executive coach, specializing in maximizing performance for small to mid-size businesses. Mr. Giffen holds over 30 years of broad business experience, both managing and advising a wide variety of companies in different industries and sectors (manufacturing, wholesale, service, professional), and he has worked as a management consultant for the last 15 years. Previously, Mr. Giffen served as President and Chief Operating Officer of GTCO Calcomp, Inc., a leading manufacturer of computer input peripherals and pioneer in electromagnetic digitizing technology. He has also developed entertainment ventures in cable television (New Culture Network, Inc.) and motion simulation (RideTime USA, Inc.), and managed operations for publishing and technical education companies. In addition to his other consulting activities, he currently serves as President of Contractors State License Schools (Van Nuys, CA), which provides license exam preparation and other related services at 23 locations throughout California. Mr. Giffen holds a Bachelor of Arts in Economics from the University of Maryland at College Park. Mr. Giffen's experience in optimizing operational and financial performance led to the conclusion that Mr. Giffen should serve on our board of directors in light of our business and structure.

*Table Of Contents*                57

**Audit Committee of the Board of Directors**

The Audit Committee of our board of directors currently consists of Messrs. DiGregorio (Chair) and Giffen. Our board of directors has determined that Mr. DiGregorio is an audit committee financial expert, as defined in Item 407(d)(5) of Regulation S-K, and that Messrs. DiGregorio and Giffen are "independent" as that term is defined in the applicable rules for companies traded on the NASDAQ Stock Market. Our board of directors has also determined that each other member of our Audit Committee is able to read and understand fundamental financial statements and has substantial business experience that results in such member's financial sophistication. Accordingly, our board of directors believes that each member of our Audit Committee has sufficient knowledge and experience necessary to fulfill such member's duties and obligations on our Audit Committee. The primary purposes of the Audit Committee are (i) to review the scope of the audit and all non-audit services to be performed by our independent registered public accounting firm and the fees incurred by us in connection therewith, (ii) to review the results of such audit, including the report of our independent registered accounting firm and letter of comment to management and management's response thereto, (iii) to review with our independent registered public accounting firm our internal accounting principles, policies and practices and financial reporting, (iv) to engage our independent registered public accounting firm and (v) to review our quarterly and annual financial statements prior to public issuance. The role and responsibilities of the Audit Committee are more fully set forth in a written Charter adopted by our board of directors. The Audit Committee was created by our board of directors effective May 18, 2006.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Securities Exchange Act of 1934 requires that our executive officers and directors, and persons who own more than ten percent of a registered class of our equity securities, file reports of ownership and changes in ownership with the SEC. Executive officers, directors and greater-than-ten percent stockholders are required by SEC regulations to furnish us with all Section 16(a) forms they file. Based solely on our review of the copies of the forms received by us and written representations from certain reporting persons that they have complied with the relevant filing requirements, we believe that, during the year ended December 31, 2016, all of our executive officers, directors and greater-than-ten percent stockholders complied with all Section 16(a) filing requirements other than Mr. Clayton who did not timely file two Form 4s each reporting one transaction, and Messrs. Aisenberg, Cordes, DiGregorio, Giffen and Jacobs, each of whom did not timely file one Form 4 reporting one transaction.

**Code of Ethics**

We have adopted a Code of Ethics applicable to all of our board members and to all of our employees, including our Chief Executive Officer and Principal Financial Officer. The Code of Ethics constitutes a "code of ethics" as defined by applicable SEC rules and a "code of conduct" as defined by applicable NASDAQ rules. We will provide a copy of the Code of Ethics to any person without charge, upon request by writing or calling us at:

Ironclad Performance Wear Corporation

Attn: Investor Relations

1920 Hutton Court, Suite 300

Farmers Branch, TX 75234

(972) 996-5664

Any waiver of the Code of Ethics pertaining to a member of our board of directors or one of our executive officers will be disclosed in a report on Form 8-K filed with the SEC.

*Table Of Contents*                                                 58

## Item 11. Executive Compensation.

### Summary Compensation Table

The following table sets forth, as to each individual serving as our principal executive officer, each of the other two most highly compensated executive officers and two additional individuals for whom disclosure would have been provided but for the fact that the individuals were not serving as executive officers at the end of our last completed fiscal year, whose compensation exceeded $100,000 during our last fiscal year, information concerning all compensation paid for services to us in all capacities for our last two fiscal years.

| Name and Principal Position | Year | Salary ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|
| Jeffrey Cordes [1]<br>Chief Executive Officer, President, Director | 2016<br>2015 | 300,000<br>300,000 | 61,697 | 10,600<br>10,600 | 372,297<br>310,600 |
| William Aisenberg [2]<br>Executive Vice President, Chief<br>Financial Officer, Secretary | 2016<br>2015 | 225,000<br>225,000 | 41,132<br>— | 8,795<br>9,036 | 274,927<br>234,036 |

(1) Mr. Cordes commenced employment as our Chief Executive Officer, President and a Director on February 18, 2014. The other compensation disclosed for Mr. Cordes represents 401(k) employer matching funds. Mr. Cordes' annual base salary is $300,000 and he may also receive a discretionary bonus as determined by the Compensation Committee of our board of directors. Mr. Cordes has an employment agreement with us the terms of which are discussed below. On February 18, 2014, we granted Mr. Cordes options to purchase 2,700,000 shares of our common stock, with 25% vesting on the first anniversary of the date of grant and 1/36th of the remaining amount vesting at the end of each month thereafter. On January 20, 2016, we granted Mr. Cordes options to purchase 300,000 shares of our common stock, with 25% vesting on the first anniversary of the date of grant and 1/36th of the remaining amount vesting at the end of each month thereafter. The fair value of those options was estimated on the date of grant using the Black-Scholes Model with the following weighted-average assumptions:

*Table Of Contents*

59

| Year | Risk Free Interest Rate | Volatility | Term | Dividends |
|------|------|------|------|------|
| 2014 | 2.14% | 80.90% | 6.25 years | None |
| 2016 | 1.70% | 101.00% | 6.25 years | None |

(2)   Mr. Aisenberg commenced employment as our Executive Vice President, Chief Financial Officer and Secretary on May 5, 2014. The other compensation disclosed for Mr. Aisenberg represents 401(k) employer matching funds. Mr. Aisenberg's annual base salary is $225,000 and he may also receive a discretionary bonus as determined by the Compensation Committee of our board of directors. Mr. Aisenberg has an employment agreement with us the terms of which are discussed below. On May 8, 2014, we granted Mr. Aisenberg options to purchase 1,000,000 shares of our common stock, with 25% vesting on the first anniversary of the date of grant and 1/36th of the remaining amount vesting at the end of each month thereafter. On January 20, 2016, we granted Mr. Aisenberg options to purchase 200,000 shares of our common stock, with 25% vesting on the first anniversary of the date of grant and 1/36th of the remaining amount vesting at the end of each month thereafter. The fair value of those options was estimated on the date of grant using the Black-Scholes Model with the following weighted-average assumptions:

| Year | Risk Free Interest Rate | Volatility | Term | Dividends |
|------|------|------|------|------|
| 2014 | 2.62% | 82.20% | 6.25 years | None |
| 2016 | 1.70% | 101.00% | 6.25 years | None |

**Outstanding Equity Awards at Fiscal Year End**

The following table presents information regarding outstanding options held by our named executive officers as of the end of our fiscal year ended December 31, 2016.

| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | | Number of Securities Underlying Unexercised Options (#) Unexercisable | | Option Exercise Price ($) | Option Expiration Date |
|------|------|------|------|------|------|------|
| Jeffrey Cordes | -- | (1) | 2,700,000 | (1) | 0.17 | 2/18/24 |
| | | (1) | 300,000 | (1) | 0.27 | 1/20/26 |
| | | | | | | |
| William Aisenberg | -- | (2) | 1,000,000 | (2) | 0.19 | 5/8/24 |
| | | (2) | 200,000 | (2) | 0.27 | 1/20/26 |

(1)   Mr. Cordes was granted options to purchase 2,700,000 shares on 2/18/14, 25% vested on the first anniversary of the effective date of grant and 1/36th of the remaining amount of shares vest at the end of each month thereafter. On January 20, 2016, Mr. Cordes was granted options to purchase 300,000 shares of our common stock, with 25% vesting on the first anniversary of the date of grant and 1/36th of the remaining amount vesting at the end of each month thereafter.

(2)   Mr. Aisenberg was granted options to purchase 1,000,000 shares on 5/8/14, 25% vested on the first anniversary of the effective date of grant and 1/36th of the remaining amount of shares vest at the end of each month thereafter. On January 20, 2016, Mr. Aisenberg was granted options to purchase 200,000 shares of our common stock, with 25% vesting on the first anniversary of the date of grant and 1/36th of the remaining amount vesting at the end of each month thereafter.

*Table Of Contents*
60

None of the executive officers listed in the above table exercised options during the fiscal year ended December 31, 2016.

**Director Compensation**

The following table presents information regarding compensation paid to our non-employee directors for our fiscal year ended December 31, 2016.

| Name | Fees Earned or Paid in Cash ($) | Restricted Share Awards ($) | Total ($) |
|---|---|---|---|
| Vane Clayton | 42,000 | 40,000 | 82,000 |
| Michael DiGregorio | 36,000 | 32,000 | 68,000 |
| Charles Giffen | 30,000 | 24,000 | 54,000 |
| David Jacobs | 30,000 | 24,000 | 54,000 |
| Patrick O'Brien [1] | 18,000 | - | 18,000 |
| R. D. Pete Bloomer [1] | 15,000 | - | 15,000 |

(1)    Term ended June 27, 2016.

The following non-employee directors listed in the above table exercised options during the fiscal year ended December 31, 2016:

| Name | # Options Exercised | Exercise Price | Total |
|---|---|---|---|
| R. D. Pete Bloomer | 161,291 | $ 0.09 | $ 14,516.19 |
| Vane Clayton | 31,854 | $ 0.09 | $ 2,866.86 |

In 2015 and 2016, non-employee directors of Ironclad received $30,000 per year, payable in four quarterly installments of $7,500 each, and a grant of 100,000 shares of restricted Common Stock, vesting quarterly in four equal installments, for attending meetings and serving on Ironclad's board of directors. In addition, the Chairman of the Board received an additional $12,000 per year, payable in four quarterly installments of $3,000 each, and a grant of 66,667 shares of restricted Common Stock, vesting quarterly in four equal installments. Also, committee chairs received an additional $6,000 per year, payable in four quarterly installments of $1,500 each, and a grant of 33,333 shares of restricted Common Stock, vesting quarterly in four equal installments. Compensation payable to non-employee directors may be adjusted from time to time, as approved by our board of directors.

**Service Contracts**

Except as described in this section, neither our company nor Ironclad California is party to any employment agreements with any of its executive officers.

*Table Of Contents*                          61

On February 18, 2014, we entered into an offer letter with Jeffrey Cordes, amended effective January 1, 2017, pursuant to which Mr. Cordes will serve as our Chief Executive Officer and a member of our board of directors. Mr. Cordes will receive an annual salary of $300,000 and was eligible to receive an incentive bonus for fiscal 2014 of $125,000 based upon our company achieving revenue and operating income (defined as earnings before interest, taxes, depreciation, amortization and stock compensation expense) targets, and based upon Mr. Cordes and/or our company achieving certain corporate objectives, as determined by our board of directors with input from Mr. Cordes within 30 days following the commencement of Mr. Cordes employment. No bonus was earned for fiscal 2014. In the event that Mr. Cordes' employment is terminated by the us (other than for cause) (A) within 9 months following a sale of the company (i) by the Company other than for cause or (ii) by Mr. Cordes for good reason, the Company shall (1) pay in a lump sum payment of 2 times Mr. Cordes' then-current base salary, such payment to be made within 20 days following the termination date, and (2) to the extent Mr. Cordes is eligible and elects continuation coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA") under a health, dental, or vision plan sponsored by the Company, within the time period prescribed pursuant to COBRA, reimburse Mr. Cordes, as and when due to the COBRA carrier, for the COBRA premiums for such coverage (at the coverage levels in effect immediately prior to Mr. Cordes' termination of employment) until the earliest to occur of (a) a period of twenty-four (24) months following the effective date of such termination, (b) the date upon which Mr. Cordes becomes eligible for coverage under a health, dental, or vision insurance plan of a subsequent employer and (c) the date Mr. Cordes ceases to be eligible for COBRA coverage; or (B) at any other time during the term of Mr. Cordes' employment, the Company shall continue to pay Mr. Cordes' then-current base salary for a period of six (6) months following the effective date of such termination.

On May 5, 2014, we entered into an offer letter with William Aisenberg, amended effective January 1, 2017, pursuant to which Mr. Aisenberg will serve as our Executive Vice President and Chief Financial Officer. Mr. Aisenberg will receive an annual salary of $225,000 and was eligible to receive an incentive bonus for fiscal 2014 of 30% of his annual salary based upon our company achieving revenue and operating income (defined as earnings before interest, taxes, depreciation, amortization and stock compensation expense) targets, and based upon Mr. Aisenberg and/or our company achieving certain corporate objectives, as determined by our board of directors with input from Mr. Aisenberg within 30 days following the commencement of Mr. Aisenberg's employment. No bonus was earned for fiscal 2014. In the event that Mr. Aisenberg's employment is terminated by us (other than for cause) (A) within 9 months following a sale of the company (i) by the Company other than for cause or (ii) by Mr. Aisenberg for good reason, the Company shall (1) pay in a lump sum payment of 2 times Mr. Aisenberg's then-current base salary, such payment to be made within 20 days following the termination date, and (2) to the extent Mr. Aisenberg is eligible and elects continuation coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA") under a health, dental, or vision plan sponsored by the Company, within the time period prescribed pursuant to COBRA, reimburse Mr. Aisenberg, as and when due to the COBRA carrier, for the COBRA premiums for such coverage (at the coverage levels in effect immediately prior to Mr. Aisenberg's termination of employment) until the earliest to occur of (a) a period of twenty-four (24) months following the effective date of such termination, (b) the date upon which Mr. Aisenberg becomes eligible for coverage under a health, dental, or vision insurance plan of a subsequent employer and (c) the date Mr. Aisenberg ceases to be eligible for COBRA coverage; or (B) at any other time during the term of Mr. Aisenberg's employment, the Company shall continue to pay Mr. Aisenberg's then-current base salary for a period of six (6) months following the effective date of such termination.

*Table Of Contents*                62

**2006 Stock Incentive Plan**

Our 2006 Stock Incentive Plan, or the Plan, was adopted on September 18, 2006 and became effective on January 12, 2007. A total of 21,000,000 shares of common stock were reserved for issuance upon exercise of awards granted under the Plan, as amended. Any shares of common stock subject to an award, which for any reason expires or terminates unexercised, were again available for issuance under the Plan.

The Plan terminated on May 18, 2016.

The Plan is administered by our board of directors or the Compensation Committee of our board of directors as determined by our board of directors or otherwise permitted under the Plan. Our board of directors has the authority to set the terms, conditions and provisions of outstanding awards, to cancel or suspend outstanding awards under certain conditions, and to accelerate the exercisability of outstanding awards. Our board of directors is authorized to interpret the Plan, to establish, amend, and rescind any rules and regulations relating to the plan, to determine the terms of agreements entered into with recipients under the Plan, and to make all other determinations that may be necessary or advisable for the administration of the Plan.

Subject to approval of our board of directors, options may be exercised by payment of the exercise price in cash, shares of common stock, which have been held for at least six months, or pursuant to a "cashless exercise" through a broker-dealer under an arrangement approved by us. Our board of directors may require the grantee to pay to us any applicable withholding taxes that the company is required to withhold with respect to the grant or exercise of any award. The withholding tax may be paid in cash or, subject to applicable law, our board of directors may permit the grantee to satisfy these obligations by the withholding or delivery of shares of common stock. We may withhold from any shares of common stock that may be issued pursuant to an option or from any cash amounts otherwise due from the company to the recipient of the award an amount equal to such taxes.

Stock purchase rights are generally treated similar to stock options with respect to exercise/purchase price, exercisability and vesting.

In the event of any change affecting the shares of common stock by reason of any stock dividend or split, recapitalization, merger, consolidation, spin-off, combination or exchange of shares or other similar corporate change, or any distribution to stockholders other than cash dividends, our board of directors will make such substitution or adjustment in the number of shares underlying outstanding options and the per share option price (or exercise or purchase price, if applicable) as it deems to be appropriate in order to maintain the purpose of the original grant.

No option is assignable or otherwise transferable by the grantee other than by will or the laws of descent and distribution and, during the grantee's lifetime, an option may be exercised only by the grantee.

If a grantee's service to the company terminates on account of death, disability or retirement, then the grantee's unexercised options, if exercisable immediately before the grantee's death, disability or retirement, may be exercised in whole or in part, not later than one year after this event. If a grantee's service to the company terminates for cause, then the grantee's unexercised option terminates effective immediately upon such termination. If a grantee's service to us terminates for any other reason, then the grantee's unexercised options, to the extent exercisable immediately before such termination, will remain exercisable, and may be exercised in whole or in part, for a period of three months after such termination of employment.

*Table Of Contents*                                       63

Under the Plan, the occurrence of a "Change in Control" can affect options and other awards granted under the plan. Generally, the Plan defines a "Change in Control" to include the consummation of a merger or consolidation with or into another entity or any other corporate reorganization, if more than 80% of the combined voting power of the continuing or surviving entity's securities outstanding immediately after the merger, consolidation or other reorganization is owned, directly or indirectly, by persons who were not our stockholders immediately before the merger, consolidation or other reorganization, except that in making the determination of ownership by our stockholders, immediately after the reorganization, equity securities that persons own immediately before the reorganization as stockholders of another party to the transaction will be disregarded. For these purposes voting power will be calculated by assuming the conversion of all equity securities convertible (immediately or at some future time) into shares entitled to vote, but not assuming the exercise of any warrants or rights to subscribe to or purchase those shares. "Change in Control" also includes the sale, transfer or other disposition of all or substantially all of our assets. A transaction will not constitute a Change in Control if its sole purpose is to change the state of our incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held our securities immediately before such transaction.

If a "Change in Control" were to occur, our board of directors would determine, in its sole discretion, whether to accelerate any unvested portion of any option grant. Additionally, if a Change in Control were to occur, any agreement between us and any other party to the Change in Control could provide for (i) the continuation of any outstanding awards, (ii) the assumption of the Plan or any awards by the surviving corporation or any of its affiliates, (iii) cancellation of awards and substitution of other awards with substantially the same terms or economic value as the cancelled awards, or (iv) cancellation of any vested or unvested portion of awards, subject to providing notice to the option holder.

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.

The following table presents information regarding the beneficial ownership of our common stock as of March 22, 2017 by:

- each of our executive officers;
- each of our directors;
- all of our directors and executive officers as a group; and
- each stockholder known by us to be the beneficial owner of more than 5% of our common stock.

Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Unless otherwise indicated below, to our knowledge, the persons and entities named in the table have sole voting and sole investment power with respect to all shares beneficially owned, subject to community property laws where applicable. Shares of our common stock subject to options or warrants that are currently exercisable or exercisable within 60 days of March 22, 2017 are deemed to be outstanding and to be beneficially owned by the person holding the options or warrants for the purpose of computing the percentage ownership of that person but are not treated as outstanding for the purpose of computing the percentage ownership of any other person.

The information presented in this table is based on 85,646,354 shares of our common stock outstanding on April 7, 2017. Unless otherwise indicated, the address of each of the executive officers and directors and 5% or more stockholders named below is c/o Ironclad Performance Wear Corporation, 1920 Hutton Court, Suite 300, Farmers Branch, Texas 75234.

*Table Of Contents*                    64

| Name of Beneficial Owner | Number of Shares Beneficially Owned | Percentage of Shares Outstanding |
|---|---|---|
| **Executive Officers and Directors:** | | |
| Jeffrey Cordes (1) | 2,947,373 | 3.4% |
| Chief Executive Officer, Director | | |
| William Aisenberg (2) | 2,746,173 | 3.2% |
| Chief Financial Officer, Executive Vice President, Secretary | | |
| Vane Clayton (3) | 1,899,696 | 2.2% |
| Director | | |
| David Jacobs (4) | 954,310 | 1.1% |
| Director | | |
| Michael DiGregorio (5) | 1,100,809 | 1.3% |
| Director | | |
| Charles Giffen (6) | 619,577 | * |
| Director | | |
| Directors and officers as a group (6 persons) (7) | 10,267,938 | 11.4% |
| **5% Shareholders:** | | |
| Ronald Chez | 7,535,791 | 8.8% |
| Scott Jarus | 7,299,700 | 8.5% |
| Kenneth J. Frank | 5,842,951 | 6.8% |

\* Less than 1%

(1) Includes 2,293,750 shares of common stock reserved for issuance upon exercise of stock options which currently are exercisable or will become exercisable within 60 days of April 7, 2017.

(2) Includes 12,000 shares held by Mr. Aisenberg's son and 816,667 shares of common stock reserved for issuance upon exercise of stock options which currently are exercisable or will become exercisable within 60 days of April 7, 2017.

(3) Consists of (i) 833,884 shares of common stock held directly, (ii) 198,521 shares of common stock held by Clayton Wyoming, LLC, of which Mr. Clayton is the manager and as such has voting and investment power, and (iii) 867,291 shares of common stock reserved for issuance upon exercise of stock options which currently are exercisable or will become exercisable within 60 days of April 7, 2017.

(4) Includes 306,000 shares of common stock reserved for issuance upon exercise of stock options which currently are exercisable or will become exercisable within 60 days of April 7, 2017.

(5) Consists of (i) 748,309 shares of common stock held directly, (ii) 120,000 shares of common stock held by M. DiGregorio and A. DiGregorio trustees of the DiGregorio Revocable Trust, and (iii) 232,500 shares of common stock reserved for issuance upon exercise of stock options which currently are exercisable or will become exercisable within 60 days of April 7, 2017.

(6) Includes 232,500 shares of common stock reserved for issuance upon exercise of stock options which currently are exercisable or will become exercisable within 60 days of April 7, 2017.

(7) Includes 4,748,708 shares of common stock reserved for issuance upon exercise of stock options which currently are exercisable or will become exercisable within 60 days of April 7, 2017.

*Table Of Contents*                    65

**Equity Compensation Plan Information**

The following table sets forth information concerning our equity compensation plans as of December 31, 2016.

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|---|
| Equity compensation plans approved by security holders (2000 Stock Incentive Plan) | 406,795 | (1) $ | 0.09 | - |
| Equity compensation plans approved by security holders (2006 Stock Incentive Plan) | 10,510,030 | (2) $ | 0.168 | 3,007,648 |
| Equity compensation plans not approved by security holders (Warrants) | 43,146 | (3) $ | 0.185 | - |
| **Total** | 10,959,971 | $ | 0.165 | 3,007,648 |

(1) This number represents options assumed in connection with the merger with Ironclad California.

(2) This number represents stock options to purchase 10,510,030 shares of our common stock under the 2006 Stock Incentive Plan, or the Plan.

(3) This number represents warrants issued to purchase 43,146 shares of our common stock in exchange for services. This warrant has no expiration.

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

**Transactions with Officers and Directors**

Other than the transactions described below, since January 1, 2016, there has not been, nor is there currently proposed, any transaction or series of similar transactions to which we were or will be a party:

·    in which the amount involved exceeds the lesser of $120,000 or one percent of the average of our total assets at year end for the last two completed fiscal years; and

·    in which any director, executive officer, stockholder who beneficially owns 5% or more of our common stock or any member of their immediate family had or will have a direct or indirect material interest.

**Director Independence**

Our board of directors currently consists of five members: Messrs. Clayton, Cordes, DiGregorio, Giffen and Jacobs. We are not a "listed issuer" under SEC rules. We believe that Messrs. Clayton, DiGregorio, Giffen and Jacobs are "independent" as that term is defined in the applicable rules for companies traded on the NASDAQ Stock Market.

*Table Of Contents*
66

**Item 14. Principal Accounting Fees and Services.**

Aggregate fees for professional services rendered by BDO USA, LLP for the years ended December 31, 2016 and December 31, 2015, are set forth below.

|  | 2016 | 2015 |
|---|---|---|
| Audit Fees | $ 248,000 | $ 118,000 |
| Audit-Related Fees | — | — |
| Tax Fees | 14,800 | 14,510 |
| Total Auditor Fees | $ 262,800 | $ 132,500 |

*Audit Fees*

The audit fees for the years ended December 31, 2016 and December 31, 2015 were for professional services rendered by BDO USA, LLP. Audit fees relate to professional services rendered in connection with the audit of the Company's consolidated annual financial statements, quarterly review of consolidated financial statements included in the Company's Quarterly Reports on Form 10-Q and audit services provided in connection with other statutory and regulatory filings.

*Audit-Related Fees*

There were no fees for audit-related services for the years ended December 31, 2016 and 2015. Audit-related services principally include accounting consultations.

*Tax Fees*

Fees were incurred totaling approximately $20,400 during the years ended December 31, 2016 and 2015, respectively for tax services, including for tax compliance, tax advice and tax planning. The tax services were provided by Huselton, Morgan & Maultsby and BDO USA, LLP during the years ended December 31, 2016 and December 31, 2015.

*All Other Fees*

No other fees were incurred during the years ended December 31, 2016 and 2015 for services provided by BDO USA, LLP, except as described above.

**Audit Committee Pre-Approval Policy**

The Audit Committee is responsible for appointing, setting the compensation for and overseeing the work of our independent registered public accounting firm. In recognition of this responsibility, the Audit Committee is required to approve all audit and non-audit services performed by our independent registered public accounting firm in order to assure that the provision of these services does not impair the independent auditor's independence; except that the Chairman of the Audit Committee has discretion to unilaterally engage accounting professionals previously approved by the Audit Committee to perform additional services, provided that the cost of such services does not exceed certain predetermined amounts.

The Audit Committee specifically approved all audit and non-audit services performed by our independent accountants in 2016.

*Table Of Contents*                    67

## PART IV

**Item 15. Exhibits, Financial Statement Schedules.**

The financial statements filed as part of this Annual Report on Form 10-K are listed on page 25.

The following exhibits are filed with this Annual Report on Form 10-K:

| Exhibit Number | Exhibit Title |
|---|---|
| 3.1.1 | Articles of Domestication of the Registrant.  Incorporated by reference to Exhibit 3.1 to our Registration Statement on Form SB-2 (File No. 333-118808), filed September 3, 2004. |
| 3.1.2 | Certificate of Change effecting a forward stock split and increasing the number of authorized shares, filed May 9, 2006.  Incorporated by reference to Exhibit 3.2 to our Current Report on Form 8-K (File No. 000-51365), filed May 12, 2006. |
| 3.1.3 | Articles of Merger effecting a name change to the Registrant.  Incorporated by reference to Exhibit 3.3 to our Current Report on Form 8-K (File No. 000-51365), filed May 12, 2006. |
| 3.2 | Amended and Restated Bylaws.  Incorporated by reference to Exhibit 3.2 to our Current Report on Form 8-K (File No. 000-51365), filed March 7, 2014. |
| 4.1.1 | Articles of Domestication of the Registrant.  Incorporated by reference to Exhibit 3.1 to our Registration Statement on Form SB-2 (File No. 333-118808), filed September 3, 2004. |
| 4.1.2 | Certificate of Change effecting a forward stock split and increasing the number of authorized shares, filed May 9, 2006.  Incorporated by reference to Exhibit 3.2 to our Current Report on Form 8-K (File No. 000-51365), filed May 12, 2006. |
| 4.1.3 | Articles of Merger effecting a name change to the Registrant.  Incorporated by reference to Exhibit 3.3 to our Current Report on Form 8-K (File No. 000-51365), filed May 12, 2006. |
| 4.2 | Amended and Restated Bylaws.  Incorporated by reference to Exhibit 3.2 to our Current Report on Form 8-K (File No. 000-51365), filed March 15, 2012. |
| 4.3 | 2006 Stock Incentive Plan.  Incorporated by reference to Exhibit 99.1 to our Registration Statement on Form S-8 (File No. 333-145855), filed September 4, 2007. |
| 4.4 | Amendment No. 1 Ironclad Performance Wear Corporation's 2006 Stock Incentive Plan.  Incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K (File No. 000-51365), filed May 11, 2009. |
| 4.5 | Amendment No. 2 to Ironclad Performance Wear Corporation's 2006 Stock Incentive Plan.  Incorporated by reference to Appendix A to our Definitive Proxy Statement on Schedule 14A (File No. 000-51365), filed April 18, 2011. |
| 4.6 | Amendment No. 3 to Ironclad Performance Wear Corporation's 2006 Stock Incentive Plan.  Incorporated by reference to Appendix A to our Definitive Proxy Statement on Schedule 14A (File No. 000-51365), filed April 5, 2013. |
| 4.7 | Amendment No. 4 to Ironclad Performance Wear Corporation's 2006 Stock Incentive Plan.  Incorporated by reference to Appendix A to our Definitive Proxy Statement on Schedule 14A (File No. 000-51365), filed April 9, 2014. |

*Table Of Contents*                68

| 10.1† | Form of Indemnification Agreement. Incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K (File No. 000-51365), filed December 21, 2012. |
| 10.2† | Separation Agreement between Eduard Albert Jaeger and the Registrant. Incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K (File No. 000-51365), filed May 12, 2006. |
| 10.3 | Letter Agreement with Advantage Media Systems, Inc., dated June 29, 2007. Incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K (File No. 000-51365), filed July 6, 2007. |
| 10.4* | Exclusive License and Distributorship Agreement dated January 6, 2009, between the Registrant and Orr Safety Corporation. Incorporated by reference to Exhibit 10.1 to our Quarterly Report on Form 10-Q (File No. 000-51365), filed May 15, 2009. |
| 10.5† | Offer Letter dated February 3, 2014 issued by Ironclad Performance Wear Corporation to Jeffrey Cordes. Incorporated by reference to Exhibit 10.1 to our Quarterly Report on Form 10-Q (File No. 000-51365), filed May 13, 2014. |
| 10.6† | Offer Letter dated February 18, 2014 issued by Ironclad Performance Wear Corporation to K. Bryan Griggs. Incorporated by reference to Exhibit 10.15 to our Annual Report on Form 10-K (File No. 000-51365), filed March 16, 2015. |
| 10.7† | Offer Letter dated April 22, 2014 issued by Ironclad Performance Wear Corporation to William Aisenberg. Incorporated by reference to Exhibit 10.1 to our Quarterly Report on Form 10-Q (File No. 000-51365), filed August 13, 2014. |
| 10.8 | Industrial Multi-Tenant Lease dated June 11, 2014, between Ironclad Performance Wear Corporation and 6400 Broadway L.L.L.P. Incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K (File No. 000-51365) filed June 17, 2014. |
| 10.9 | Form of Subscription Agreement. Incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K (File No. 000-51365), filed August 25, 2014. |
| 10.10 | Form of Lock-Up Agreement. Incorporated by reference to Exhibit 10.2 to our Current Report on Form 8-K (File No. 000-51365), filed August 25, 2014. |
| 10.11* | Revolving Loan and Security Agreement dated November 28, 2014, among Ironclad Performance Wear Corporation, a California corporation, Ironclad Performance Wear Corporation, a Nevada corporation and Capital One, N.A. Incorporated by reference to Exhibit 10.20 to our Annual Report on Form 10-K (File No. 000-51365), filed March 16, 2015. |
| 10.12 | Revolving Line of Credit Note issued by Ironclad Performance Wear Corporation, a California corporation, and Ironclad Performance Wear Corporation, a Nevada corporation, to Capital One, N.A. Incorporated by reference to Exhibit 10.1 to our Quarterly Report on Form 10-Q (File No. 000-51365), filed May 11, 2015. |
| 10.13* | Settlement Agreement dated August 26, 2016, between Ironclad Performance Wear Corporation and ORR Safety Corporation. Incorporated by reference to Exhibit 10.1 to our Quarterly Report on Form 10-Q (File No. 000-51365) filed November 14, 2016 |
| 21.1 | Subsidiaries of the Registrant. Incorporated by reference to Exhibit 21.1 to our Current Report on Form 8-K (File No. 000-51365), filed May 12, 2006. |
| 23.1 | Consent of BDO USA, LLP |
| 24.1 | Power of Attorney (included on signature page). |
| 31.1 | Certification of Principal Executive Officer pursuant to Securities Exchange Act Rules 13a-14(a) and 15d-14(a) as adopted pursuant to section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of Principal Financial Officer pursuant to Securities Exchange Act Rules 13a-14(a) and 15d-14(a) as adopted pursuant to section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1** | Certification of Principal Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2** | Certification of Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002. |

*Table Of Contents*     69

| 101.INS | XBRL Instance. |
| 101.SCH | XBRL Taxonomy Extension Schema. |
| 101.CAL | XBRL Taxonomy Extension Calculation. |
| 101.DEF | XBRL Taxonomy Extension Definition. |
| 101.LAB | XBRL Taxonomy Extension Labels. |
| 101.PRE | XBRL Taxonomy Extension Presentation. |

† Each a management contract or compensatory plan or arrangement required to be filed as an exhibit to this report on Form 10-K.

* Confidential treatment has been requested with respect to certain portions of this exhibit. Omitted portions have been filed separately with the Securities and Exchange Commission.

** Furnished herewith.

**Item 16.**          **Form 10-K Summary**

None

*Table Of Contents*                                        70

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

### IRONCLAD PERFORMANCE WEAR CORPORATION

Date: April 17, 2017

| | /s/ William Aisenberg |
|---|---|
| By: | William Aisenberg |
| Its: | Executive Vice President and Chief Financial Officer |

### POWER OF ATTORNEY

The undersigned directors and officers of Ironclad Performance Wear Corporation do hereby constitute and appoint Jeffrey Cordes and William Aisenberg, and each of them, with full power of substitution and resubstitution, as their true and lawful attorneys and agents, to do any and all acts and things in our name and behalf in our capacities as directors and officers and to execute any and all instruments for us and in our names in the capacities indicated below, which said attorney and agent, may deem necessary or advisable to enable said corporation to comply with the Securities Exchange Act of 1934, as amended and any rules, regulations and requirements of the Securities and Exchange Commission, in connection with this Annual Report on Form 10-K, including specifically but without limitation, power and authority to sign for us or any of us in our names in the capacities indicated below, any and all amendments (including post-effective amendments) hereto, and we do hereby ratify and confirm all that said attorneys and agents, or either of them, shall do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Jeffrey Cordes<br>Jeffrey Cordes | Chief Executive Officer and Director<br>(Principal Executive Officer) | April 17, 2017 |
| /s/ William Aisenberg<br>William Aisenberg | Executive Vice President and<br>Chief Financial Officer<br>(Principal Financial and Accounting Officer) | April 17, 2017 |
| /s/ David Jacobs<br>David Jacobs | Director | April 17, 2017 |
| /s/ Vane Clayton<br>Vane Clayton | Director | April 17, 2017 |
| /s/ Michael DiGregorio<br>Michael DiGregorio | Director | April 17, 2017 |
| /s Charles Giffen<br>Charles Giffen | Director | April 17, 2017 |

*Table Of Contents*                                          71

**Exhibit "3"**

*Ironclad Performance Wear*
*2201 Park Place, Suite 101*
*El Segundo, California 90245*

February 3, 2014

Jeff Cordes
1570 Bent Creek Drive
Southlake, Texas 76092

Dear Jeff:

Ironclad Performance Wear Corp. (the "***Company***") is pleased to offer you employment on the following terms:

1. **Position.** You will serve in a full-time capacity as Chief Executive Officer of the Company, and so long as you serve in that capacity, will have a position on the Board of Directors of the Company (the "***Board***"). You will report directly to the Board. Your primary duties will be those normally and customarily vested in the office of Chief Executive Officer of a corporation, subject to the supervision, direction and control of the Board. By signing this letter agreement, you represent and warrant to the Company you are under no contractual commitments inconsistent with your obligations to the Company.

2. **Salary and Bonus.** You will be paid a salary at the annual rate of $300,000, payable in semi-monthly installments in accordance with the Company's standard payroll practices for salaried employees. Your pay will be reviewed annually by the Board. Your pay will be subject to adjustment pursuant to the Company's employee compensation policies in effect from time to time. You will also have the opportunity to earn an incentive bonus of $125,000 (with upside potential with over-achievement of the corporate objectives) based upon the Company's achieving its stated revenue and Operating Income (Operating Income is defined as Earnings before interest, tax, depreciation, amortization, and stock option expense) targets, and upon you and or the Company achieving certain stated corporate objectives. The actual bonus plan will be completed with your input within 30 days of the commencement date of your employment. Your earned bonus will be paid based upon the results of 2014, with 50% paid in cash on or before the end of Q1 2015 and 50% paid in restricted stock. The restricted stock will be granted, if the bonus is earned, at the end of Q1 2015, and 50% of such grant (the "***Unvested Portion***") shall be subject to a risk of forfeiture until such time as the Board reasonably determines that the 2015 performance will surpass the 2014 performance for revenue and Operating Income, and upon such determination, the Unvested Portion shall become fully vested. If the Board has not made the determination that 2015 performance for revenue and Operating Income will surpass the same for 2014 on or before December 31, 2015, the Unvested Portion shall become forfeited. You will be responsible for making your own determination as to whether you will make an 83(b) election with respect to the Unvested Portion and pay income tax on the Unvested Portion at the fair market value thereof on the date of grant, or wait until the Unvested Portion becomes fully vested, and pay income tax on the Unvested Portion at the fair market value thereof on the date of vesting.

Jeff Cordes
February 3, 2014
Page 2

3. **Stock Options**. Subject to the approval of the Company's Board of Directors or its Compensation Committee, you will be granted an option to purchase 2,700,000 shares of the Company's Common Stock. The exercise price per share will be equal to the fair market value per share on the last trading date prior to your first day of employment, which will be the date the option is actually granted. The option will be subject to the terms and conditions applicable to options granted under the Company's Stock Incentive Plan, as described in that Plan and the applicable stock option agreement. You will vest in 25% of the option shares after 12 months of continuous service, and the balance will vest in monthly installments over the next 36 months of service, as described in the applicable stock option agreement. In the event there is a sale of the Company to an unaffiliated third party buyer (provided that a "going private" transaction or private equity investment or purchase of equity interests in the Company shall not be considered a "sale" even if it might constitute a "change in control"), during the term of your employment, your unvested stock options shall be vested immediately prior to such sale. In the event there is a "going private" transaction or private equity investment or purchase of equity interests in the Company that is not considered a "sale," during the term of your employment, ***and*** if your employment with the Company is terminated by the Company for any reason other than "cause" (as defined below) within 6 months thereafter, your unvested stock options shall be vested immediately upon such termination.

4. **Employment Benefits**. During your employment, you shall be eligible to participate in all operative employee benefit and welfare plans of the Company then in effect from time to time and in respect of which all executive officers of the Company generally are entitled to participate, including, to the extent then in effect, group life, medical, disability and other insurance plans, all on the same basis applicable to employees of the Company who are senior executive officers. You shall also be entitled to vacation benefits commensurate with that provided to senior executive officers, and reimbursement of all business expenses in accordance with the Company's policies on expense reimbursement. We understand that you will be commuting to California from your home in Texas. The Company agrees to pay the reasonable costs of your commute and lodging in California, pursuant to arrangements to be determined between you and the Company.

5. **Proprietary Information and Inventions**. Like all Company employees, you will be required, as a condition to your employment with the Company, to sign the Company's standard Employee Proprietary Information and Inventions Agreement, a copy of which is attached hereto as Exhibit A.

6. **Period of Employment**. Your employment with the Company will be "at will," meaning that either you or the Company will be entitled to terminate your employment at any time and for any reason, with or without cause. Any contrary representations which may have been made to you are superseded by this offer. Notwithstanding the foregoing, in the event your employment is terminated by the Company other than for "cause" (as defined below) (A) within six (6) months of a sale of the Company to an unaffiliated third party buyer or any "going private" transaction or private equity investment or purchase of equity interests in the Company that

Jeff Cordes
February 3, 2014
Page 3

results in a change in the beneficial ownership of securities of the Company of more than fifty percent (50%) of the total combined voting power of all outstanding securities of the Company, the Company shall continue to pay your then-current base salary for a period of twelve (12) months following the effective date of such termination, and (B) at any other time during the term of your employment, the Company shall continue to pay your then-current base salary for a period of six (6) months following the effective date of such termination. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of the Company. For purposes of this letter agreement, "cause" means (i) a material breach of any provision of any written agreement between you and the Company after notice to you of the particular details thereof and a period of 30 days thereafter within which to cure such breach and your failure to cure such breach within such 30 day period; (ii) conviction of, or a plea of nolo contendere for, any felony criminal offense or any offense involving dishonesty or moral turpitude; (iii) engaging in dishonest or fraudulent activities which are injurious to Company; (iv) refusal to follow any lawful directives of the Board; (v) gross negligence or incompetence or willful misconduct which is injurious to Company; or (vi) breach of fiduciary duty to the Company which involves a material personal profit.

7. **Outside Activities**. While you render services to the Company, you will not engage in any other gainful employment, business or activity without the written consent of the Board. While you render services to the Company, you also will not assist any person or organization in competing with the Company, in preparing to compete with the Company or in hiring any employees of the Company.

8. **Withholding Taxes**. All forms of compensation referred to in this letter are subject to reduction to reflect applicable withholding and payroll taxes.

9. **Entire Agreement**. This letter and the Exhibit attached hereto contain all of the terms of your employment with the Company and supersede any prior understandings or agreements, whether oral or written, between you and the Company.

10. **Amendment and Governing Law**. This letter agreement may not be amended or modified except by an express written agreement signed by you and a duly authorized officer of the Company. THE TERMS OF THIS LETTER AGREEMENT AND THE RESOLUTION OF ANY DISPUTES WILL BE GOVERNED BY CALIFORNIA LAW, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

Pursuant to Ironclad's policy for hiring executive officers, this offer is contingent upon the satisfactory results of a background check, and your passing a drug screening test. Also, as required by law, your employment with the Company is contingent upon your providing legal proof of your identity and authorization to work in the United States.

2

Jeff Cordes
February 3, 2014
Page 4

We hope that you find the foregoing terms acceptable. You may indicate your agreement with these terms and accept this offer by signing and dating both the enclosed duplicate original of this letter and the enclosed Proprietary Information and Inventions Agreement and returning them to the Company.

This offer, if not accepted, will expire at the close of business on February 9, 2014

If you have any questions, please call me at office (303) 228-8760 or cell (720) 470-3411

Very truly yours,

**IRONCLAD PERFORMANCE WEAR CORP.**

By: _____
    Vane Clayton, Director

I have read and accept this employment offer:

_____
Signature of Jeff Cordes

Dated: 2/9 ___, 2014

# IRONCLAD PERFORMANCE WEAR CORPORATION
## INDEMNIFICATION AGREEMENT

This Indemnification Agreement ("*Agreement*") is effective as of February 11, 2014, by and between Ironclad Performance Wear Corporation, a Nevada corporation (the "*Company*"), and Jeff Cordes ("*Indemnitee*").

WHEREAS, the Company and Indemnitee recognize the increasing difficulty in obtaining liability insurance for its officers and directors, the significant increases in the cost of such insurance and the general reductions in the coverage of such insurance; and

WHEREAS, the Company and Indemnitee further recognize the substantial increase in corporate litigation, subjecting officers and directors to expensive litigation risks at the same time as the availability and coverage of liability insurance has been severely limited; and

WHEREAS, Indemnitee does not regard the current protection available as adequate under the present circumstances, and the Indemnitee and other officers and directors of the Company may not be willing to continue to serve in such capacities without additional protection; and

WHEREAS, the Company desires to attract and retain the services of highly qualified individuals, such as Indemnitee, to serve the Company and, in part, in order to induce Indemnitee to continue to provide services to the Company, wishes to provide for the indemnification and advancing of expenses to Indemnitee to the maximum extent permitted by law.

NOW, THEREFORE, in consideration for Indemnitee's agreement to continue to serve the company, the Company and Indemnitee hereby agree as follows:

1.    **Indemnification.**

(a)    **Indemnification of Expenses.** The Company shall indemnify Indemnitee to the fullest extent permitted by law if Indemnitee was or is or becomes a party to or witness or other participant in, or is threatened to be made a party to or witness or other participant in, any threatened, pending or completed action, suit, proceeding or alternative dispute resolution mechanism, or any hearing, inquiry or investigation that Indemnitee in good faith believes might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism, whether civil, criminal, administrative, investigative or other, including any proceeding by or in the right of the Company or any subsidiary of the Company (hereinafter a "*Claim*") by reason of (or arising in part out of) any event or occurrence, arising or occurring at any time before or after the date of this Agreement, related to the fact that Indemnitee is or was a director, officer, employee or agent of the Company, or any subsidiary of the Company, or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, or by reason of any action or inaction on the part of Indemnitee while serving in such capacity (hereinafter an "*Indemnifiable Event*") against any and all expenses (including attorneys' fees, disbursements of and retainers, accounting and witness fees, travel and deposition costs, and all other costs, expenses and obligations incurred in connection with investigating, defending, being a witness in or participating in (including an appeal), or preparing to defend, be a witness in or participate in, any such action, suit, proceeding, alternative dispute resolution mechanism, hearing, inquiry or investigation),

judgments, fines, penalties and amounts paid in settlement (if such settlement is approved in advance by the Company, which approval shall not be unreasonably withheld) of such Claim and any federal, state, local or foreign taxes imposed on the Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement (collectively hereinafter, "*Expenses*"), including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses.

(b)　　**Reviewing Party**.  Notwithstanding the foregoing, (i) the obligation of the Company under Section 1(a) shall be subject to the condition that the Reviewing Party (as defined in Section 10(e) hereof) shall not have determined (in a written opinion in any case in which the Independent Legal Counsel referred to in Section 1(c) hereof is involved) that Indemnitee would not be permitted to be indemnified under applicable law, and (ii) the obligation of the Company to make an advance payment of Expenses to Indemnitee pursuant to Section 2(a) (an "*Expense Advance*") shall be subject to the condition that, if, when and to the extent that the Reviewing Party shall have determined that Indemnitee would not be permitted to be so indemnified under applicable law, the Company shall be entitled to be reimbursed by Indemnitee (who hereby agrees to reimburse the Company) for all such amounts theretofore paid; provided, however, that if Indemnitee has commenced or thereafter commences legal proceedings in a court of competent jurisdiction to secure a determination that Indemnitee should be indemnified under applicable law, any determination made by the Reviewing Party that Indemnitee would not be permitted to be indemnified under applicable law shall not be binding and Indemnitee shall not be required to reimburse the Company for any Expense Advance until a final judicial determination is made with respect thereto (as to which all rights of appeal therefrom have been exhausted or lapsed). Indemnitee's obligation to reimburse the Company for any Expense Advance shall be unsecured and no interest shall be charged thereon. If there has not been a Change in Control (as defined in Section 10(c) hereof), the Reviewing Party shall be selected by the Board of Directors, and if there has been such a Change in Control (other than a Change in Control which has been approved by a majority of the Company's Board of Directors who were directors immediately prior to such Change in Control), the Reviewing Party shall be the Independent Legal Counsel referred to in Section 1(c) hereof. If there has been no determination by the Reviewing Party or if the Reviewing Party determines that Indemnitee substantively would not be permitted to be indemnified in whole or in part under applicable law, Indemnitee shall have the right to commence litigation seeking an initial determination by the court or challenging any such determination by the Reviewing Party or any aspect thereof, including the legal or factual bases therefor, and the Company hereby consents to service of process and to appear in any such proceeding. Any determination by the Reviewing Party otherwise shall be conclusive and binding on the Company and Indemnitee.

(c)　　**Change in Control**.  The Company agrees that if there is a Change in Control of the Company (other than a Change in Control which has been approved by a majority of the Company's Board of Directors who were directors immediately prior to such Change in Control) then with respect to all matters thereafter arising concerning the rights of Indemnitee to payments of Expenses and Expense Advances under this Agreement or any other agreement or under the Company's Articles of Incorporation or Bylaws as now or hereafter in effect, Independent Legal Counsel (as defined in Section 10(d) hereof) shall be selected by Indemnitee and approved by the Company (which approval shall not be unreasonably withheld).   Such counsel, among other things, shall render its written opinion to the Company and Indemnitee as to whether and to what extent Indemnitee would be permitted to be indemnified under applicable law

and the Company agrees to abide by such opinion. The Company agrees to pay the reasonable fees of the Independent Legal Counsel referred to above and to indemnify fully such counsel against any and all expenses (including attorneys' fees), claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

(d)    **Mandatory Payment of Expenses**. Notwithstanding any other provision of this Agreement other than Section 9 hereof, to the extent that Indemnitee has been successful on the merits or otherwise, including, without limitation, the dismissal of an action without prejudice, in defense of any action, suit, proceeding, inquiry or investigation referred to in Section 1(a) hereof or in the defense of any claim, issue or matter therein, Indemnitee shall be indemnified against all Expenses incurred by Indemnitee in connection therewith.

2.    **Expenses; Indemnification Procedures**.

(a)    **Advancement of Expenses**. The Company shall advance all Expenses incurred by Indemnitee in connection with the investigation, defense, settlement or appeal of any Claim referenced in Sections 1(a) hereof. Indemnitee hereby undertakes to repay such amounts advanced only if, and to the extent that, it shall ultimately be determined that Indemnitee is not entitled to be indemnified by the Company as authorized hereby. The advances to be made hereunder shall be paid by the Company to Indemnitee within thirty (30) days following delivery of a written request therefor by Indemnitee to the Company.

(b)    **Notice/Cooperation by Indemnitee**. Indemnitee shall, as a condition precedent to Indemnitee's right to be indemnified under this Agreement, give the Company notice in writing as soon as practicable of any Claim made against Indemnitee for which indemnification will or could be sought under this Agreement. Notice to the Company shall be directed to the Chief Executive Officer of the Company at the address shown on the signature page of this Agreement (or such other address as the Company shall designate in writing to Indemnitee). In addition, Indemnitee shall give the Company, at the Company's expense, such information and cooperation as it may reasonably require and as shall be within Indemnitee's power.

(c)    **Procedure**. Any indemnification and advances of Expenses provided for in this Agreement shall be made no later than thirty (30) days after receipt of the written request of Indemnitee. If a claim under this Agreement is not paid in full by the Company within thirty (30) days after a written request for payment therefor has first been received by the Company, Indemnitee may, but need not, at any time thereafter bring an action against the Company to recover the unpaid amount of the claim and, subject to Section 13 of this Agreement, Indemnitee shall also be entitled to be paid for the expenses (including attorneys' fees) of bringing such action. It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in connection with any action, suit or proceeding in advance of its final disposition) that Indemnitee has not met the standards of conduct which make it permissible under applicable law for the Company to indemnify Indemnitee, but the burden of proving such defense shall be on the Company and Indemnitee shall be entitled to receive interim payments of Expenses pursuant to Section 2(a) unless and until such defense is finally adjudicated by court order or judgment from which no further right of appeal exists. It is the intention of the parties that if the Company contests Indemnitee's right to indemnification under this Agreement or applicable law, the question of Indemnitee's right to indemnification shall be for the court to decide, and neither

3

the failure of the Reviewing Party to have made a determination that indemnification of Indemnitee is proper in the circumstances because Indemnitee has met the applicable standard of conduct required by this Agreement or by applicable law, nor an actual determination by the Reviewing Party that Indemnitee has not met such applicable standard of conduct, shall create a presumption that Indemnitee has not met the applicable standard of conduct.

(d)     **Notice to Insurers**. If, at the time of the receipt by the Company, of a notice of a Claim pursuant to Section 2(b) hereof, the Company has liability insurance in effect which may cover such claim, the Company shall give prompt notice of the commencement of such Claim to the insurers in accordance with the procedures set forth in the respective policies. The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts payable as a result of such action, suit, proceeding, inquiry or investigation in accordance with the terms of such policies.

(e)     **Selection of Counsel**. In the event the Company shall be obligated hereunder to pay the Expenses of any Claim, the Company, if appropriate, shall be entitled to assume the defense of such Claim with counsel approved by Indemnitee, upon the delivery to Indemnitee of written notice of its election so to do; *provided, however*, that (i) the Company shall have no right to assume the defense of any Claim which seeks, in whole or in part, any remedy other than monetary damages (e.g., injunction, specific performance, criminal sanctions) or which could, if Indemnitee were not to prevail therein, materially damage Indemnitee's personal or business reputation, and (ii) the Company shall have no right to assume the defense of any Claim unless the Company first agrees fully and unconditionally, in writing, that the Company is obligated to indemnify Indemnitee in full with respect thereto, and waives any and all defenses, counterclaims or set-offs which might otherwise be asserted in limitation or mitigation of such indemnification obligation. After delivery of such notice, approval of such counsel by Indemnitee and the retention of such counsel by the Company, the Company will not be liable to Indemnitee under this Agreement for any fees of counsel subsequently incurred by Indemnitee with respect to the same Claim; provided that, (i) Indemnitee shall have the right to employ Indemnitee's counsel in any such Claim at Indemnitee's expense and (ii) if (A) the employment of counsel by Indemnitee has been previously authorized by the Company, (B) Indemnitee shall have reasonably concluded that there may be a conflict of interest between the Company and Indemnitee in the conduct of any such defense, or (C) the Company shall not, in fact, have retained or continued to retain such counsel to defend such Claim, then the reasonable fees and expenses of Indemnitee's counsel shall be at the expense of the Company.

3.     **Additional Indemnification Rights; Nonexclusivity.**

(a)     **Scope**. Notwithstanding any other provision of this Agreement, the Company hereby agrees to indemnify the Indemnitee to the fullest extent permitted by law, notwithstanding that such indemnification is not specifically authorized by the other provisions of this Agreement, the Company's Articles of Incorporation, the Company's Bylaws or by statute. In the event of any change after the date of this Agreement in any applicable law, statute or rule which expands the right of a Nevada corporation to indemnify a member of its Board of Directors or an officer, such changes shall be, ipso facto, within the purview of an Indemnitee's rights, and the Company's obligations, under this Agreement. In the event of any change in any applicable law, statute or rule which narrows the right of a Nevada corporation to indemnify a member of its

4

Board of Directors or an officer, such changes, to the extent not otherwise required by such law, statute or rule to be applied to this Agreement, shall have no effect on this Agreement or the parties' rights and obligations hereunder.

(b) **Nonexclusivity**. The indemnification provided by this Agreement shall not be deemed exclusive of any rights to which an Indemnitee may be entitled under the Company's Articles of Incorporation, the Company's Bylaws, any agreement, any vote of stockholders or disinterested Directors, the Nevada Revised Statutes, or otherwise, both as to action in Indemnitee's official capacity and as to action in another capacity while holding such office. The indemnification provided under this Agreement shall continue as to Indemnitee for any action taken or not taken while serving in an indemnified capacity even though Indemnitee may have ceased to serve in such capacity at the time of any action, suit or other covered proceeding.

4. **No Duplication of Payments**. The Company shall not be liable under this Agreement to make any payment in connection with any Claim made against Indemnitee to the extent Indemnitee has otherwise actually received payment (under any insurance policy, Articles of Incorporation, Bylaw or otherwise) of the amounts otherwise indemnifiable hereunder.

5. **Partial Indemnification**. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for some or a portion of Expenses incurred by him in connection with any Claim, but not, however, for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion of such Expenses to which Indemnitee is entitled.

6. **Mutual Acknowledgment**. Both the Company and Indemnitee acknowledge that in certain instances, Federal law or applicable public policy may override Nevada law and prohibit the Company from indemnifying its directors and officers under this Agreement or otherwise. For example, the Company and Indemnitee acknowledge that the Securities and Exchange Commission has taken the position that indemnification is not permissible for liabilities arising under certain federal securities laws, and federal legislation prohibits indemnification for certain ERISA violations. Indemnitee understands and acknowledges that the Company has undertaken or may be required in the future to undertake with the Securities and Exchange Commission to submit the question of indemnification to a court in certain circumstances for a determination of the Company's right under public policy to indemnify Indemnitee. The Company agrees to assert vigorously, in any such action pertaining to the Company's right to indemnify Indemnitee, the position that the Company has the full and unfettered right to so indemnify Indemnitee, and further agrees that Indemnitee may, at any time and in Indemnitee's sole discretion, assume control of the Company's defense of such right (including without limitation selection of counsel and determination of strategy), with such defense nonetheless being conducted at the Company's expense.

7. **Officers and Director Liability**. The Company will obtain and maintain a policy or policies of insurance with reputable insurance companies providing the officers and directors of the Company with coverage for losses from wrongful acts, or to ensure the Company's performance of its indemnification obligations under this Agreement. In all policies of director and officer liability insurance, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights and benefits as are accorded to the most favorably insured of

5

the Company's directors, if the Indemnitee is a director; or of the Company's officers, if the Indemnitee is not a director of the Company but is an officer; or of the Company's key employees, if Indemnitee is not an officer or director but is a key employee. Notwithstanding the foregoing, the Company shall have no obligation to obtain or maintain such insurance if the Company determines in good faith that such insurance is not reasonably available, the premium costs for such insurance are disproportionate to the amount of coverage provided, the coverage provided by such insurance is limited by exclusions so as to provide an insufficient benefit, or Indemnitee is covered by a similar insurance maintained by a subsidiary or parent of the Company.

8.    **Exceptions.**    Any other provision herein to the contrary notwithstanding, the Company shall not be obligated pursuant to the terms of this Agreement:

(a)    **Excluded Action or Omissions.**    To indemnify Indemnitee for acts, omissions or transactions from which Indemnitee may not be relieved of liability under applicable law;

(b)    **Claims Initiated by Indemnitee.**    To indemnify or advance expenses to Indemnitee with respect to Claims initiated or brought voluntarily by Indemnitee and not by way of defense, except (i) with respect to actions or proceedings brought to establish or enforce a right to indemnification under this Agreement or any other agreement or insurance policy or under the Company's Articles of Incorporation or Bylaws now or hereafter in effect relating to Claims for Indemnifiable Events, (ii) in specific cases if the Board of Directors has approved the initiation or bringing of such Claim, or (iii) as otherwise required under Section 78.7502 of the Nevada Revised Statutes, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advance expense payment or insurance recovery, as the case may be;

(c)    **Lack of Good Faith.**    To indemnify Indemnitee for any expenses incurred by the Indemnitee with respect to any proceeding instituted by Indemnitee to enforce or interpret this Agreement, if a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous;

(d)    **Insured Claims.**    To indemnify Indemnitee for expenses or liabilities of any type whatsoever (including, but not limited to, judgments, fines, ERISA excise taxes or penalties, and amounts paid in settlement) which have been paid directly to Indemnitee by an insurance carrier under a policy of officers' and directors' liability insurance maintained by the Company or any parent or subsidiary of the Company;

(e)    **Claims Under Section 16(b).**    To indemnify Indemnitee for expenses or the payment of profits arising from the purchase and sale by Indemnitee of securities in violation of Section 16(b) of the Securities Exchange Act of 1934, as amended, or any similar successor statute;

(f)    **Failure to Settle Proceeding.**    In the event that Indemnitee Fails to Pursue a Recommended Settlement of a Qualifying Claim, to indemnify Indemnitee (i) for amounts paid or payable in settlement of such Qualifying Claim in excess of the amount of such Recommended Settlement thereof, or (ii) for any Expenses directly related to such Qualifying Claim incurred by Indemnitee following the date upon which Indemnitee Fails To Pursue such Recommended

6

Settlement. For purposes of this clause, "*Qualifying Claim*" shall mean any claim the defense of which may be assumed by the Company under Section 2(e) above (i.e., any claim that (A) is not described in the first clause (i) of said Section 2(e) and (B) with respect to which the Company has acknowledged its unconditional duty to indemnify as described in first clause (ii) of said Section 2(e)), "*Recommended Settlement*" shall mean a reasonable written settlement proposal, in full and final executable form in all material respects, and "*Fails To Pursue*" shall mean either (i) Indemnitee's failure to communicate a Recommended Settlement to the principal adverse party in the subject matter within 30 days after Indemnitee' receipt thereof from the Company, or (ii) Indemnitee's failure to agree to any Recommended Settlement that has been accepted by all adverse parties in the subject matter within 30 days after receipt thereof, *provided* the Company has (A) irrevocably deposited all funds necessary to satisfy all of Indemnitee's obligations under such Recommended Settlement in an account subject to Indemnitee's or a third party's control and (B) irrevocably taken all actions and given all instructions necessary or appropriate to permit such funds to be applied in satisfaction of such obligations of Indemnitee; or

        (g)     **Breach of Employment Agreement**. To indemnify Indemnitee for any breach by Indemnitee of any employment agreement between Indemnitee and the Company or any of its subsidiaries.

        9.     **Period of Limitation**. No legal action shall be brought and no cause of action shall be asserted by or in the right of the Company against Indemnitee, Indemnitee's estate, spouse, heirs, executors or personal or legal representatives after the expiration of two years from the date of accrual of such cause of action, and any claim or cause of action of the Company shall be extinguished and deemed released unless asserted by the timely filing of a legal action within such two-year period; provided, that if any shorter period of limitations is otherwise applicable to any such cause of action, such shorter period shall govern.

        10.    **Construction of Certain Phrases.**

        (a)     For purposes of this Agreement, references to the "*Company*" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its officers and directors, so that if Indemnitee is or was an officer or director of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, Indemnitee shall stand in the same position under the provisions of this Agreement with respect to the resulting or surviving corporation as Indemnitee would have with respect to such constituent corporation if its separate existence had continued.

        (b)     For purposes of this Agreement, references to "*other enterprises*" shall include employee benefit plans; references to "*fines*" shall include any excise taxes assessed on Indemnitee with respect to an employee benefit plan; and references to "*serving at the request of the Company*" shall include any service as an officer or director of the Company which imposes duties on, or involves services by, such officer or director with respect to an employee benefit plan, its participants or its beneficiaries and if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit

7

plan, Indemnitee shall be deemed to have acted in a manner "not opposed to the best interests of the Company" as referred to in this Agreement.

(c)     For purposes of this Agreement a *"Change in Control"* shall be deemed to have occurred if (i) any "person" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned directly or indirectly by the stockholders of the company in substantially the same proportions as their ownership of stock of the Company, (A) who is or becomes the beneficial owner, directly or indirectly, of securities of the Company representing 10% or more of the combined voting power of the Company's then outstanding Voting Securities, increases his beneficial ownership of such securities by 5% or more over the percentage so owned by such person, or (B) becomes the "beneficial owner" (as defined in Rule 13d-3 under said Act), directly or indirectly, of securities of the Company representing more than 20% of the total voting power represented by the Company's then outstanding Voting Securities, (ii) during any period of two consecutive years, individuals who at the beginning of such period constitute the Board of Directors of the Company and any new director whose election by the Board of Directors or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the period or whose election or nomination or election was previously so approved, cease for any reason to constitute a majority thereof, or (iii) the stockholders of the Company approve a merger or consolidation of the Company with any other corporation other than a merger or consolidation which would result in the Voting Securities of the company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into Voting Securities of the surviving entity) at least 80% of the total voting power represented by the Voting Securities of the company or such surviving entity outstanding immediately after such merger or consolidation, or the stockholders of the company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of (in one transaction or a series of transactions) all of substantially all of the Company's assets.

(d)     For purposes of this Agreement, *"Independent Legal Counsel"* shall mean an attorney or firm of attorneys, selected in accordance with the provisions of Section 1(c) hereof, who shall not have otherwise performed services for the Company or Indemnitee within the last three years (other than with respect to matters concerning the rights of Indemnitee under this Agreement, or of other indemnitees under similar indemnity agreements).

(e)     For purposes of this Agreement, a *"Reviewing Party"* shall mean any appropriate person or body consisting of a member or members of the Company's Board of Directors or any other person or body appointed by the Board of Directors who is not a party to the particular claim for which Indemnitee is seeking indemnification, or Independent Legal Counsel.

(f)     For purposes of this Agreement, *"Voting Securities"* shall mean any securities of the Company that vote generally in the election of directors.

11.    **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall constitute an original.

8

12. **Binding Effect; Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors, assigns, including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the company, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all, or a substantial part, of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume and agree to perform the Company's obligations under this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place. This Agreement shall continue in effect regardless of whether Indemnitee continues to serve as a director or officer of the Company or of any other enterprise at the Company's request.

13. **Attorneys' Fees**. In the event that any action is instituted by Indemnitee under this Agreement or under any liability insurance policies maintained by the Company to enforce or interpret any of the terms hereof or thereof, Indemnitee shall be entitled to be paid all Expenses incurred by Indemnitee with respect to such action, regardless of whether Indemnitee is ultimately successful in such action, and shall be entitled to the advancement of Expenses with respect to such action, unless as a part of such action a court of competent jurisdiction over such action determines that each of the material assertions made by Indemnitee as a basis for such action were not made in good faith or were frivolous. In the event of an action instituted by or in the name of the Company under this Agreement to enforce or interpret any of the terms of this Agreement, Indemnitee shall be entitled to be paid all Expenses incurred by Indemnitee in defense of such action (including costs and expenses incurred with respect to Indemnitee's counterclaims and crossclaims made in such action), and shall be entitled to the advancement of Expenses with respect to such action, unless as a part of such action a court having jurisdiction over such action determines that each of Indemnitee's material defenses to such action were made in bad faith or were frivolous.

14. **Notice**. All, notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed duly given (i) if delivered by hand and signed for by the party addressed, on the date of such delivery, or (ii) if mailed by domestic certified or registered mail with postage prepaid, on the third business day after the date postmarked. Addresses for notice to either party are as shown on the signature page of this Agreement, or as subsequently modified by written notice.

15. **Severability**. The provisions of this Agreement shall be severable in the event that any of the provisions hereof (including any provision within a single section, paragraph or sentence) are held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, and the remaining provisions shall remain enforceable to the fullest extent permitted by law. Furthermore, to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of this Agreement containing any provision held to be invalid, void or otherwise unenforceable, that is not itself invalid, void or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

16.    **Choice of Law**. This Agreement shall be governed by and its provisions construed and enforced in accordance with the laws of the State of Nevada without regard to the conflict of laws principles thereof.

17.    **Subrogation**. In the event of payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all documents required and shall do all acts that are necessary to secure such rights and to enable the Company effectively to bring suit to enforce such rights.

18.    **Amendments and Termination**. No amendment, modification, termination or cancellation of this Agreement shall be effective unless it is in writing signed by both the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

19.    **Integration and Entire Agreement**. This Agreement sets forth the entire understanding between the parties hereto and supersedes and merges all previous written and oral negotiations, commitments, understandings and agreements relating to the subject matter hereof between the parties hereto.

20.    **No Construction as Employment Agreement**. Nothing contained in this Agreement shall be construed as giving Indemnitee any right to be retained in the employ of the Company or any of its subsidiaries.

*[Signature Page Follows]*

10

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

IRONCLAD PERFORMANCE WEAR CORPORATION
a Nevada corporation, as the Company

By: _____
Name: Vane Clayton
Title: Director

Notice Address:

Ironclad Performance Wear Corporation
2201 Park Place, Suite 101
El Segundo, CA 90245
Attn:   EVP of Finance

AGREED TO AND ACCEPTED:

INDEMNITEE:

_____
(Signature)

Jeff Cordes, CEO Ironclad

Notice Address:

1570 BENT CREEK DN
SOUTHLAKE TX 76092

11

**Exhibit "5"**

December 18, 2015
To: The Ironclad Board
From: Jeff Cordes
Subject:  Q4 Update

To all board members, as promised, here is an update on both Wesco and ICPW's 4th quarter outlook.

**_Fast view for 4th quarter_**:
o   We will not have Wesco orders in the 4th quarter, originally expected to add $2.3 million in revenues.
o   With any quarter we also have accounts that miss and exceed their expected totals. In Q4, lower insulated product volume and Grainger order issues were offset by higher Vibram & private label volume.
o   To offset part of the Wesco reduction, we have driven other opportunities. Our goal is to finish up between 5% and 10% for Q4, 2015.  Q4, 2014 revenues were $9.1 million. A Q4 -2015 increase of 5% would translate to $9.6 million and end 2015 full year at $24.8 million versus $24.2 million in 2014.
o   Please also remember that in order to achieve Q4 revenue targets, the team had to land nearly $3.5 million in new revenues from sources other than ORR and POH to replace their lower 2015 volumes.

**_More detail recap of Q4 and where we are currently:_**
General Q4 sales results have been impacted by two other significant factors:

First, we had extremely low insulated orders, the obvious result of continuing nationwide warm weather. The total expected drop is $350k from mid-November to year end. Nearly every insulated glove order was canceled or passed on by our customers.  Retailers report insulated at retail is a mess. Mike Fowler, in speaking with REI was told they just announced to their vendors they were delaying mark downs till February, stating they could not take the expected hit based on current stock levels.

Second, Grainger process issues created slower & lower orders. While Grainger has been highly concerned about our ability to ship quickly, they failed in several cases to manage their own areas.  Grainger Canada, for example, is in a systems transition and chose to delay ordering initial shelf stock. Grainger USA has struggled numerous times with mapping old and new items.  The result is orders that are smaller than expected and will not change until the Grainger team fixes mapping.  The combined impact of these for all of Grainger is about $450k. (Grainger Q4 estimated volume is $650k and has $500k on our Q1 2016 books already.)

These shortfalls have been offset by an increase in Vibram sales and private label shipments to Redwing.

Despite Wesco and the shortfalls above, we expect to finish no lower than prior year 4th quarter results. No one here has tossed in the towel.  The entire team has been pulling double time, diligently working other customers. The goal is to finish ahead 5% to 10% of the 2014 quarter totals. As a reference, our Q4, 2014 revenues were $9.1 million. Our Q4, 2015 target revenues, at 15% up, were $11.1 million. We now are working to achieve at least a 5% revenue up to $9.6 million for Q4, 2015.

The Conney /Wesco Q4 order situation:
(Gentlemen, this may be a little long but more color to understand better I think is important here)

As background on how we got here:
Conney Safety is a division of Wesco, a $9.0 billion, NYSE public company, focused on industrial distribution
and public utilities.  Today, Ironclad is a supplier to both Conney and Wesco for gloves. Conney is Wesco's
leader in personal protective equipment (PPE) for all customers and, was acquired for this sole purpose.

Conney and members of Wesco came to Ironclad at the National Safety Conference, in Atlanta, during
September where they asked for the complete first run of Vibram products.  Conney management was very
serious about the opportunity. Their goal was 6 months exclusivity and first mover advantage in oil and gas as
well as electric utilities.

From our perspective, the choice to drive Conney / Wesco was easy to appreciate. One year-end customer
for production made the execution process with Vibram so much simpler. Further, Wesco was a huge positive
from a public stock perspective.  This gave us a 2nd Grainger like story to relay to street.

Our team worked all fall with Conney Safety to build the program. Training and planning had already begun in
the USA and with Wesco's large Canada division. During the fall, Conney, and several other Wesco divisions
carried out significant due diligence with customers on Vibram products and our IVE technology. Their safety
teams, including two other Wesco divisions all recognized the opportunity.  The Conney team and the
Ironclad team worked through nearly every area of the program. Even Conney's CEO was on board and ready
as of Thanksgiving and into early December.

It is now clear the Wesco reversal of direction came from on top.
On the same day Conney Safety relayed the decision to not provide the Q4 orders to ICPW, Wesco Corporate,
announced to the street they expected as much as a 5% revenue decline looking ahead to 2016. They had
already announced their Q3 revenues were off 7.4% and profit off 21.4%. Internally the company announced
freezes and inventory reduction initiatives impacting both Ironclad and others.

Just FYI, if you are following the sector, Wesco has had lots of company when it comes to bad news.

| Distributor | 3rd Quarter 2015 | |
| | Revenue Change | Earnings Change |
| --- | --- | --- |
| Grainger | -1.20% | -13.40% |
| WESCO | -7.40% | -21.40% |
| MSC | 0.00% | -6.80% |
| Anixter | 0.70% | 0.00% |
| Airgas | -1.20% | 0.00% |
| Fastenal | 1.50% | NA |

I am confident that the Conney divisional team was told to stand down on this major investment.
Their CEO, Marty Daly, thought and even perhaps initially had, the authority to move forward with Ironclad
until he had kick back from Wesco's financial management. While I have no proof, having done such division
changes myself as a prior corporate executive, my hunch is, that Wesco's curtailing of division's autonomy
was being devised and implemented during the same time we were preparing to execute our plan with them.

2

Marty Daly, Conney Safety's CEO has called, texted, and emailed numerous times. I don't know many CEO's that would have taken the time to communicate back to a vendor like this. Marty is clear that he and his team see the value and opportunity of Vibram. While today he is scrambling to make corporate mandated changes and reductions in his division he is also trying to do some things to help me as we address the street's view of this.

I also want to speak to the matter of why we were moving forward with Vibram production for Wesco/Conney without hard PO's. First, it is very common in this business, especially with larger end users like Wesco, Grainger, and others, that orders follow long after new program processes start; many times, right up to the wire for shipment. In this case, everyone at Conney was involved including their CEO. Secondly, with regards to Vibram production, we knew other companies had great interest in Vibram. We had told these customers their demand would be delayed until at least the end of Q1. Our one failure internally, and frustration with Conney/Wesco, was that the timing of the change was so late we could not work through all other possible customers.

<u>Knowing when to lose the battle to win the war:</u>
It is very frustrating to not ship Wesco the $2.0 million plus we had expected this quarter. However, it is my view that no action we could take today, including appeals to WESCO's CEO, would get us much movement for this quarter, and with reasonable certainty, would destroy any future if we push now.

However, the key here is to look at the larger and even near term 2016 picture:
- It is somewhat amusing that when Conney first came on the radar screen we considered not adding it to 2015, even if that meant lowering Q4 expectations.
- WESCO, regardless of this single quarter is a force in the Northeast and Midwest, especially in the area of electrical utilities where we have minimal entrée and exposure.
- The Wesco /Conney team, despite corporate's edict has been calling with customers questions and requests after seeing Vibram.
- Conney's CEO, Marty Daly, has committed to build a program in 2016 without the year end pressures that will drive both our businesses. Hopefully, the end result is more customers and greater partnership.
- Our teams including myself will meet in Madison on Tuesday and again in early January.
- Conney's CEO and team, along with the Wesco management have prepared an MOU showing the 2016 commitment with a focus on electric utilities. I expect to have this before year end.

Please note also, that not doing Wesco this quarter may actually have some silver linings. We now have several other mid-size distributors crazed over their new opportunity to grow a business first. They are in, excited and already out talking to end users.

The obvious challenge Bill and I face is to carefully work our investor community, focusing they on the end game. Our goal now must be to end 2015 with an up number, although perhaps not to our first targets, and then drive a stronger story going into 2016.

Please do not read into the above comments that I am pleased with 2015 expected volumes. Nothing could be further from the truth. However, I do believe we have made significant progress. The reality is that this

3

has been a really tough year where we have landed some important wins. We have gutted through dramatic declines in oil and gas, mining, some of the warmest fall weather on record, and a litigation that cut off over 60% of our largest customer's largest quarter's volumes. We have in less than 120 days bought amazing new technology to market and shipped it.

The chart below is the chart Bill and I studied long and hard last summer as we contemplated recommending to move forward with litigation against ORR.  Knowing POH's soft year, ORR's drop with litigation, and our expected growth targets, we set ourselves a tall order.  Perhaps a little too tall.

|  |  | Q4 |  |  |
|---|---|---|---|---|
|  |  | 2014 | 2015 | Change |
| ORR |  | $ 2,886,116 | $   744,979 | $  (2,141,137) |
| POH |  | $ 2,790,508 | $ 1,366,654 | $  (1,423,854) |
| Total |  | $ 5,676,624 | $ 2,111,633 | $  (3,564,991) |

Regardless of Wesco, we have driven new business growth from international, industrial including execution on the Vibram roll out that has offset these changes.

After the Christmas holiday and before year end I will provide a shorter update on our progress with bringing in the year.

If you have any questions please email or call me.

Thanks so much.

Jeff

4

**Exhibit "7"**

## FIRST AMENDMENT TO EMPLOYMENT LETTER AGREEMENT AND EMPLOYEE PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

This First Amendment to Employment Letter Agreement and Employee Proprietary Information and Inventions Agreement (this "*Amendment*") is dated January 1, 2017, and amends that certain letter agreement (the "*Employment Agreement*") dated February 3, 2014, between Ironclad Performance Wear Corporation (the "*Company*") and Jeff Cordes (the "*Executive*"), and that certain Employee Proprietary Information and Inventions Agreement dated February 3, 2014, between the Company and Executive (the "*PIIA*"). Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Employment Agreement or the PIIA, as applicable.

WHEREAS, the parties desire to amend the Employment Agreement to revise the severance provisions thereunder as set forth herein;

WHEREAS, the parties desire to amend the PIIA to change the controlling law and to provide for an extended non-compete covenant as set forth herein;

WHEREAS, pursuant to Section 10 of the Employment Agreement the Employment Agreement may not be amended or modified except by an express written agreement signed by Executive and a duly authorized officer of the Company; and

WHEREAS, pursuant to Section 22 of the PIIA, the PIIA may only be modified by a subsequent written agreement or subsequent written amendment to the PIIA executed by an officer of the Company.

NOW THEREFORE, for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Section 6 of the Employment Agreement is hereby amended in its entirety to read as follows:

"6.      **Period of Employment.** Your employment with the Company will be "at will," meaning that either you or the Company will be entitled to terminate your employment at any time and for any reason, with or without cause. Any contrary representations which may have been made to you are superseded by this offer.

Notwithstanding the foregoing, in the event your employment is terminated:

(A)     Within 9 months following the Sale of the Company (as defined below) (i) by the Company other than for Cause (as defined below) or (ii) by you for Good Reason (as defined below), the Company shall (1) pay in a lump sum payment 2 times your then-current base salary, such payment to be made within 20 days following the termination date, and (2) to the extent you are eligible and elect continuation coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("*COBRA*") under

a health, dental, or vision plan sponsored by the Company, within the time period prescribed pursuant to COBRA, reimburse you, as and when due to the COBRA carrier, for the COBRA premiums for such coverage (at the coverage levels in effect immediately prior to your termination of employment) until the earliest to occur of (a) a period of twenty-four (24) months following the effective date of such termination, (b) the date upon which you become eligible for coverage under a health, dental, or vision insurance plan of a subsequent employer and (c) the date you cease to be eligible for COBRA coverage; or

(B)     At any other time during the term of your employment, the Company shall continue to pay your then-current base salary for a period of six (6) months following the effective date of such termination.

This is the full and complete agreement between you and the Company on this term.

Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of the Company.

It is intended that the provisions of this letter agreement comply with Section 409A of the Internal Revenue Code and the regulations and guidance promulgated thereunder (collectively, "*Code Section 409A*"), and all provisions of this letter agreement shall be construed in a manner consistent with the requirements for avoiding taxes or penalties under Code Section 409A. Notwithstanding the foregoing, Company shall have no liability with regard to any failure to comply with Code Section 409A so long as it has acted in good faith with regard to compliance therewith.

For purposes of this letter agreement, "*Cause*" means (i) a material breach of any provision of any written agreement between you and the Company after notice to you of the particular details thereof and a period of 30 days thereafter within which to cure such breach and your failure to cure such breach within such 30-day period; (ii) conviction of, or a plea of nolo contendere for, any felony criminal offense or any offense involving dishonesty or moral turpitude; (iii) engaging in dishonest or fraudulent activities which are injurious to Company; (iv) refusal to follow any lawful directives of the Board; (v) gross negligence or incompetence or willful misconduct which is injurious to the Company; or (vi) breach of fiduciary duty to the Company which involves a material personal profit.

For purposes of this letter agreement, "*Sale of the Company*" shall be defined as any sale of the Company to an unaffiliated third party buyer or any "going private" transaction or private equity investment or purchase of equity interests in the Company that results in a change in the beneficial ownership of securities of the Company of more than fifty percent (50%) of the total combined voting power of all outstanding securities of the Company.

4843-8160-7997, v. 5

For purposes of this letter agreement, *"Good Reason"* shall be defined as (i) a change in your reporting structure or change in your responsibilities or obligations that is materially inconsistent with your then existing responsibilities and obligations, without your prior written consent; (ii) any reduction in the base salary, unless such reduction is agreed to by you in writing; (iii) without limiting the generality of the forgoing, any material breach by the Company of this letter agreement; or (iv) the relocation by the Company of its principal Corporate office from within 40 miles of Dallas, Texas."

2.   Section 10 of the Employment Agreement is hereby amended in its entirety to read as follows:

"10.   **Amendment and Governing Law.** This letter agreement may not be amended or modified except by an express written agreement signed by you and a duly authorized officer of the Company. THE TERMS OF THIS LETTER AGREEMENT AND THE RESOLUTION OF ANY DISPUTES WILL BE GOVERNED BY TEXAS LAW, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES."

3.   Section 8 of the PIIA is hereby amended in its entirety to read as follows:

"8.   **Non-Competition.** I agree that at all times during my employment with the Company, and for all periods after my employment with the Company in connection with or during which I receive severance compensation from the Company (which for purposes of clarity shall be 24 months in connection with severance compensation provided under Section 6(A) and 6 months in connection with severance compensation provided under Section 6(B)), I will not engage, directly or indirectly, in any employment, business, or activity that is in any way competitive with the business or reasonably anticipated business of the Company or would otherwise conflict with my employment by the Company, and I will not assist any third party in competing with the Company or in preparing to engage in competition with the business or proposed business of the Company."

4.   Section 15 of the PIIA is hereby amended in its entirety to read as follows:

"15.   **Controlling Law.** This Agreement shall be governed by the laws of the State of Texas without regard to conflicts of laws principles. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in Texas for any lawsuit filed there against me by the Company arising from or related to this Agreement."

5.   Except as expressly modified herein, all terms and conditions of the Employment Agreement and the PIIA are hereby ratified, confirmed and approved and shall remain in full force and effect. In the event of any conflict or inconsistency between this Amendment and the Employment Agreement, or this Amendment and the PIIA, this Amendment shall govern.

[Signature Page Follows]

4843-8160-7997, v. 5

27

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first above written.

**COMPANY:**

**EXECUTIVE:**

**Ironclad Performance Wear Corporation**

By: _____

Name: VANE CLAYTON

Title: CHAIRMAN

_____

Jeff Cordes

4843-8160-7997, v. 5

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first above written.

**COMPANY:**                                    EXECUTIVE:

**Ironclad Performance Wear Corporation**

By:_____              _____
Name:                                     Jeff Cordes
Title:

**Exhibit "8"**

<u>EXHIBIT A</u>

## ARTICLES OF INCORPORATION
## OF
## IRONCLAD PERFORMANCE WEAR CORPORATION

### ARTICLE I

The name of this corporation is Ironclad Performance Wear Corporation (the "**Corporation**").

### ARTICLE II

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

### ARTICLE III

The Corporation is authorized to issue only one class of shares of stock, to be designated Common Stock; and the total number of shares which the Corporation is authorized to issue is 1,000 no par value.

### ARTICLE IV

(a)     The liability of the directors of the Corporation for monetary damages shall be eliminated to the fullest extent permissible under California law.

(b)     The Corporation is authorized to provide indemnification of agents (as defined in Section 317 of the California Corporations Code) to the fullest extent permissible under California law.

(c)     Any amendment, repeal or modification of the foregoing provisions of this Article IV by the shareholders of the corporation shall not adversely affect any right or protection of a director or agent of the corporation existing at the time of such amendment repeal or modification.

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

2021 McKinney Avenue, Suite 1600, Dallas, TX 75201.

A true and correct copy of the foregoing document entitled: **DECLARATION OF JEFFREY CORDES IN SUPPORT OF DEFENDANTS WILLIAM AISENBERG'S AND JEFFREY  CORDES' 12(B)(6) MOTION TO DISMISS AND MEMORANDUM IN SUPPORT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) February 20, 2018, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Ron Bender: rb@lnbyb.com (counsel to Debtors)

- Cathrine M Castaldi: ccastaldi@brownrudnick.com (counsel to Creditors' Committee)

- Russell Clementson: russell.clementson@usdoj.gov (counsel to United States Trustee)

- Aaron S Craig: acraig@kslaw.com, lperry@kslaw.com (Big Time Products, LLC)

- Matthew A Gold: courts@argopartners.net (counsel to Argo Partners)

- Monica Y Kim: myk@lnbrb.com, myk@ecf.inforuptcy.com (counsel to Debtors)

- Jeffrey A Krieger: jkrieger@ggfirm.com, kwoodson@greenbergglusker.com; calendar@greenbergglusker.com; jking@greenbergglusker.com (counsel to Brighton-Best International, Inc.)

- Samuel R Maizel: samuel.maizel@dentons.com, alicia.aguilar@dentons.com; docket.general.lit.LOS@dentons.com; tania.moyron@dentons.com; kathryn.howard@dentons.com (counsel to Equity Security Holders' Committee)

- Krikor J Meshefejian: kjm@lnbrb.com (counsel to Debtors)

- Tania M Moyron: tania.moyron@dentons.com, chris.omeara@dentons.com (counsel to Equity Security Holders' Committee)

- S Margaux Ross margaux.ross@usdoj.gov (counsel to United States Trustee)

- Susan K Seflin sseflin@brutzkusgubner.com (counsel to Province Inc)

- John M Stern john.stern@oag.texas.gov, bk-mbecker@oag.texas.gov (counsel to Texas Comptroller of Public Accounts)

- United States Trustee (SV) ustpregion16.wh.ecf@usdoj.gov (United States Trustee)

- Sharon Z. Weiss: sharon.weiss@bryancave.com, raul.morales@bryancave.com, geri.anderson@bryancave.com(counsel to Radians Wareham Holdings, Inc.)

1

- Douglas Wolfe:  dwolfe@asmcapital.com (counsel to ASM Capital V, L.P.

**2.  SERVED BY UNITED STATES MAIL**:

On (*date*) February 20, 2018, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

| **Debtor** | **Debtor** |
|---|---|
| ICPW Liquidation Corporation, | ICPW Liquidation Corporation, |
| a CA corporation | a Nevada corporation |
| 15260 Ventura Blvd., 20th Floor | 15260 Ventura Blvd., 20th Floor |
| Sherman Oaks, CA 91403 | Sherman Oaks, CA 91403 |

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) February 20, 2018, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Judge's Copy – VIA OVERNIGHT**

Hon. Martin R. Barash
United States Bankruptcy Court
21041 Burbank Boulevard, Suite 342
Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 2/20/2018 | Shiva Delrahim Beck | */s/ Shiva Delrahim Beck* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |